**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, On behalf of Itself and All Others Similarly Situated, and Derivatively On behalf of Wells Real Estate Investment, Trust, Inc.<br><br>　　　　Plaintiff<br><br>v.<br><br>WELLS REAL ESTATE INVESTMENT TRUST, INC.<br><br>**Serve On:**<br>The Corporation Trust Incorporated<br>200 E. Lombard Street<br>Baltimore, Maryland  21202<br><br>WELLS CAPITAL, INC.,<br>6200 The Corners Parkway<br>Norcross, Georgia  30092<br><br>WELLS MANAGEMENT COMPANY, INC.<br>6200 The Corners Parkway<br>Norcross, Georgia  30092<br><br>**Serve On:**<br>Leo F. Wells, III<br>6200 The Corners Parkway<br>Norcross, Georgia  30092<br><br>WELLS ADVISORY SERVICES I, LLC<br>6200 The Corners Parkway, #250<br>Atlanta, Georgia  30092<br><br>**Serve On:**<br>Douglas P. Williams<br>6200 The Corners Parkway, #250<br>Atlanta, Georgia  30092<br><br>WELLS REAL ESTATE ADVISORY SERVICES, INC. | CASE NO. __ _____ |

| | |
|---|---|
| 6200 The Corners parkway, #250<br>Atlanta, Georgia  30092<br><br>**Serve On:**<br>Douglas P. Williams<br>6200 The Corners Parkway, #250<br>Atlanta, Georgia  30092<br><br>WELLS GOVERNMENT<br>SERVICES, INC.<br><br>**Serve On:**<br>M. Scott Meadows<br>6200 The Corners Parkway<br>Norcross, Georgia  30092<br><br>LEO F. WELLS, III,<br>DOUGLAS P. WILLIAMS, RANDALL D.<br>FRETZ, DONALD A. MILLER, MICHAEL<br>R. BUCHANAN, RICHARD W.<br>CARPENTER, BUD CARTER, WILLIAM H.<br>KEOGLER, JR., DONALD S. MOSS, NEIL<br>H. STRICKLAND, AND W. WAYNE<br>WOODY<br><br>**Serve On:**<br>The Corporation Trust Incorporated<br>200 E. Lombard Street<br>Baltimore, Maryland  21202<br><br>     Defendants | |

## CLASS ACTION COMPLAINT AND DERIVATIVE ACTION FOR VIOLATION OF FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTIES

1

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT & SYNOPSIS ...................................................1

II.   JURISDICTION AND VENUE ................................................................4

III.  PARTIES ..................................................................................5

A.    Plaintiff ...............................................................................5

B.    Wells REIT .............................................................................5

C.    The Advisor ............................................................................8

      1.    The Entities Comprising the Advisor. ............................................9

            a.    Wells Capital, Inc. .......................................................9

            b.    Wells Management Company, Inc. ............................................9

            c.    Wells Real Estate Funds, Inc. ............................................10

            d.    Wells Real Estate Advisory Services, Inc. ................................10

            e.    Wells Advisory Services I, LLC. ..........................................10

            f.    Wells Government Services, Inc. ..........................................11

      2.    The Advisory Agreements. .......................................................15

            a.    The Acquisition Advisory Agreement .......................................15

            b.    The Asset Management Agreement ...........................................16

            c.    The Master Property Agreement ............................................18

      3.    The Fees Paid to the Advisor. ..................................................19

D.    The Individual Defendants .............................................................20

      1.    Defendant Wells – Management Director Defendant ................................20

      2.    Defendant Williams -- Management Director Defendant............................21

      3.    Defendant Fretz -- Management Defendant ........................................22

i

4.    Defendant Miller -- Management Director Defendant ...........................23

5.    Defendant Buchanan -- Non-Management Director Defendant.................24

6.    Defendant Carpenter -- Non-Management Director Defendant ...............24

7.    Defendant Carter -- Non-Management Director Defendant .....................24

8.    Defendant Keogler - Non-Management Director Defendant ....................25

9.    Defendant Moss- Non-Management Director Defendant ..........................26

10.   Defendant Strickland—Non-Management Director Defendant.................26

11.   Defendant Woody—Non-Management Director Defendant ......................26

IV.   CLASS ACTION ALLEGATIONS ...........................................................27

V.    DERIVATIVE DEMAND ALLEGATIONS................................................29

VI.   SUBSTANTIVE ALLEGATIONS .............................................................36

      A.   The Proxy And The Merger Of The Advisor Into Wells REIT ..........................36

      B.   The Proxy Contains Materially False And Misleading Statements...................44

           1.    The Proxy Contains Materially False And Misleading
                 Statements Concerning the Reason for the Internalization .......................44

           2.    The Proxy Contains Materially False And Misleading
                 Statements Concerning Several Ancillary Service Agreements
                 which will Provide Additional Fees to Affiliates of the Advisor.................46

                 a.   Transition Services Agreement.................................................48

                 b.   Support Services Agreement .......................................................53

           3.    The Proxy Contains Materially False And Misleading
                 Statements Concerning the Subordinated Incentive Fee ............................55

           4.    The Fairness Opinion is False and Misleading .............................................57

                 a.   The Assumptions Used in the Fairness Opinion Are Not
                      Supported By History and Comparable Transactions, and

*are thus, Unreasonable, False and Misleading* ..........................59

    **b.**   **The Fairness Opinion Does Not Consider or Opine on the Services Agreements That Remain in Place After the Merger** ..............60

    **c.**   **The Fairness Opinion is False and Misleading in its Use of Non-Comparable Companies and Transactions.** ..........................61

        **i.**   **Assets under Management Analysis** ..........................62

        **ii.**   **Selected Companies Analysis** ..........................62

        **iii.**   **Precedent Transactions Analysis** ..........................63

    **d.**   **The Proxy and Fairness Opinion Omit Material Facts About the Advisor's Projected Earnings** ..........................66

    **e.**   **The Fairness Opinion Uses Inflated Historical Financial Statements** ..........................66

    **f.**   **The Fairness Opinion and Valuation Use Unsupported Assumptions and Multiples** ..........................67

  **5.**  **The Proxy Makes False and Misleading Statements About a Prior Valuation Done of the Advisor** ..........................67

  **6.**  **The Proxy Contains Materially False And Misleading Statements Concerning the Pricing of Wells REIT's Stock** ..........................68

  **7.**  **The False and Misleading Statements About the Advisor's Performance** ..........................71

**C.**  <u>**Breaches of Fiduciary Duty by the Individual Defendants and the Advisor**</u> ..........................72

  **1.**  **The Advisor Performed Poorly and Such Poor Performance was Left Unchecked by the Defendants** ..........................72

  **2.**  **The Merger and Internalization Are Self-Dealing Transactions** ..........................76

**VII.**  <u>**COUNTS**</u> ..........................76

**VIII.**  <u>**PRAYER FOR RELIEF**</u> ..........................93

## CLASS ACTION COMPLAINT
## FOR VIOLATION OF FEDERAL SECURITIES LAWS AND
## DERIVATIVE ACTION FOR BREACHES OF FIDUCIARY DUTIES

Plaintiff, Washtenaw County Employees' Retirement System, individually and on behalf of all other persons similarly situated and on behalf of Wells Real Estate Investment Trust, Inc., by its undersigned attorneys, for its Class Action and Derivative Complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Wells Real Estate Investment Trust, Inc. ("Wells REIT"), other regulatory filings and reports, industry analysts' reports about the Company, press releases and other public statements issued by the Company, reference to authoritative accounting literature and consultations with forensic accounting experts.

## I.     PRELIMINARY STATEMENT & SYNOPSIS

1.     This Action involves wrongdoing inflicted against the shareholders of Wells REIT who have been asked to approve a proposed transaction whereby their fiduciaries will improperly garner millions in excessive and unjustifiable consideration.  The proposed transaction consists of Wells REIT's acquisition of its affiliated-Advisor, which is wholly owned directly and indirectly by officers and directors of Wells REIT, for $175 million worth of Wells REIT's stock.  The Wells REIT shareholders are being asked to approve this improper, self-dealing transaction pursuant to a materially false and misleading proxy statement.

2.     Wells REIT, a Maryland Corporation with its principal place of business in Georgia, is a real estate investment trust primarily engaged in the acquisition and ownership of commercial real estate properties.  The day-to-day operations of Wells REIT are handled by

external affiliated-entities, collectively deemed an "Advisor." On February 2, 2007, Wells REIT

informed its shareholders that it had entered into an agreement and plan of merger (the "Merger

Agreement") with these various affiliated- Advisor entities so that the Advisor, and the functions

of the Advisor will be merged, or internalized, with and into Wells REIT. ("Merger" or

"Internalization"). The price-tag for this Merger will be $175 million comprised entirely of

19,546,302 shares of Wells REIT's common stock (the "Merger Consideration").

3.      The Defendants are also telling the shareholders in the Proxy that a key reason for

the Internalization is to facilitate a listing of the Company's shares on a national stock exchange,

but that the Company cannot guarantee that such listing will occur. The deadline by which the

Company must do this listing is January 30, 2008 – only 11 months away. Absent a Listing,

Internalizing the Advisor is essentially a worthless endeavor. And, based on industry trends, it is

at least as likely that the Company will not list, as it will list. The shareholders are not given

this, in addition to other, material information concerning the Internalization and the Merger.

4.      So, in addition to seeking to extract grossly excessive consideration for the

Advisor in the Merger, Defendants' Merger, in its entirety, is essentially a worthless endeavor if

the Company's stock does not become listed in the next 11 months. Defendants are asking the

shareholders to vote on a purely self-dealing transaction that is structured only to serve the

interests of the Company's affiliates, and is presented to the shareholders for approval based on

meaningless and materially false misleading information.

5.      Moreover, despite having received $175 million for the Advisor in the Merger,

certain Defendants and their affiliates will continue to reap fees from Wells REIT and its

stockholder pursuant to Services Agreements (*see* ¶¶ 147-166, below) that go into effect

subsequent to the Merger. The Services Agreements provide that the Company and its

stockholders must continue to pay certain Defendants and their affiliates to perform precisely the

same services the Advisor was purportedly providing and for which they would have just paid $175 million.

6.     Because Wells REIT's securities have never been listed on any securities exchange, it operates outside the realm of a public market that responds to market conditions and analysts' commentary, and its investors rely entirely on the accuracy and completeness of the disclosures provided in Wells REIT's proxy statements and annual and quarterly SEC filings for information about the Company, its business, it finances, and the value of its securities.  Absent from the body of investor information available about Wells REIT stock in the marketplace, therefore, is the type of in-depth analysis that institutions generate about market-traded securities.

7.     In the March 12, 2007 issue of <u>Forbes</u>, an article by Stephane Fitch titled "REIT Rip-Off" comments on the Merger noting that, "Instead of a boon for Wells REIT, the deal looks like a sweet one for Leo Wells…How has the Wells REIT performed? Poorly… [since September 2003] …share prices of office REITs have doubled on average, but Wells REIT shares are estimated to be up just 5.7%" since it began selling shares eight years ago.

8.     Wells REIT and the defendants named herein are charged with disseminating a materially false and misleading Proxy in violation of Sections 14(a) and/or 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act").  This federal class action and, alternatively, derivative suit asserts claims on behalf of the Company and all persons who received and are entitled to vote on the Proxy, which seeks approval of, among other things, the Merger, and is alleged herein to contain numerous materially false and misleading statements. This suit also seeks injunctive relief and damages on behalf of the Class to render null and void any approvals given by shareholders to Wells REIT and its management in response to the materially false and misleading Proxy.

3

9.     The Individual Defendants and the Advisor are also charged herein with breaches of the fiduciary duties respectively owed by them to the shareholders and Wells REIT. This claim is brought directly by the Plaintiff and derivatively by the Plaintiff on behalf of the Company. The Individual Defendants and the Advisor were to act in accordance with the following directive, set forth in Wells REIT's Articles of Incorporation: "The Directors serve in a fiduciary capacity to the Company and have a fiduciary duty to the Stockholders of the Company, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor." Further, "[t]he Advisor has a fiduciary responsibility to the Company and to the Stockholders." The Individual Defendants and the Advisor failed in their capacity as fiduciaries, and the operations of the Advisor have simply become a vehicle for self-dealing. The underperforming Advisor, which is virtually wholly-owned by Wells REIT's management team, would have been, and should have been, terminated under the terms of the Advisory Agreement and the mandates of the Offering Documents.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78aa, 28 U.S.C. §§1331, 1337, and principles of supplemental and pendent jurisdiction.

11.     Venue is proper in this Court pursuant to Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and certain of the Defendants have incorporated in their principal places of business within this District.

12.     In connection with the acts, conduct and other wrongs complained or herein, Defendants used the means and instrumentalities of interstate commerce.

### III.    PARTIES

#### A.    Plaintiff

13.    Plaintiff Washtenaw County Employees' Retirement System, a citizen of Ann Arbor, Michigan, holds 1,274,794 shares of Wells REIT stock as of February 28, 2007, and continues to hold shares of Wells REIT stock, as set forth in the accompanying certification (Exhibit A),. Washtenaw County Employees' Retirement System is entitled to vote on the Proxy and is, thus, a member of the Class. Washtenaw County Employees' Retirement System continues to hold shares of Wells REIT stock and this action is not collusive to confer jurisdiction on a court of the United States, which it would not otherwise have. Washtenaw County Employees' Retirement System has suffered substantial damages as a result of Defendants' wrongful acts, as alleged herein.

#### B.    Wells REIT

14.    Defendant Wells REIT is a corporation organized under the laws of the State of Maryland on July 3, 1997, with its principal executive offices at 6200 The Corners Parkway, Norcross, Georgia. Defendant Wells REIT is primarily engaged in the acquisition and ownership of commercial real estate properties, including properties that are under construction, newly constructed, or have operating histories. Its portfolio consists primarily of high-grade office and industrial buildings leased to large corporate tenants located throughout the United States.

15.    From its formation through 2003, Wells REIT raised capital through the issuance of common stock for $10 per share under four public offerings and invested the capital proceeds in income producing commercial real estate properties. During 2004 and 2005, Wells REIT continued to raise additional capital, through the sale of shares under its dividend reinvestment plan, and acquired or constructed certain additional real estate properties. In total, Wells REIT

raised over $5 billion from investors, most of whom now comprise the class of shareholders for which the relief herein is sought. As of December 31, 2006, Wells REIT had 465,856,546 million shares of common stock outstanding held by a total of approximately 109,000 stockholders.

16.    Defendant Wells REIT operates for federal income tax purposes as an equity real estate investment trust ("REIT"). An equity REIT is a business trust combining the capital of many investors to own and, in most cases, operate income-producing real estate. As a REIT, Wells REIT is not treated for federal income tax purposes as a corporation, and thus, is not taxed at the corporate level on its "real estate investment trust taxable income" that is distributed to shareholders. Wells REIT thereby eliminates "double taxation" on its earnings. In order to qualify as a REIT, Wells REIT must comply with a number of requirements and provisions within the Internal Revenue Code, including that it must:

(a)    pay at least 90 percent of its taxable income to shareholders;

(b)    derive most of its income from real estate held for the long term;

(c)    operate or manage its assets through a Taxable REIT Subsidiary ("TRS") which can be wholly owned by the REIT; and

(d)    be widely held.

17.    Wells REIT's business model is fundamental. It takes the money raised and acquires the most durable of assets – real estate, a long-lived physical asset with the potential to produce income. Wells REIT, the Advisor (defined below) and the Individual Defendants' (defined below) primary responsibility is to preserve and protect the equity or value of its real estate assets.

18.    Wells REIT's primary investment objectives are to maximize cash dividends paid to investors; to preserve, protect, and return investors' capital contributions; to realize growth in

6

the value of properties upon the ultimate sale of such properties; and to provide the shareholders with liquidity for their investment by listing shares on a national stock exchange, or, if the listing of the shares does not occur by January 30, 2008, to being the process of selling the properties and distributing the net proceeds from such sales to Wells REIT's shareholders.

19.    Substantially all of Wells REIT's business is conducted through Wells Operating Partnership, L.P. ("Wells OP"), a Delaware limited partnership, or subsidiaries of Wells OP. Wells REIT is the sole general partner, and Wells Capital, Inc. is the sole limited partner, of Wells OP.

20.    As of September 30, 2006, Wells REIT owned interests in 84 properties which were approximately 95% leased with an average lease term remaining of approximately 6.7 years. To date, Wells REIT has financed its acquisitions through a combination of equity raised in public offerings and debt incurred or assumed upon the acquisition of certain properties.

21.    Reminiscent of the real estate limited partnerships of two decades ago, Wells REIT is a public unlisted REIT, meaning that, (1) it is *public* because it is registered with the SEC, can sell to the investing public rather than only to "qualified investors" and is required to file reports with the SEC; and (2) it is *unlisted* because its securities are not listed on a national stock exchange.

22.    Wells REIT as an unlisted REIT has a fixed life.  If its stock is not listed on a national securities exchange or over-the-counter market by January 30, 2008, Wells REIT must sell its assets and distribute the proceeds.  Prior to such time, if an investor wants to cash out, he may be able to sell his shares back to Wells REIT or on a secondary market.

**C.    The Advisor**

23.    Wells REIT is an externally managed REIT.  This means that external business entities have been employed or contracted with by Wells REIT to "direct[] or perform[] the

7

day-to-day business affairs" of Wells REIT, collectively, these defendant entities are referred to herein as the "Advisor".

24.    Wells REIT is currently a party to three agreements to which advisory and property management services are provided to Wells REIT by the Advisor: the Asset Management Advisory Agreement, the Acquisition Advisory Agreement, and the Master Property Management Agreement.

25.    In addition to its direct involvement with the wrongs complained of herein, by reason of its position, and intimate involvement in the day-to-day management of Wells REIT and in its advisory role to Wells REIT and Wells REIT's Board of Directors (discussed below), the Advisor was a controlling person of Wells REIT and had the power to cause (and did cause) Wells REIT to engage in the conduct complained of herein. Because of its managerial position with Wells REIT, the Advisor had access to the adverse, non-public and undisclosed information with respect to Wells REIT's operations and its financial condition.

### 1.    The Entities Comprising the Advisor.

26.    The following entities comprise the Advisor:

#### a.    *Wells Capital, Inc.*

27.    Defendant Wells Capital, Inc. ("Wells Capital") is a Georgia Corporation, incorporated on April 20, 1984. Wells Capital is the sole limited partner of Wells OP, which limited partnership interest it acquired for $200,000.  Wells Capital has been providing Wells REIT with advisory services pursuant to an advisory agreement since 1998.  On January 1, 2005, Wells REIT and Wells Capital entered into the Acquisition Advisory Agreement which engaged

and retained Wells Capital to provide advisory services to Wells REIT as its Acquisition

Advisor.  Pursuant to the Acquisition Advisory Agreement, the Acquisition Advisor has the right

to assign the Acquisition Advisory Agreement to a successor organization with the written

consent of Wells REIT.

### b.    *Wells Management Company, Inc.*

28.    Defendant Wells Management Company, Inc. ("Wells Management") was

incorporated in Georgia on February 17, 1983.  Wells Management has been providing property

management services to Wells REIT since 1998.  On January 1, 2005, Wells Management and

Wells REIT entered into two advisory agreements:

(a)    The Asset Management Advisory Agreement which engages and retains Wells

Management to perform asset management services for Wells REIT as its Asset

Manager.  Pursuant to the Asset Management Advisory Agreement, the Asset

Advisor shall have the right to assign this Agreement to a successor organization

with the written consent of Wells REIT.

(b)    The Master Property Management, Leasing and Construction Management

Agreement ("Master Property Agreement"), which retains Wells Management to

manage, coordinate the leasing of, and manage construction activities related to,

some of the real estate properties acquired for the benefit of Wells REIT as its

Manager. Pursuant to the Master Property Agreement, the Manager may assign

partially or in full its duties and rights with the prior written consent of Wells

REIT.

### c.    *Wells Real Estate Funds, Inc.*

29.    Defendant Wells Real Estate Funds, Inc. ("Wells REF") was formed on February

17, 1997 as a Georgia S Corporation for the purpose of providing real estate investment and

advisory services to Wells REF-sponsored real estate investment products through its subsidiaries. Wells REF is wholly owned by Leo Wells. Wells REF is the sole shareholder of both Wells Capital and Wells Management.

### d.    *Wells Real Estate Advisory Services, Inc.*

30.    Defendant Wells Real Estate Advisory Services, Inc. ("WREAS") was formed as a Georgia corporation on December 30, 2004 for the purpose of providing various real estate, corporate advisory services and asset management services to properties owned by Wells REF-sponsored real estate investment products. WREAS is a wholly owned subsidiary of Wells Management.

### e.    *Wells Advisory Services I, LLC.*

31.    Defendant Wells Advisory Services I, LLC ("WASI") was formed in Georgia on December 21, 2005 for the purpose of managing the day-to-day activities of and providing certain asset management and advisory services to Wells REIT. As part of the formation of WASI:

> (a)    Wells Management transferred and assigned its interest in the Asset Management Advisory Agreement to WASI and transferred and assigned all of the issued and outstanding common stock of WREAS to WASI. WREAS became a wholly owned subsidiary of WASI;

> (b)    Wells Capital transferred and assigned its interest in the Acquisition Advisory Agreement to WASI;

> (c)    Eight executives of Wells REF, including Defendants Douglas P. Williams and Donald A. Miller, made cash capital contributions to WASI.

32.    WASI is owned by Wells Management, Wells Capital and 8 Executives of Wells REF.

33.    On February 15, 2006, Wells Management made an additional capital contribution to WASI by transferring and assigning its interest in the Master Property

Management Agreement to WASI.

34.    On October 25, 2006, WASI transferred and assigned its interests in the Asset Management Advisory Agreement, the Acquisition Advisory Agreement and the Master Property Agreement to WREAS.

### f.    *Wells Government Services, Inc.*

35.    Defendant Wells Government Services, Inc. ("WGS") was incorporated in Georgia on June 1, 2004 for the purpose of providing property management, leasing and asset management services to commercial properties primarily leased to government entities and owned by Wells REF-sponsored real estate investment products. WGS is a wholly owned subsidiary of Wells Management. On January 27, 2006, Wells Management transferred and assigned all of the issued and outstanding stock of WGS to WASI. WGS became a wholly owned subsidiary of WASI. WGS is currently property manager for 12 office buildings in Washington, D.C.

36.    The Advisor includes collectively WREAS, WGS and their predecessors, as applicable, including those portions of Wells Capital and Wells Management which previously provided advisory and management services to Wells REIT under the Asset Management Advisory Agreement, the Acquisition Advisory Agreement and the Master Property Agreement (collectively, "the Advisory Agreements"). Therefore, WREAS, WGS, WASI, Wells Capital, and Wells Management are referred to collectively as "the Advisor."

37.    As depicted in the following chart, the Advisor, owned directly or indirectly by several entities, is also directly and indirectly owned by some of the Individual Defendants (*see* ¶¶ 58-92, below):



38.     All of the officers and a majority of the directors of the Advisor are Wells REIT's officers and directors.

39.     The following timeline summarizes the order and manner in which the Advisor was created:

(a)     February 17, 1983, Wells Management Company, Inc. ("Wells Management") incorporated in Georgia.

(b)     April 20, 1984, Wells Capital, Inc. ("Wells Capital") incorporated in Georgia.

(c)     February 17, 1997, Wells Real Estate Funds, Inc. ("REF") incorporated in Georgia, wholly owned by Leo Wells. Sole shareholder of Wells Management and Wells Capital.

(d)     June 1, 2004, Wells Government Services, Inc. ("WGS") incorporated in Georgia, wholly owned subsidiary of Wells Management.

(e)     December 30, 2004, Wells Real Estate Advisory Services, Inc. ("WREAS"), incorporated in Georgia, wholly owned subsidiary of Wells Management.

(f)     December 21, 2005, Wells Advisory Services I, LLC ("WASI") is formed in Georgia:

      1.     Wells Management transferred and assigned its interest in Asset Management Advisory Agreement to WASI,

      2.     Wells Management transfers and assigns all of the issued and outstanding common stock of WREAS. WREAS becomes wholly owned subsidiary of WASI;

      3.     Wells Capital transfers and assigns its interest in the Acquisition Advisory Agreement to WASI;

      4.     Eight executives of Wells REF, including Defendants Williams, Fretz and Miller make cash capital contributions to WASI.

(g)     February 15, 2006, Wells Management makes additional capital contribution by transferring and assigning its interest in the Master Property Management Agreement to WASI.

(h)     October 25, 2006, Wells Management transfers and assigns its rights to receive fees and reimbursements under the Asset Management Advisory Agreement, the Acquisition Advisory Agreement, and the Master Property Management Agreement with Wells REIT to WREAS.

(i)     January 25, 2007, Wells Management transferred and assigned all of the issued and outstanding common stock of WGS to WASI. WGS became a wholly-owned subsidiary of WASI.

## 2.    The Advisory Agreements.

40.    As an externally-managed REIT, Wells REIT's day-to-day operations are conducted by the Advisor through the authority delegated to it under Wells REIT's Articles of Incorporation and the Advisory Agreements:

### a.  The Acquisition Advisory Agreement

41.    Pursuant to the Acquisition Advisory Agreement, the Acquisition Advisor investigates, selects and acquires properties, and performs capital-raising functions, and transfer agent and stockholder communication functions for Wells REIT.

42.    Wells REIT originally entered into the Acquisition Advisory Agreement with Wells Capital, but it has been assigned by Wells Capital to WASI and then by WASI to WREAS.

43.    The duties and responsibilities of the Acquisition Advisor are enumerated by Section 3 of the Acquisition Advisory Agreement and include, but are not limited to:

(a)    Capital Raise Functions such as managing and supervising the offerings of Wells REIT's common stock;

(b)    Property Related Functions such as presenting to Wells REIT potential investment opportunities, locating, analyzing and selecting potential investments in properties for Wells REIT, providing a continuing and suitable investment program consistent with the investment objectives and policies of Wells REIT as determined and adopted from time to time by Wells REIT's Board of Directors, assisting the Board in the formulation and implementation of Wells REIT's financial policies, and, as necessary, furnishing the Board with advice and recommendations with respect to the making of investments consistent with the investment objectives and policies of Wells REIT;

(c)    Transfer Agent Functions such as maintaining stockholder lists and managing transfers of Wells REIT's stock.

(d)    Stockholder Communications Functions such as managing communications with stockholders and establishing technology infrastructure to assist in providing stockholder support and service.

44.     In performing these undertakings, the Acquisition Advisor is subject to the supervision of the Board.

45.     In exchange for those services, the Acquisition Advisor is entitled to receive fees. The Acquisition Advisor receives Acquisition and Advisory Fees and reimbursement of expenses in an amount equal to 3.5% of aggregate gross proceeds raised from the sale of Wells REIT's shares, exclusive of proceeds received from Wells REIT's dividend reinvestment plan which are used to fund share repurchases pursuant to Wells REIT's share redemption program. On November 15, 2005, the Wells REIT Board approved an amendment to the dividend reinvestment plan which eliminated acquisition and advisory fees on shares sold under this plan beginning in September 2006.

### b.     The Asset Management Agreement

46.     Pursuant to the Asset Management Agreement, the Asset Advisor serves as Wells REIT's investment and financial advisor, manages Wells REIT's day-to-day operations, formulates and implements strategies to administer, promote, manage, operate, maintain, improve, finance and refinance, market, lease and dispose of properties; and provides certain accounting, compliance and other administrative services.

47.     Well REIT originally entered into the Asset Management Advisory Agreement with Wells Management, but it has been assigned by Wells Management to WASI and then by WASI to WREAS.

48.     The duties and responsibilities of the Asset Advisor are enumerated by Section 3 of the Acquisition Advisory Agreement and include, but are not limited to:

> (a)     Advisory Functions such as serving as Wells REIT's investment and financial advisor, providing the daily management of Wells REIT, consult with the officers and the Board of Wells REIT and assist the Board in the formulation and implementation of Wells REIT's financial policies, and,

15

as necessary, furnish the Board with advice and recommendations with
respect to the making of investments

(b)     Asset Management Functions such as formulating and overseeing the
implementation of strategies for the administration, promotion, operation,
and disposition of Wells REIT's properties on an overall portfolio basis

(c)     Accounting, SEC Compliance and Administrative Services Functions such
as maintaining Wells REIT's accounting systems, records and data,
providing financial and operational planning services and portfolio
management functions, and perform all reporting, record keeping, internal
controls and similar matters in a manner to allow Wells REIT to comply
with applicable law including the Sarbanes-Oxley Act of 2002.

49.     In performance of these undertakings, the Advisor is subject to the supervision of
the Board.

50.     In exchange for those services, the Asset Advisor is entitled to receive fees: The
fees for these services are payable monthly in an amount equal to one-twelfth of 0.5% of the fair
market value of all properties the Company owns directly, plus its interest in properties held
through joint ventures, which such fee is reduced under certain circumstances.

51.     Additionally, pursuant to the Asset Management Advisory Agreement, Wells
Management is entitled to earn the following disposition and incentive fees, which are similar in
nature to previous agreements ("Incentive Fee"):

(a)     A disposition fee of the lesser of 50% of a competitive real estate commission or
3.0% of the sales price of the property, subordinated to the payment of
distributions to stockholders equal to the sum of the stockholders' invested capital
plus an 8% return on invested capital;

(b)     Incentive fee of 10% of net sales proceeds remaining after stockholders have
received distributions equal to the sum of the stockholders' invested capital plus
an 8% return on invested capital; or

(c)     Listing fee of 10% of the excess by which the market value of our common stock
plus distributions paid prior to listing exceeds the sum of 100% of the
stockholders' invested capital plus an 8% return on invested capital.

### c.     *The Master Property Agreement*

52.     Pursuant to the Master Property Agreement, the Advisor performs functions as a

Property Manager, Leasing Agent and Construction Manager.

53.     Well REIT originally entered into the Master Property Agreement with Wells

Management, but it has been assigned by Wells Management to WASI and then by WASI to

WREAS (as discussed above).

54.     The duties and responsibilities of the Advisor are enumerated by Sections 2.4, 2.5

and 2.6 of the Master Property Agreement and include, but are not limited to:

(a)     Property Management functions including collecting rent and other monies from tenants with respect to the properties, performing all duties of the landlord including duties relating to operation, maintenance, and day-to-day management of the properties and leases, inspecting the properties and ensuring the properties are maintained.

(b)     Leasing Agent functions including coordinating the leasing of the properties.

(c)     Construction Manager functions including securing or assisting in securing all licenses, registrations, or permits required by law and complying with all ordinances, laws, orders, codes, rules, and regulations pertaining to building the properties and improvements, providing updated and detailed project budgets, and monitor and advise on tenant improvements and construction projects.

55.     In exchange for those services, the Manager is entitled to various fees:

(a)     *Property Management Fee* – a market-based property management fee generally based on gross monthly income of the property.

(b)     *Leasing Commissions Fee-*  (1) a one-time initial lease-up fee in an amount not to exceed one-month's rent for the initial rent-up of a newly constructed building; (2) a market-based commission based on the net rent payable during the term of a new lease (not to exceed ten years); (3) a market-based commission based on the net rent payable during the term of any renewal or extension of any tenant lease; and (4) a market-based commission based on the net rent payable with respect to expansion space for the remaining portion of the initial lease term.

(c)     *Construction Management Fee*: (1) for planning and coordinating the construction of tenant-directed improvements, that portion of lease concessions for tenant-directed improvements as is specified in the lease

or lease renewal, subject to a limit of 5% of such lease concessions; and (2) for other construction management services, a construction management fee to be determined and agreed to in an appropriate contract amendment.

**3.     The Fees Paid to the Advisor.**

56.     Since 1998 through 2005, the Advisor has earned more than $265 million in fees in connection with the acquisitions, development, the securing of permanent financing on properties and monthly asset management fees.  In connection with the marketing and sale of stock in Wells REIT, the Advisor and its designate selling agents were paid over $475 million, in addition to reimbursement of over $63 million in costs.

57.     The following chart sets forth the amounts Wells REIT incurred in these fees, totaling over $800 million, since January 1998:

|  | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Mngt & Leasing Fees – Wells Management | 22,200,000 | 23,100,000 | 13,300,000 | 5,000,000 |
| Allocated Salaries and Wages | 8,700,000 | 8,400,000 | 3,900,000 | 2,000,000 |
| Acquisition and Advisory Fees and Expenses | 3,306,000 | 6,759,000 | 87,300,000 | 46,377,714 |
| Selling Commissions | 7,930,000 | 18,795,000 | 244,310,000 | 127,332,000 |
| Offering Costs | 371,000 | 14,082,000 | 16,463,000 | 13,156,000 |
| Leasing Commissions | n/a | n/a | 800,000 | n/a |
|  | $42,507,000 | $71,136,000 | $366,073,000 | $193,865,714 |

|  | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|
| Mngt & Leasing Fees – Wells Management | 2,468,294 | 1,111,748 | 336,517 | 5,673 |
| Allocated Salaries and Wages | n/a | n/a | n/a | n/a |
| Acquisition and Advisory Fees and Expenses | 18,143,305 | 6,264,101 | 3,610,967 | 1,103,913 |
| Selling Commissions | 49,246,118 | 17,002,554 | 9,801,197 | 2,996,334 |
| Offering Costs | 9,312,884 | 5,369,228 | 3,094,111 | 946,210 |
| Leasing Commissions | n/a | n/a | n/a | n/a |
|  | $79,170,601 | $29,747,631 | $16,842,792 | $ 5,052,130 |

**D.     The Individual Defendants**

**1.     Defendant Wells – Management Director Defendant**

58.    Defendant Leo F. Wells, III ("Wells") serves as Chairman of the Board of

Directors of Wells REIT. Wells is founder of Wells REIT and a multitude of Wells real estate

investment entities. Up until February 2, 2007, Wells served as the President of Wells REIT

since its inception in 1997.

59.    In addition to his direct service to Wells REIT, Defendant Wells is involved with

the Advisor and its affiliates:

(a)    as the sole stockholder, sole director, President and Treasurer of Wells REF;

(b)    as sole director, President and Treasurer of Wells Management, which is wholly-
owned by Wells REF;

(c)    as sole director, President and Treasurer of Wells Capital, which is wholly-owned
by Wells REF;

(d)    as President and sole director of WREAS;

(e)    as part owner of WASI, which is approximately 92% owned by Wells
Management and Wells Capital, he will acquire a significant ownership interest in
Wells REIT common stock as a result of the Internalization.

60.    In addition, Wells is currently President and a director of Wells Real Estate

Investment Trust II, Inc. ("Wells REIT II") and Wells Timber Real Estate Investment Trust, Inc.

("Wells Timber REIT") and Wells also serves as a trustee of the Wells Family of Real Estate

Funds, an open-end management company organized as an Ohio business trust, which includes

as one of its series the Wells S&P REIT Index Fund.

61.    Wells has material financial interests in the Internalization. If the Internalization

is consummated as presently proposed, Defendant Wells (along with Defendants Douglas P.

Williams and Randall D. Fretz, discussed in ¶¶ 62-72, below) will collectively receive beneficial

economic interests in approximately 18,373,524 shares of Wells REIT common stock. This

means that Defendants Wells, Williams and Fretz will indirectly receive as a result of the

Internalization an aggregate of approximately $168 million (of the $175 million in proposed

19

consideration) of Wells REIT common stock if valued at the same per-share amount used to determine the amount of shares to be issued as consideration for the Internalization.[1] Defendant Wells' interest in this is approximately 92% (18,373,524 shares of Wells REIT's stock) or over $164 Million.

### 2.     Defendant Williams - Management Director Defendant

62.     Defendant Douglas P. Williams ("Williams") serves as Executive Vice President, Secretary, Treasurer and as a director of Wells REIT

63.     Defendant Williams is also involved with the Advisor:

(a)     as a Senior Vice President of Wells Capital;

(b)     as Vice President of Wells REF;

(c)     as an approximately 1% owner of WASI, he will acquire a significant ownership interest in Wells REIT common stock as a result of the Internalization.

64.     Defendant Williams has served as Executive Vice President, Secretary, Treasurer and as a director of Wells REIT II since 1997 and began serving in those capacities for Wells Timber REIT in 2005. Defendant Williams is also Vice President, Chief Financial Officer, Treasurer and a director of Wells Investment Securities, Inc., the dealer manager of Wells REIT, and Vice President of Wells Asset Management, Inc.

65.     Defendant Williams signed the Proxy and the supplements filed thereto.

66.     Defendant Williams has material financial interests in the Internalization.  If the Internalization is consummated as presently proposed, Defendant Williams (along with Defendants Wells and Randall D. Fretz, discussed in ¶¶ 68-72, below) will collectively receive beneficial economic interests in approximately 18,373,524 shares of Wells REIT common stock.

---

[1]     In addition, as part of the Internalization, Wells Capital, a wholly-owned subsidiary of Wells REF, which is wholly-owned by Defendant Wells, will exchange its 20,000 limited partnership units of Wells OP for an additional 22,339 shares of Wells REIT commons stock.

This means that Defendants Wells, Williams and Fretz will indirectly receive as a result of the Internalization an aggregate of approximately $168 million (of the $175 million in proposed consideration) of Wells REIT common stock if valued at the same per-share amount used to determine the amount of shares to be issued as consideration for the Internalization.

67.     Defendant Williams interest in this is approximately 1% (195,463 shares of Wells REIT's stock) or $1.75 Million.

### 3.    Defendant Fretz- Management Defendant

68.     Defendant Randall D. Fretz ("Fretz") serves as a Senior Vice President of Wells REIT.

69.     Defendant Fretz is also involved with the advisor:

(a)     as a Senior Vice President of Wells Capital, he is primarily responsible for corporate strategy and planning and advising and coordinating the executive officers of Wells Capital on corporate matters and special projects

(b)     as the Chief of Staff and a Vice President of Wells REF;

(c)     as an approximately 1% owner of WASI, he will acquire a significant ownership interest in Wells REIT common stock as a result of the Internalization.

70.     Defendant Fretz is also a Senior Vice President of Wells REIT II and Wells Timber REIT and a director of Wells Investment Securities, Inc.

71.     Defendant Fretz has material financial interests in the Internalization.  If the Internalization is consummated as presently proposed, Defendants Williams, Wells and Fretz will collectively receive beneficial economic interests in approximately 18,373,524 shares of Wells REIT common stock. This means that Defendants Wells, Williams and Fretz will indirectly receive as a result of the Internalization an aggregate of approximately $168 million (of the $175 million in proposed consideration) of Wells REIT common stock if valued at the

same per-share amount used to determine the amount of shares to be issued as consideration for the Internalization.

72.    Defendant Fretz's interest in this is approximately 1% (195,463 shares of Wells REIT's stock) or $1.75 Million.

### 4.    Defendant Miller -  Management Director Defendant

73.    Defendant Donald A. Miller ("Miller") has served as Wells REIT's Chief Executive Officer, President and as a director since February 2, 2007.

74.    Defendant Miller is also involved with the Advisor:

(a)    as a former Vice President of Wells REF and as a former Senior Vice President of Wells Capital, Defendant Miller was previously responsible for directing all aspects of the acquisitions, dispositions, property management, construction and leasing groups for Wells REF, Wells Capital and their affiliates, in connection with those entities providing services to Wells REIT under the existing advisory, asset management and property management agreements;

(b)    as an approximately 1% owner of WASI, he will acquire a significant ownership interest in Wells REIT common stock as a result of the Internalization.

75.    Defendant Miller signed the Proxy and the supplements filed thereto.

76.    Defendant Miller has material financial interests in the Internalization.  If the Internalization is consummated as presently proposed, Defendant Miller will receive an indirect beneficial economic ownership in approximately 195,463 shares of Wells REIT's stock, or $1.75 Million, through his approximately 1% economic ownership interest in WASI.

### 5.    Defendant Buchanan- Non-Management Director Defendant

77.    Defendant Michael R. Buchanan ("Buchanan") has served as a director of Wells REIT since 1998.  At relevant times, Defendant Buchanan has served as a member of Wells REIT's Asset Management Committee, Finance and Planning Committee, and the Special Committee which investigated, evaluated and ultimately approved the internalization scheme.

78.     Defendant Buchanan is currently a trustee of the Wells Family of Real Estate Funds.

### 6.     Defendant Carpenter - Non-Management Director Defendant

79.     Defendant Richard W. Carpenter ("Carpenter") has served as a director of Wells REIT since 1998.  At relevant times, Defendant Carpenter has served as a member of Wells REIT's Compensation Committee, Asset Management Committee, Finance and Planning Committee and the Special Committee which investigated, evaluated and ultimately approved the internalization scheme.

80.     Defendant Carpenter is currently a director of Wells REIT II and a trustee of the Wells Family of Real Estate Funds.

### 7.     Defendant Carter - Non-Management Director Defendant

81.     Defendant Bud Carter ("Carter") has served as a director of Wells REIT since 1998. At relevant times, Defendant Carter served on Wells REIT's Compensation Committee, Nominating and Corporate Governance Committee, and Shareholder Relations, Communication and Development Committee.

82.     Defendant Carter serves as a chairman for TEC International, an organization designed to aid corporate executives in the sharing of ideas on ways to improve the management and profitability of their respective companies. As a chairman, Mr. Carter facilitates monthly meetings for groups of executives and meets individually with each member of the group on a monthly basis. Three executives of Wells REF and its affiliates, including Defendant Wells, are members in groups chaired by Mr. Carter. While Mr. Carter has no equity interest in TEC International, he is compensated by TEC International for such services. Wells Capital paid TEC International fees of approximately $21,000 and $37,000 for the years ended December 31, 2005 and 2004, respectively.

83.     Defendant Carter is currently a director of Wells REIT II and a trustee of the Wells Family of Real Estate Funds.

### 8.     Defendant Keogler - Non-Management Director Defendant

84.     Defendant William H. Keogler, Jr. ("Keogler") has served as a director of Wells REIT since 1998. At relevant times, Defendant Keogler served on Wells REIT's Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, Shareholder Relations, Communication and Development Committee, and the Special Committee which investigated, evaluated and ultimately approved the internalization scheme.

85.     Defendant Keogler is currently a trustee of the Wells Family of Real Estate Funds.

### 9.     Defendant Moss- Non-Management Director Defendant

86.     Defendant Donald S. Moss ("Moss") has served as a director of Wells REIT since 1998.  At relevant times, Defendant Moss served on the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and the Shareholder Relations, Communication and Development Committee.

87.      Defendant Moss a currently a director of Wells REIT II and Wells Timber REIT and a trustee of the Wells Family of Real Estate Funds.

### 10.     Defendant Strickland—Non-Management Director Defendant

88.     Defendant Neil H. Strickland ("Strickland") has served as a director of Wells REIT since 1998. At relevant times, Defendant Strickland served as a member of the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Shareholder Relations, Communication and Development Committees.

24

89.     Defendant Strickland is currently a director of Wells REIT II and a trustee of the Wells Family of Real Estate Funds.

### 11.     Defendant Woody—Non-Management Director Defendant

90.     Defendant W. Wayne Woody ("Woody") has served as a director of Wells REIT since 2003.  At relevant times, Defendant Woody served as a member of the Audit Committee, Finance and Planning Committee, and the Special Committee which investigated, evaluated and ultimately approved the internalization scheme.

91.     Defendant Woody is currently a director of Wells REIT II and a trustee of the Wells Family of Real Estate Funds.

92.     Wells, Williams, Miller, Buchanan, Carpenter, Carter, Keogler, Moss, Strickland and Woody are referred to collectively herein as the "Director Defendants."  Together, the Director Defendants and Management Defendant Fretz are referred to as the "Individual Defendants."

93.     In addition to their direct involvement with the wrongs complained of herein, by reason of their management positions, and /or membership on Wells REIT's Board of Directors, and their authority and ability to make public statements in the name of Wells REIT, the Individual Defendants were controlling persons of Wells REIT and had the power to cause (and did cause) Wells REIT to engage in the conduct complained of herein.

94.     Because of their Board memberships and/or executive and managerial positions with Wells REIT, each of the Individual Defendants had access to the adverse, non-public and undisclosed information with respect to Wells REIT's operations and financial condition, or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was false and misleading to the market or any accounting treatment in Wells REIT's financial statements that violated GAAP.

25

95.    Each Defendant is liable as a primary violator in making false and misleading statements that operated to mislead Wells REIT stockholders in exercising their right to vote on the proposals contained in the Proxy.

### IV.    CLASS ACTION ALLEGATIONS

96.    This is a class action pursuant to Rule 23(a), (b) (2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons who were entitled to vote on the Schedule 14A Proxy Statement, pursuant to Section 14(a) of the Securities Exchange Act of 1934, that was filed with the SEC on February 26, 2007 by Wells REIT and defendants as amended or supplemented ("Proxy"), who suffered harm as a result of the actions complained of herein.

97.    Excluded from the Class are the Defendants named herein, the officers and directors of Defendants at all relevant times, members of each Individual Defendant's immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

98.    Because as of December 31, 2006, Wells REIT had 465,856,546 million shares of common stock outstanding held by a total of approximately 109,000 stockholders, members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined through appropriate discovery, Class members number at least in the tens of thousands and they are geographically dispersed.

99.    Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct.

26

100.    Plaintiff will fairly and adequately protect the interests of all Class members and has retained counsel experienced and competent in class and securities litigation. Plaintiff has no interest contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

101.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

102.    Final injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the entire Class.

103.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

    (a)    Whether Wells REIT, the Advisor and the Individual Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, and Rule 14a-9 promulgated thereunder by causing to be issued a materially false and misleading Proxy and supplements thereto;

    (b)    Whether the Advisor and the Individual Defendants breached their fiduciary duties to the members of the Class by engaging in the conduct alleged herein; and

    (c)    Whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

## V.    DERIVATIVE DEMAND ALLEGATIONS

104.    Plaintiffs did not make a demand upon the Board of Directors of Wells REIT at the time of the filing of this Complaint to bring action against the directors and officers of Wells REIT, or the other culpable parties named herein, because doing so is excused or would be futile.

105.    The majority of the Wells REIT directors serving on the Board are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

106.    Defendants Wells, Williams, Miller, Buchanan, Carpenter, Carter, Keogler, Moss, Strickland and Woody comprise Wells REIT's Board of Directors.

107.    Defendant Wells directly or indirectly owns 92% of the Advisor and Williams and Miller each directly or indirectly own 1% of the Advisor.

108.    Moreover as to the Internalization, Defendants Woody, Buchanan, Carpenter, and Keogler were the members of the Special Committee which investigated, evaluated and ultimately approved the Internalization.

109.    Importantly, Wells REIT's Articles of Incorporation state that each of the directors serves in a fiduciary capacity to the Company and has a fiduciary duty to the Stockholders of the Company, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor.  (*see* ¶¶ 225-231 below).

110.    Each of the so-called independent directors of the Board of Directors[2] – which

includes, Defendants Buchanan, Carpenter, Carter, Keogler, Moss, Strickland and Woody, - is

responsible for, among other things (*see* ¶¶ 225-231, below), evaluating and monitoring the

Advisor, reviewing fees and expenses paid to the Advisor and monitoring and reviewing the

Advisor's performance.  It was incumbent on these Director Defendants to implement

appropriate measures to assure that the Advisor and Advisory Agreements did not become a

vehicle for wrongful self-dealing.  These Director Defendants failed to implement such

measures, and consequently breached the fiduciary duties of loyalty, good faith and due care that

they owed to Wells REIT and the Wells REIT stockholders.

111.    Moreover, several so-called independent directors of the Board of Directors,

including Defendants Carpenter, Carter, Moss, Strickland and Woody lack independence

because they serve on multiple boards of Wells affiliated-entities in addition to serving on the

Board of Wells REIT:

| Richard W. Carpenter | <ul><li>director of Wells REIT II;</li><li>trustee of the Wells Family of Real Estate Funds.</li></ul> |
| --- | --- |
| Bud Carter | <ul><li>director of Wells REIT II;</li><li>trustee of the Wells Family of Real Estate Funds.</li></ul> |

---

[2]      The term "Independent Director" is defined in the Articles of Incorporation as "a
Director who is not, and within the last two (2) years has not been, directly or indirectly
associated with the  Advisor by virtue of (i) ownership of an interest in the Advisor or its
Affiliates, (ii) employment by the Advisor or its Affiliates, (iii) service as an officer or director
of the Advisor or its Affiliates, (iv) performance of services, other than as a Director, for the
Company, (v) service as a director or trustee of more than three (3) real estate investment trusts
advised by the Advisor, or (vi) maintenance of a material business or professional relationship
with the Advisor or any of its Affiliates.  An indirect relationship shall include circumstances in
which a Director's spouse, parents, children, siblings, mothers- or fathers-in-law, sons- or
daughters-in-law or brothers- or sisters- in-law is or has been associated with the Advisor, any of
its Affiliates or the Company.  A business or professional relationship is considered material if
the gross revenue derived by the Director from the Advisor and Affiliates exceeds five percent
(5%) of either the Director's annual gross revenue during either of the last two (2) years or the
Director's net worth on a fair market value basis.

| | |
|---|---|
| Donald S. Moss | • director of Wells REIT II;<br>• director of Wells Timber REIT;<br>• trustee of the Wells Family of Real Estate Funds. |
| Neil H. Strickland | • director of REIT II;<br>• trustee of the Wells Family of Real Estate Funds. |
| W. Wayne Woody | • director of Wells REIT II;<br>• trustee of the Wells Family of Real Estate Funds |

Defendants Carpenter, Carter, Moss, Strickland and Woody, as noted above, serve as directors or trustees, and of two or three REITs advised by the Advisor and thus lack independence.[3] Even Wells REIT acknowledges in its Articles of Incorporation that service as a director or trustee of multiple real estate investment trusts advised by the Advisor causes a conflict that affects independence.[4] These Director Defendants' service on multiple boards of Wells-affiliated companies that are so entwined renders Director Defendants Carpenter, Carter, Moss, Strickland and Woody so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

112.    Defendants Buchanan, Carpenter, Carter, and Woody are the current members of the Finance and Planning Committee. The primary function of the Finance and Planning Committee is to review and advise the board of directors on the overall financial performance of Wells REIT which includes issues related to net proceeds raised, fees and expenses, operating

---

[3]    Wells Capital is the advisor of both Wells REIT II and Wells Timber REIT.
[4]    According to the Articles of Incorporation, a director is independent so long as he is not serving as a director or trustee of more than 3 real estate investment trusts advised by the Advisor. Defendants' selection of "more than 3" as the cut-off for when a director is or is not deemed independent is wholly arbitrary.

earnings, dividends, capital structure and budgetary and reporting processes.  It was incumbent on these Director Defendants to review and track Wells REIT and the Advisor's performance as the advisor was granted broad authority under the Asset Management Agreement to maintain Wells REIT's accounting systems, records and data, providing financial and operational planning services and portfolio management functions, and perform all reporting, record keeping and internal controls.  Moreover, these Director Defendants failed to assure that the Advisor and Advisory Agreements, including the fees and expenses paid to the Advisor, did not become a vehicle for wrongful self-dealing. These Director Defendants failed to implement such measures, and consequently breached the fiduciary duties of loyalty, good faith and due care that they owed to Wells REIT and the Wells REIT stockholders.

113.    Defendants Buchanan and Carpenter are the current members of the Asset Management Committee. The primary function of the Asset Management Committee is to review and advise the board of directors on investment criteria and acquisition policies, general economic environment in various real estate markets, existing or prospective properties or tenants, and portfolio diversification goals. It was incumbent on these Defendants to review and track the Advisor's performance as the Advisor was granted broad authority under the Asset Management Agreement to formulate and implement strategies to administer, promote, manage, operate, maintain, improve, finance and refinance, market, lease and dispose of properties and under the Acquisition Advisory Agreement to select and acquire properties. Moreover, the Defendants failed to implement measures to assure that the Advisor and Advisory Agreements did not become a vehicle for wrongful self-dealing. These Defendants consequently breached the fiduciary duties of loyalty, good faith and due care that they owed to Wells REIT and the Wells REIT stockholders.

31

114.    The following chart summarizes the conflicts which permeate the current Wells

REIT Board of Directors rendering them lacking in independence and rendering demand futile:

|  | Interest in Advisor? | Multiple Directorships? | Membership in Pertinent Board Committees? | Charged with Oversight of the Advisor? | Interested/ Demand Excused |
|---|---|---|---|---|---|
| **Leo Wells, III** | Sole stockholder, director, President and Treasurer of Wells REF, Sole director, President and Treasurer of Wells Management and Wells Capital; Owns approximately 92% interest in WASI | President and director of Wells REIT II;<br><br>President and director of Wells Timber REIT;<br><br>Trustee of Wells Family of Real Estate Funds |  |  | ✓ |
| **Douglas P. Williams** | Senior Vice President of Wells Capital, Executive of Wells REF; Owns approximately 1% interest in WASI |  |  |  | ✓ |
| **Donald A. Miller** | Owns approximately 1% interest in WASI |  |  |  | ✓ |
| **Michael R. Buchanan** |  | Trustee of Wells Family of Real Estate Funds | Finance and Planning Committee, Asset Management Committee, Special Committee | YES | ✓ |
| **Richard W. Carpenter** |  | Director of Wells REIT II; trustee of the Wells Family of Real Estate Funds. | Finance and Planning Committee, Asset Management Committee, Special Committee | YES | ✓ |
| **Bud Carter** |  | Director of Wells REIT II; trustee of the Wells Family of Real Estate Funds. | Finance and Planning Committee | YES | ✓ |
| **William H. Keogler** |  | Trustee of the Wells Family of Real Estate Funds. | Special Committee | YES | ✓ |

| | | | | | |
|---|---|---|---|---|---|
| **Donald S. Moss** | | Director of Wells REIT II; director of Wells Timber REIT; trustee of the Wells Family of Real Estate Funds. | | YES | ✓ |
| **Neil H. Strickland** | | Director of Wells REIT II; trustee of the Wells Family of Real Estate Funds. | | YES | ✓ |
| **W. Wayne Woody** | | Director of Wells REIT II; trustee of the Wells Family of Real Estate Funds | Finance and Planning Committee, Special Committee | YES | ✓ |

115.    For these reasons, in addition to the ones alleged in ¶¶ 116-119, below, each of the members of the Board were so directly conflicted or committed to the decisions in dispute and could not reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.  Thus, a demand on the Board would have been futile.

116.    Each of the members of the Board cannot be expected to have acted in the best interest of Wells REIT in their consideration of a demand because they are directly involved in the mismanagement of Wells REIT and self-dealing practices within Wells REIT as alleged herein and by their actions, are deeply implicated in the breach of fiduciary claims brought derivatively in this action.

117.    Indeed, each Wells REIT Director on the Board: (i)  caused or permitted Wells REIT to engage in transactions which harmed Wells REIT's financial situation while benefiting certain Individual Defendants; (iii) failed to take action to investigate the wrongful acts alleged herein or to put in place the proper supervision and control mechanisms that would have brought these unlawful practices to their attention and; (iv) despite the Advisor's continuing mismanagement of Wells REIT, allowed Wells REIT to pay unwarranted fees to the Advisor and to renew its Advisory Agreements notwithstanding the Advisor's improper conduct.

118.    Each Wells REIT director on the Board subjected itself to a substantial risk of personal liability for breach of fiduciary duty because of its gross negligence in failing to prevent or remedy the Advisor's improper self-dealing with Wells REIT and instead renewing the Advisory Agreement with the Advisor. Indeed, because all Wells REIT directors on the Board knew that among the Wells REIT Directors were certain of the Individual Defendants who derived substantial benefits from the Advisor's management of Wells REIT, it was incumbent upon the Board to take prudent measures to implement audit systems or other programs that would enable it to properly oversee all aspects of the Advisor's conduct and the Advisory Agreement. Had each of the Wells REIT directors on the Board done this, it would have become aware of the Advisor's improper acts of self-dealing with respect to Wells REIT. However, each Wells REIT director on the Board failed to put any such necessary system or program in place, subjected itself to a substantial risk of personal liability for breach of its fiduciary duties, and rendered itself incapable of impartially considering a shareholder demand.

119.    Because each Wells REIT Director is deeply and directly involved in the wrongdoing alleged herein, and had ample opportunity to consider and reconsider the Advisor's self-dealing misconduct in managing Wells REIT, it is highly unlikely that a demand by the Plaintiffs would have led to a resolution of the dispute prior to litigation. All Wells REIT Directors owed fiduciary duties at all times and were required to act in Wells REIT's best interest, to protect Wells REIT from harm, and to recover damages for Wells REIT when it has been harmed.

## VI.    SUBSTANTIVE ALLEGATIONS

120.    Wells REIT is a Maryland REIT formed in 1997 to invest in Properties that would be leased to and managed by third-party operators. At the time that operations commenced in 1998, the size and scope of Wells REIT's business operations were insufficient to support the

34

overhead costs associated with a self-advised structure. Wells REIT contracted with the Advisor to provide all personnel, accounting, administrative and other support services and resources necessary for our business operations.

### A.    The Proxy And The Merger Of The Advisor Into Wells REIT

121.    Similar to many unlisted public REITs, Wells REIT has a fixed life.  Pursuant to its Articles of Incorporation, if its stock is not listed on a national securities exchange or over-the-counter market by January 30, 2008, Wells REIT must sell its assets and distribute the proceeds.  The objective is to provide Wells REIT's stockholders with liquidity for their investments.

122.    On February 2, 2007, Wells Real Estate Investment Trust, Inc., ("Wells REIT") informed its shareholders entered into an agreement and plan of merger (the "Merger Agreement") with Wells Real Estate Funds, Inc. ("Wells REF"), Wells Capital, Inc. ("Wells Capital"), Wells Management Company, Inc. ("Wells Management"), Wells Advisory Services I, LLC ("WASI"), Wells Real Estate Advisory Services, Inc. ("WREAS"), Wells Government Services, Inc. ("WGS"), and its wholly-owned subsidiaries, WRT Acquisition Company, LLC ("WRT Acquisition Sub") and WGS Acquisition Company, LLC ("WGS Acquisition Sub"). (*See also* Chart in ¶ 37, above)

123.    Wells REIT is an externally-managed REIT and since the Wells REIT commenced operations in 1998, its day-to-day operations, including investment analysis, acquisitions, financing, development, due diligence, asset management, property management and certain administrative services, such as financial, tax and regulatory compliance reporting, have been provided by WREAS, WGS and their predecessors pursuant to certain advisory, asset management and property management agreements. WREAS, WGS and their predecessors including those portions of the operations of Wells Capital and Wells Management which

35

previously provided advisory and management services to Wells REIT under such advisory, asset management and property management agreements. These Advisor entities and agreements are discussed above.

124.    The purpose of the Merger Agreement is to internalize the functions of the Advisor with and into Wells REIT.

125.    Pursuant to the Merger Agreement, WREAS will be merged with and into WRT Acquisition Sub and WGS will be merged with and into WGS Acquisition Sub (the "Mergers") and all of the outstanding shares of the capital stock of WREAS and WGS will be exchanged for a total consideration of $175 million (the "Merger Consideration"), comprised entirely of 19,546,302 shares of Wells REIT's common stock, which constitutes approximately 4.2% of Wells REIT's currently outstanding common stock. In addition, in connection with the transaction, Wells Capital will transfer the 20,000 limited partnership units it currently owns in Wells REIT's operating partnership, Wells Operating Partnership, L.P. ("Wells OP"), to Wells REIT or one of its subsidiaries in exchange for 22,339 shares of Wells REIT's common stock. The Mergers and other transactions contemplated by the Merger Agreement are referred to herein as the "Internalization."

126.    Upon consummation of the Internalization, the Advisor will become Wells REIT's wholly-owned subsidiary, and the Advisor's employees will become Wells REIT's employees. Upon the closing of the transaction contemplated by the Merger Agreement, Wells REIT will no longer be subject to the existing advisory and asset management agreements and certain of its property management agreements with its existing external advisors, and Wells REIT's will become self-advised.

127.    On February 26, 2007, Defendants filed a Schedule 14A Proxy Statement, pursuant to Section 14(a) of the Securities Exchange Act of 1934, with the SEC as amended or

supplemented ("Proxy").

128.    Generally, the Proxy indicates that if Wells REIT's Board of Directors were to determine that a listing of its common stock on a national stock exchange was in its best interest, having a self-advised or internally advised management structure would better position Wells REIT for a future listing partially because "there is a perception in the marketplace that an internalized structure, among other things, achieves a better alignment of interests between management and the stockholders and eliminates certain conflicts of interest associated with having an external advisor."

129.    Thus, Wells REIT is seeking shareholder approval via the Proxy to become a self-advised REIT through the merger of the affiliated Advisor into a wholly owned subsidiary of Wells REIT.

130.    Specifically the Proxy presents the shareholders with five proposals (in addition to the election of the nominees to Wells REIT's board of directors) for which Wells REIT seeks its shareholders' votes and approval:

(a)    **The Internalization Proposal**:  "A proposal to approve the internalization of the Advisor (defined below) with and into Wells Real Estate Investment Trust, Inc. (which we refer to in the accompanying proxy statement as the "Internalization Proposal") by approving the Definitive Merger Agreement (defined below) and the transactions contemplated thereby (which we refer to in the proxy statement as both the "Internalization" and the "Internalization Transaction"). Since we commenced operations in 1998, our day-to-day operations, including investment analysis, acquisitions, financings, development, due diligence, asset management, property management and certain administrative services, such as financial, tax and regulatory compliance reporting, have been provided by Wells Capital, Inc. ("Wells Capital") and Wells Management Company, Inc. ("Wells Management"), both of which are wholly owned subsidiaries of Wells Real Estate Funds, Inc. ("Wells REF"), pursuant to certain advisory, asset management and property management agreements. Such advisory, asset management and property management agreements have since been transferred and contributed to Wells Real Estate Advisory Services, Inc. ("WREAS"), and WREAS is currently responsible for providing the services formerly rendered to us by Wells Management and Wells Capital. In addition, certain of our properties having primarily government tenants are being managed by Wells Government Services, Inc. ("WGS"). WREAS and WGS are both wholly-owned subsidiaries of Wells Advisory Services I,

LLC ("WASI") (references to the "Advisor" in the accompanying proxy statement include, collectively, WREAS, WGS and their predecessors, as applicable, including those portions of the operations of Wells Capital and Wells Management which previously provided advisory and management services to us under such advisory, asset management and property management agreements). In the Internalization, all of the outstanding shares of the capital stock of WREAS and WGS will be exchanged for a total consideration of $175 million, comprised entirely of 19,546,302 shares of our common stock (the "Internalization Consideration"), which constitutes approximately 4.2% of our currently outstanding common stock. Wells Capital will also exchange its 20,000 limited partnership units in Wells OP for 22,339 shares of our common stock as part of the Internalization Transaction. Upon consummation of the Internalization, WREAS and WGS will be our wholly-owned subsidiaries, and the Advisor's employees will become our employees. In connection with the Internalization, we will no longer pay the fees and expense reimbursements associated with our existing advisory and asset management agreements and certain of our property management agreements to our external advisors, and we will become self-advised. Our executive officers and certain of our directors, including our new Chief Executive Officer and President, Donald A. Miller, CFA, and another individual currently affiliated with Wells REF who may become one of our executive officers collectively own economic interests in WASI, which is the sole stockholder of WREAS and WGS, and will indirectly receive as a result of the Internalization an aggregate of approximately $168 million in shares of our common stock valued at the same per-share amount used to determine the amount of shares to be issued to WASI as the Internalization Consideration. Even if approved by our stockholders, the Internalization Proposal will not be implemented unless other conditions to the Internalization are satisfied. We may waive certain of these conditions in our sole discretion;

(b)    **The Pre-Listing Charter Amendment Proposal:** "Approval of an amendment and restatement of our articles of incorporation (the "Articles"), in order to modify certain provisions to reflect that we have become self-advised (the "Pre-Listing Charter Amendment Proposal"). Even if approved by our stockholders, this proposal will not be implemented unless the Internalization occurs";

(c)    **The Post-Listing Charter Amendment Proposal:** "Approval of a further amendment and restatement of our Articles, which will become effective in the event of a future listing of our common stock, if any, on a national securities exchange or quotation of our common stock by The NASDAQ Stock Market, Inc. or an over-the-counter market (the "Listing"), to modify certain provisions to conform more closely to the charters of other real estate investment trusts ("REITs") whose securities are publicly traded and listed ("Listed REITs") (the "Post-Listing Charter Amendment Proposal"). There can be no assurance that we will determine to list our common stock or, if we make such determination, that we will successfully list our common stock. Even if approved by our stockholders, this proposal will not be implemented unless the Internalization occurs and until shortly before a Listing, if any, of our common stock";

(d)    **The Incentive Plan Proposal:** "Approval and adoption of our 2007 Omnibus Incentive Plan (the "Incentive Plan Proposal"). If approved, this proposal will

be implemented regardless of whether the other proposals being considered at the Special Meeting are approved by our stockholders; and

       (e)    **Other Proposals:** Any other matters that properly may be presented at the Special Meeting including proposals to adjourn the Special Meeting with respect to proposals for which insufficient votes to approve were cast and, with respect to any such proposals, to permit further solicitation of additional proxies by our Board.

131.    The Proxy all sets out the following reasons for the proposed Merger:

(a)    "…[A]t the time we commenced operations in 1998 the size and scope of our business operations were insufficient to support the overhead costs associated with a self-advised structure, we contracted with outside advisors to provide all personnel, accounting, administrative and other support services and resources necessary for our business operations. Since then, we have grown rapidly, however, and currently have over $5 billion in assets based upon the most recent valuation of our real estate portfolio. Based upon our current size and the scope of our operations, we believe that we comfortably exceed the critical mass required to support a self-advised structure."

(b)    "We believe the Internalization will provide us with an experienced management team with industry expertise, management capabilities and a unique knowledge of our assets and business strategies."

(c)    "We believe that converting from our current externally advised structure to a self-advised or internally advised management structure would result in many important benefits, including:

        • That an Internalization Transaction would be accretive over time to our earnings per share and our funds from operations ("FFO") per share as a result of the reduction in operating costs that will result from us no longer having to pay advisory, property management and other fees and expense reimbursements to our external advisors . . . No assurances can be given, however, that any such accretion in our earnings per share or FFO per share would actually occur;

        • That establishing an internal management team which would be fully dedicated and solely focused on our operations and strategic plans would enhance stockholder value;

        • That, if the Board determines that a Listing is in our best interests, a self-advised or internally advised management structure would better position us for a future Listing, partially based on our belief that there is a perception in the marketplace that an internalized structure, among

other things, achieves a better alignment of interests between management and the stockholders and eliminates certain conflicts of interest associated with having an external advisor. No assurances can be given, however, that a Listing will actually occur or, if it did occur, that being self-advised would result in a more successful Listing; and

- That an internalized management structure may have a positive impact on the retention of key management personnel, as we anticipate that our key management personnel will have an equity stake in our Company."

132.    By the Proxy, Defendants Wells REIT, the Individual Defendants and the Advisor seek the approval of the Merger. Subject to the approval of the Internalization by the Wells REIT stockholders and subject to the satisfaction of certain other conditions, the Definitive Merger Agreement provides for the simultaneous occurrence of the following:

(a)    WREAS will be merged into Wells REIT's wholly-owned subsidiary, WRT Acquisition Company, LLC ("WRT Acquisition"), with WRT Acquisition being the surviving entity;

(b)    WGS will be merged into Wells REIT's wholly-owned subsidiary, WGS Acquisition Company, LLC ("WGS Acquisition"), with WGS Acquisition being the surviving entity;

(c)    the shares of common stock of WREAS and WGS currently held by WASI will be converted into 19,546,302 shares of Wells REIT common stock in the aggregate, subject to certain escrow and other conditions; and

(d)    Wells Capital will surrender or transfer to REIT or a Subsidiary of REIT the 20,000 units of limited partnership interests in the Operating Partnership (the "Wells Capital Operating Partnership Interests") which it holds in exchange for 22,339 REIT Common Shares;

133.    As a result of the Internalization, each of WREAS and WGS will be merged into and will become wholly-owned subsidiaries of Wells REIT, and Wells REIT will become self-advised. Wells REIT currently anticipates that it will have a total of approximately 100 to 110 employees following the Internalization. Wells REIT anticipates that the Advisor will have approximately 80 to 90 employees who will become Wells REIT employees as a result of the

Internalization Transaction, that the Company will hire an additional approximately 15 to 30 employees shortly after Closing.

134.    Wells REIT engaged an independent appraisal firm to perform a valuation of its properties as of September 30, 2006. As a result of this valuation, on January 3, 2007, the Board determined that the estimated net asset value of shares of common stock, based primarily on the estimated net asset value of our real estate portfolio, was $8.93 per share. The $8.93 estimated net asset value per share was provided by an independent third party which based its estimate upon (1) the appraised value of our real estate assets as of September 30, 2006, and (2) consideration of the current value of our other assets and liabilities as of September 30, 2006 (including the contingent liability for the subordinated disposition fee described below).

135.    In the Internalization, Wells REIT has agreed to pay the Internalization Consideration of $175 million in shares of common stock and agreed to use the $8.93 September 30, 2006 estimated net asset valuation as a basis for determining the number of shares that would represent the $175 million in value. However, because the estimated net asset valuation took into account an approximately $12.4 million subordinated disposition fee otherwise payable to the Advisor upon a liquidation of our properties at their September 30, 2006 appraised values and the obligation to pay this contingent liability would be extinguished upon the acquisition of the Advisor, the parties agreed in the Definitive Merger Agreement to use a per-share value of $8.9531 (calculated by excluding the potential liability for the subordinated disposition fee) to determine the amount of shares paid as Internalization Consideration.

136.    As a result of the Internalization, all of the outstanding common stock of WREAS and WGS currently held by WASI, the parent of both WREAS and WGS, will be converted into 19,546,302 shares of Wells REIT common stock (which represents approximately 4.2% of Wells REIT's currently outstanding common stock), reflecting the agreed-to Internalization

41

Consideration of $175 million.

137.    As a result of the Internalization, Defendants Wells, Williams, Fretz and Miller will collectively receive material beneficial economic interests, discussed in ¶¶ 58-76, above.

138.    The Definitive Merger Agreement provides that the Internalization will be consummated on the Closing Date, which will be within three business days following the satisfaction or waiver of the conditions to the Internalization set forth in the Definitive Merger Agreement (other than conditions that by their nature are to be satisfied at the Closing), or on such other date as we and WASI may mutually agree

139.    Pursuant to the Merger Agreement, the Internalization Transaction must be consummated on or before August 1, 2007, whereby Wells REIT and its shareholders would pay approximately $175 million for an Advisor that was worth substantially less.  The Proxy contains materially false and misleading statements concerning the most fundamental, material aspects of the Proxy – the basis for placing this exorbitant value on the Advisor.

B.    **The Proxy Contains Materially False And Misleading Statements.**

1.    **The Proxy Contains Materially False And Misleading Statements Concerning the Reason for the Internalization.**

140.    The Proxy states that a key reason for proposing the Internalization is because a self-advised or internally advised management structure would put the Company in a better position for a future Listing, partially based on Defendants' belief that there is a perception in the marketplace that an internalized structure, among other things, achieves a better alignment of interests between management and the stockholders and eliminates certain conflicts of interest associated with having an external advisor.

141.    The Proxy then states that, Defendants cannot, however, assure a Listing will occur but the Internalization will go through regardless if there is a Listing.

142.    The deadline by which the Company must do the Listing is January 30, 2008 –
only 11 months away.  Absent a Listing, Internalizing the Advisor is essentially a worthless
endeavor.  And, based on industry trends, it at least as likely that the Company will not list, as it
is the Company will list.  *See* ¶¶ 180-184, discussing recent Internalization Transactions

143.    Shareholders are not informed in the Proxy of recent internalization transactions
(discussed below) in which other non-listed REITs have, in fact, not Listed after having
internalized their affiliated-advisors, but instead have been the subject of business combinations
(which may not account for the millions just paid for having internalized the affiliated advisor,
and not provided recompense for the dilutive effect that the internalization had on the company's
shareholders).  The Proxy thus omits material information concerning these comparable
internalization transactions and the fact that it is at least as likely as not that the Company will
not List.  This is material information a reasonable shareholder would consider important in
deciding how to vote on the Proxy.

144.    In addition, the shareholders are not given any information about the alternatives
to Listing that may occur and the negative impact the Internalization, having been consummated,
will have on the Company if those alternatives to a Listing occur (such as the Company not
Listing, the Company liquidating pursuant its Charter, or the Company engaging in business
combination).  Especially with the absolute Listing deadline only months away, this is material
information that each shareholder is entitled to know and that goes to heart of the very basis on
which each shareholder should cast his vote on the Proxy.  This is material information a
reasonable shareholder would consider important in deciding how to vote on the Proxy.

145.    Defendants also did not inform shareholders in the Proxy that the Defendants
could have provided (but did not) as part of the Merger a mechanism by which, if the Company
did not List by the January 30, 2008 deadline, the Internalization would be reversed or rescinded.

This is material information a reasonable shareholder would consider important in deciding how to vote on the Proxy.

146.    Similarly, Defendants did not inform shareholders that Defendants could have provided (but did not) as part of the Merger a mechanism whereby the Merger Consideration and the dilutive effect of the Merger on the Company's shareholders would have to be completely and appropriately adjusted to more completely reflect the benefit the self-advisement conferred on the Company as part of an alternative transaction to Listing, whether it was a liquidation or a business combination. This is material information a reasonable shareholder would consider important in deciding how to vote on the Proxy.

> **2.    The Proxy Contains Materially False And Misleading Statements Concerning Several Ancillary Service Agreements which will Provide Additional Fees to Affiliates of the Advisor**

147.    The Proxy states that "Upon consummation of the Internalization, WREAS and WGS will be our wholly-owned subsidiaries, and the Advisor's employees will become our employees.  In connection with the Internalization, we will no longer pay the fees and expense reimbursements associated with our existing advisory and asset management agreements and certain of our property management agreements to our external advisors, and we will become self-advised."

148.    In addition, Proxy states that the "Internalization Transaction would be accretive over time to our earnings per share and our funds from operations ("FFO") per share as a result of the reduction in operating costs that will result from us no longer having to pay advisory, property management and other fees and expense reimbursements …"

149.    Page four of the Proxy describes the Advisor's broad functions under the terms of the current Advisory Agreements which Wells REIT will no longer be paying for following the Internalization:

the Advisor has responsibility for our day-to-day operations subject to the supervision of our Board, including providing the management of our day-to-day operations; serving as our investment and financial advisor; formulating and overseeing the implementation of strategies for the administration, promotion, management, operation, maintenance, improvement, financing and refinancing, leasing and disposition of properties on an overall portfolio basis; maintaining and preserving our books and records, including stock records; administering, managing and maintaining stock transfers; managing communications with our stockholders; establishing technology infrastructure for stockholder support and service; performing property management functions for a number of our properties and overseeing the performance of our third-party property managers; reviewing and analyzing operating budgets, capital budgets and leasing plans of each of our properties; managing and supervising any offering of our securities, including the preparation of all related registrations and documents and other matters related to the offering process; consulting with the Board in evaluating and obtaining adequate insurance coverage based upon risk management determinations; reviewing and analyzing the on-going financial information pertaining to each of our properties and the overall portfolio of our properties; recommending the disposal of, reinvestment of the proceeds from the sale of, or otherwise dealing with our investments in properties; maintaining accounting systems, records and data and any other information requested concerning our activities as required and preparing and filing periodic financial reports and returns required to be filed with the SEC and any other regulatory agency, including annual financial statements; providing tax and compliance services and coordinating with our independent accountants and other consultants, on related tax matters; and performing all reporting, record keeping, internal controls and similar matters in a manner to allow us to comply with applicable law including the Sarbanes-Oxley Act of 2002.

150.    These affirmative statements in the Proxy are materially false and misleading because, buried on page 89, the Proxy provides abstracts of several agreements for which Wells REIT has agreed to pay to Defendants' affiliates additional fees and reimbursements for services which are currently provided by the Advisor under the Advisory Agreements. ("Services Agreements"). Such services and the attendant fees include the following:

### a.  Transition Services Agreement

151.     Prior to the Closing of the Internalization, WREAS will enter into the Transition Services Agreement with Wells REF which will provide WREAS and Wells REIT with certain transitional services which consist primarily of services Wells REIT believes it will need to continue to obtain from Wells REF at least until a potential Listing, including primarily investor relations support services, transfer agent related services, and investor communication support. Specifically, Wells REF will, among other things:

(a)     manage our communications with stockholders, including answering phone calls, emails, facsimiles, voice mails, and written inquiries, as well as initiating contact with stockholders when appropriate;

(b)     handle proxy communications, including providing assistance with the coordination of proxy statements and any householding issues.

(c)     provide support for our client relations department, including the responsibility for certain securities brokerage accounts, employee and employee-related accounts, as well as assistance in the monitoring and supervising of regulatory activities;

(d)     process and pay share redemptions and dividends to stockholders;

(e)     process tax returns;

(f)     draft and coordinate the circulation of quarterly dividend press releases and all property-related announcements;

(g)     Serve as primary contact for general media inquiries; broker dealers and financial advisors;

(h)     coordinate quarterly financial advisor conferences;

(i)     provide us with research and other support relating to the preparation of responses to any subpoenas;

(j)     perform data research and general industry research;

(k)      handle any escheatment issues

(l)     coordinate certain IRA related services

(m)     create and maintain all marketing communications

(n)     coordinate the placing of materials on our Web site and identify and implement improvements to our Web site; and

(o)     provide us with assistance with the design and printing of quarterly stockholder statements.

152.    The initial term of the Transition Services Agreement commences on the date of execution and continues for the lesser of one year or the period ending 90 days after a Listing, and is renewable by Wells REIT for an additional one-year period. Thereafter, the Transition Services Agreement is automatically renewed for successive 180 day periods unless otherwise terminated. The Transition Services Agreement may terminate upon the mutual written agreement of the parties.

153.    During the initial term of the Transition Services Agreement, Wells REIT has agreed to pay to Wells REF the following fees and reimbursements:

(a)     for investor relations related services, $66,667 per month for up to 144,000 annual contacts with stockholders, with all contacts in excess of 144,000 to be billed at $5.56 per contact

(b)     for transfer agent related services of the type previously provided to us, $75,000 per month, and any special transfer agent services will be billed at $75 per hour

(c)     for investor communication support, $41,667 per month; and

(d)     reimbursement for any out-of-pocket payments, costs or expenses incurred in connection with the termination of the services or the transfer of such services

154.    Wells REF has represented and warranted in the Transition Services Agreement that the rates charged under the Transition Services Agreement do not exceed Wells REF's good faith estimate of its actual cost and do not exceed the rates that could reasonably be expected to be charged by a third party. Additional services not listed in the Transition Services Agreement may be performed upon a written request and will be billed at rates as set forth in the Transition Services Agreement.

155.    The Proxy is false and misleading because it represents that the Internalization will cause Wells REIT to become self-managed and self-advised and that Wells REIT will no

47

longer pay the fees and expense reimbursements associated with its existing Advisory

Agreements.  This is clearly false and misleading because following the Merger, Wells REIT

will continue to pay for services under the Transition Services Agreement that the Advisor

currently provides to Wells REIT.  The following chart details the services currently provided by

the Advisor which Wells REIT will continue to pay for subsequent to paying $175 million in the

Internalization.

| Duties of Advisor under current Advisory Agreements | Duties for which Wells REIT will pay additional fees to Wells REF under Transition Services Agreement |
| --- | --- |
| Manage communications with Stockholders, including answering phone calls, preparing and sending written and electronic reports and other communications to Stockholders (Section 3(d)(i) of Acquisition Advisory Agreement). | manage our communications with stockholders, including answering phone calls, emails, facsimiles, voice mails, and written inquiries, as well as initiating contact with stockholders when appropriate.<br><br>handle proxy communications, including providing assistance with the coordination of proxy statements and any householding issues;<br><br>draft and coordinate the circulation of quarterly dividend press releases and all property-related announcements;<br><br>create and maintain all marketing communications;<br><br>provide us with assistance with the design and printing of quarterly stockholder statements. |
| Provide the Board with timely updates related to the overall regulatory environment affecting Wells REIT, as well as managing compliance with such matters, including but not limited to compliance with the Sarbanes-Oxley Act of 2002. (Section 3(c)(v) of Asset Management Advisory Agreement). | provide support for our client relations department, including the responsibility for certain securities brokerage accounts, employee and employee-related accounts, as well as assistance in the monitoring and supervising of regulatory activities. |
| Maintain and preserve the stock books and records of Wells REIT, reflecting a record of the Stockholders and their ownership of Wells REIT's uncertificated Shares and acting as transfer agent for Wells REIT's uncertificated Shares. (Section 3(c)(i) of Acquisition Advisory Agreement). | process and pay share redemptions and dividends to stockholders;<br><br>coordinate certain IRA related services. |

| | |
|---|---|
| Provide tax and compliance services and coordinate with appropriate third parties, including independent accountants and other consultants, on related tax matters. (Section 3(c)(iv) of Asset Management Advisory Agreement). | process tax returns. |
| Investigate, select, and, on behalf of Wells REIT, engage and conduct business with such Persons as the Acquisition Advisor deems necessary to the proper performance of its obligations hereunder, including but not limited to consultants, accountants, correspondents, lenders, technical advisors, attorneys, brokers, underwriters, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents, banks, builders, developers, property owners, mortgagors, and any and all agents for any of the foregoing, including Affiliates of the Acquisition Advisor, and Persons acting in any other capacity deemed by the Acquisition Advisor necessary or desirable for the performance of any of the foregoing services, including but not limited to entering into contracts in the name of Wells REIT with any of the foregoing. (Section 3(b)(i) of Acquisition Advisory Agreement). | Serve as primary contact for general media inquiries; broker dealers and financial advisors; coordinate quarterly financial advisor conferences. |
| Provide or arrange for administrative services and items, legal and other services, office space, office furnishings, personnel and other overhead items necessary and incidental to Wells REIT's business and operations. (Section 3(d)(ii) of Asset Management Advisory Agreement). | provide us with research and other support relating to the preparation of responses to any subpoenas. |
| Serve as Wells REIT's investment and financial advisor and provide research and economic and statistical data in connection with Wells REIT's investment policies. (Section 3(a)(i) of Asset Management Advisory Agreement). | perform data research and general industry research. |
| Administer, manage and maintain stock transfers in a diligent, careful and vigilant manner in accordance with the Exchange Act rules and regulations applicable to registered transfer agents, and the services shall be of the scope and quality of those generally performed by professional transfer agents of other similar corporate entities. (Section 3(c)(ii) of Acquisition Advisory Agreement). | handle any escheatment issues. |
| Establish technology infrastructure to assist in providing Stockholder support and service. (Section 3(d)(ii) of Acquisition Advisory Agreement). | coordinate the placing of materials on our Web site and identify and implement improvements to our Web site. |

156.     Moreover, the Proxy is false and misleading because it fails to disclose the additional benefit that Defendant Wells will receive as the sole stockholder of Wells REF pursuant to the fees paid to Wells REF under the Transition Services Agreement.  The Proxy fails to disclose that Defendant Wells stands to benefit from the Internalization above and beyond his 92% interest in WASI.

157.     In addition, not only does the Proxy mask the fact that Wells REIT will continue to pay for services under the Transition Services Agreement after Wells REIT pays $175 million to become "self-advised," but this is not disclosed in the Fairness Opinion at all.  Without such disclosures, the Class is left with an incomplete picture of what exactly Wells REIT is purchasing for $175 million.

158.     The Proxy did not provide any meaningful information, evaluation or comparison concerning the Transition Services Agreement, which would have been material to a member of the Class in determining how to cast their vote on the Proxy and on the Merger.

### b.  Support Services Agreement

159.     Prior to the Closing of the Internalization, WREAS will enter into the Support Services Agreement with Wells REF which will provide WREAS and Wells REIT with certain support services, including human resources services and information technology services. Specifically, Wells REF agrees to, among other things:

(a)     handle all payroll administration duties;

(b)     coordinate retirement and other employee savings benefit plans;

(c)     administer, manage and maintain employee health and wellness plans, as well as all other applicable plans, including any supplemental plans; and

(d)     provide information technology services.

160.     The initial term of the Support Services Agreement commences on the date of execution and continues for a two-year period, and Wells REIT has the right to renew the Support Services Agreement for an additional two-year period. Thereafter, the agreement will automatically renew for successive one-year periods unless otherwise terminated. The Support Services Agreement may terminate upon the mutual written agreement of the parties.

161.     During the initial term of the Support Services Agreement, Wells REIT has agreed to pay to Wells REF the following fees and reimbursements:

(a)     $38.00 per employee per month for administration of payroll, retirement and savings benefits, health and wellness, supplemental plans, and other plans;

(b)     $64,167 per month for information technology services; and

(c)     Reimbursement for any out-of-pocket expenses and reasonable third party costs incurred in connection with the termination of the services or the transfer of such services.

162.     Wells REF has represented and warranted in the Support Services Agreement that the initial rates charged do not exceed Wells REF's good faith estimate of its actual cost and do not exceed the rates that could reasonably be expected to be charged by a third party.

163.     The Proxy is false and misleading because it represents that the Internalization will cause Wells REIT to become self-managed and self-advised and that Wells REIT will no longer pay the fees and expense reimbursements associated with its existing Advisory Agreements. This is false and misleading because following the merger, Wells REIT will continue to pay for services under the Support Services Agreement that the Advisor currently provides to Wells REIT. The following chart details the services currently provided by the

Advisor which Wells REIT will continue to pay for subsequent to paying $175 million in the Internalization.

| Duties of Advisor under current Advisory Agreements | Duties for which Wells REIT will pay additional fees to Wells REF under Support Services Agreement |
| --- | --- |
| Provide or arrange for administrative services and items, legal and other services, office space, office furnishings, personnel and other overhead items necessary and incidental to Wells REIT's business and operations. (Section 3(d)(ii) of Asset Management Advisory Agreement). | handle all payroll administration duties; <br><br> coordinate retirement and other employee savings benefit plans; <br><br> administer, manage and maintain employee health and wellness plans, as well as all other applicable plans, including any supplemental plans. |
| Establish technology infrastructure to assist in providing Stockholder support and service. (Section 3(d)(ii) of Acquisition Advisory Agreement). | provide information technology services. |

164.    Moreover, the Proxy is false and misleading because it fails to disclose the additional benefit that Defendant Wells will receive as the sole stockholder of Wells REF pursuant to the fees paid to Wells REF under the Support Services Agreement. The Proxy fails to disclose that Defendant Wells stands to benefit from the Internalization above and beyond his 92% interest in WASI.

165.    In addition, not only does the Proxy mask the fact that Wells REIT will continue to pay for services under the Support Services Agreement after Wells REIT pays $175 million to become "self-advised," but this is not disclosed in the Fairness Opinion at all. Without such disclosures, the Class is left with an incomplete picture of what exactly Wells REIT is purchasing for $175 million.

166.    The Proxy did not provide any meaningful information, evaluation or comparison concerning theses Services Agreements, which would have been material to a member of the Class in determining how to cast their vote on the Proxy and on the Merger.

### 3.    The Proxy Contains Materially False And Misleading Statements Concerning the Subordinated Incentive Fee

167.    Absent a Merger, if Wells REIT was listed on a national stock exchange, the Asset Advisor would be entitled to receive Subordinated Incentive Fees.

168.    The Advisor would be compensated with the following "Subordinated Incentive Fee" at the time of the Listing:

Upon Listing, Asset Advisor shall be entitled to the Subordinated Incentive Fee in an amount equal to 10.0% of the amount by which (i) the market value of the outstanding stock of Wells REIT, measured by taking the Aggregate Share Trading Value, plus the total of all Dividends paid to Stockholders from Wells REIT's inception until the date of Listing, exceeds (ii) the sum of (A) 100% of Invested Capital and (B) the total Dividends which would be required to be paid to the Stockholders in order to pay the Stockholders' 8.0% Return from inception through the date of Listing. The Subordinated Incentive Fee shall be paid in cash or, at the option of Wells REIT, may be paid in Shares; provided, that in the event Wells REIT elects to pay all or some portion of the Subordinated Incentive Fee in Shares, the Asset Advisor shall have the right to cause such Shares to be registered with the Securities and Exchange Commission pursuant to the terms of a registration rights agreement in such form as shall be negotiated between the parties and mutually agreed upon by both Wells REIT and Asset Advisor prior to the issuance of such Shares. If some or all of the Subordinated Incentive Fee is paid in Shares, the value of such Shares shall be determined by using the average closing price or average of bid and asked price, as the case may be, over a period of 30 days during which the stock is traded, with such period beginning 180 days after Listing. The Subordinated Incentive Fee will be reduced by the amount of any prior payment to Asset Advisor of a deferred Subordinated Share of Net Sales Proceeds from a Sale or Sales of Property. In the event the Subordinated Incentive Fee is paid to Asset Advisor following Listing, no other performance fee will be paid to Asset Advisor.

169.   Initially, this was the key method set out in Wells REIT's offering documents and the Advisor Agreements by which the Advisor could be objectively evaluated and compensated for adding value to the Company at the time of a Listing. Approval of the Merger will terminate the Advisor and eliminate this provision.

170.   In their disclosures to investors concerning the Listing of the Company, the prospectuses did not discuss the possibility that the Advisor would have to be Internalized prior to a Listing, instead the investors were informed that:

> If our shares are not listed for trading on a national securities exchange or included for quotation on NASDAQ by January 30, 2008, our articles of incorporation require us to begin the process of selling our properties and distributing the net sale proceeds to you in liquidation of the Wells REIT. In making the decision to apply for listing of our shares, our directors will try to determine whether listing our shares or liquidating our assets will result in greater value for the stockholders. We cannot determine at this time the circumstances, if any, under which our directors will agree to list our shares. Even if our shares are not listed or included for quotation, we are under no obligation to actually sell our portfolio within this time period since the precise timing will depend on real estate and financial markets, economic conditions of the areas in which the properties are located and federal income tax effects on stockholders which may be applicable in the future. Furthermore, we cannot assure you that we will be able to liquidate our assets, and it should be noted that we will continue in existence until all properties are sold and our other assets are liquidated. In addition, we may consider other business strategies such as reorganizations or mergers with other entities if our board of directors determines such strategies would be in the best interests of our stockholders. Any change in the investment objectives set forth in our articles of incorporation would require the vote of stockholders holding a majority of our outstanding shares.

171.   Then, the Wells REIT investors were told that the Advisor would be subject to Incentive Fees upon listing – not that the REIT would have to purchase the Advisor for millions.

172.   The Merger then becomes a replacement for these previously disclosed and contractual agreements. The Proxy is thus false and misleading because it does not disclose a

discussion or explanation as to why these provisions should be abandoned and what the Incentive

Fee formula would have, if applied, garnered for the Advisor.

173.    In addition, in this regard, the Proxy should at least disclose (i) the current status

and amount of the 8% preferred return arrearage and (ii) The price at which the shares would

have to trade in order for the advisor to receive $175 million of incentive compensation. And,

since the Incentive Fee payable to the Advisor upon the sale of the Company's properties is

subordinated to these returns, the Proxy should have disclosed the amount that would have been

received by the Advisor assuming, *arguendo,* Defendants' NAV of $8.93.

174.    The Proxy did not provide any meaningful information, evaluation or comparison

concerning the Incentive Fee, which would have been material to a member of the Class in

determining how to cast their vote on the Proxy and on the Merger.

### 4.    The Fairness Opinion is False and Misleading.

175.    The Proxy contains materially false and misleading statements concerning the

Advisor's value.  The fairness opinion which is contained as part of the Proxy and opines on the

propriety of the Merger Consideration is false and misleading.

176.    The Special Committee retained Houlihan Lokey Howard & Zukin Financial

Advisors, Inc. ("Houlihan Lokey") to issue a fairness opinion to the Special Committee and

Wells REIT's Board in connection with the Internalization.[5]

177.    On January 31, 2007, Houlihan Lokey delivered its oral opinion, which was

---

[5]    The Proxy states that "Houlihan Lokey is an internationally recognized investment
banking firm which is regularly engaged in the valuation of businesses and securities in
connection with mergers and acquisitions . . . [and] [t]he Special Committee selected Houlihan
Lokey to issue the fairness opinion in connection with the Internalization based in part on
Houlihan Lokey's experience in transactions similar to the Internalization and its reputation in
the REIT sector and investment community."  This statement is glaring in light of Houlihan's
failure to use as part of its analysis one of the most recent comparable internalization transactions
involving CNL Hotels & Resorts, Inc. which valuation of initially over $300 million was
challenged by shareholders as an excessive valuation. *See* ¶ 182, below.

confirmed by delivery of a written opinion to the Special Committee and Wells REIT's Board

dated January 31, 2007, to the effect that, as of the date of the opinion and based on and subject

to various assumptions and limitations described in its opinion, the consideration to be paid by

Wells REIT in the Internalization "is fair to [Wells REIT] from a financial point of view."

178.    The Houlihan Lokey "Fairness" Opinion ("Fairness Opinion") states, in relevant

part: "the management of Wells REF advised Houlihan Lokey, and Houlihan Lokey assumed,

that the financial forecasts and projections were reasonably prepared on bases reflecting the best

currently available estimates and judgments of the management of Wells REF as to the future

financial results and condition of Wells REIT and the Advisor." Houlihan Lokey prepared its

opinion based entirely on Management's projections and expressed no opinion on the forecasts

or the assumptions used, yet they predicated their entire opinion on these projections. With this

statement, Houlihan Lokey reveals, unequivocally that, notwithstanding the substance of its

Fairness Opinion, it is only as good as the foundation upon which it is built -- financial

information and assumptions provided by the Advisor.

179.    In addition to its inherently flawed foundation, the Fairness Opinion is also false

and misleading in at least the following respects:

> **a.    The Assumptions Used in the Fairness Opinion Are Not
> Supported By History and Comparable Transactions, and are
> thus, Unreasonable, False and Misleading.**

180.    The Proxy notes that Houlihan Lokey made the following "material assumption:

-- that the Company does not intend to (1) liquidate or (2) sell all or substantially all of the assets

of the Company, or all or substantially all of the ownership interests in the Company, in one or

several transactions…" Therefore, Houlihan Lokey assumed that the Company would List.

181.    As just alleged, given the recent history of non-listed REITs and the business

combinations and sales of assets that occur subsequently to these comparable internalization

transactions, this is wholly improper and materially misleading assumption that undermines the foundation of the entire Fairness Opinion.

182.    Non-list REITs having completed internalization transactions have done just what Houlihan Lokey assumes they will not -- REITs have acquired their affiliated advisors for astronomical sums and do not subsequently List:

(a)    CNL Hotels and Resorts, Inc. ("CNL"), a three billion hotel non-listed REIT, sought to internalize its affiliated advisor in 2004 for $300 million. A legal action was filed by CNL shareholders challenging this transaction. Although CNL internalized its affiliated-advisor at a substantially reduced cost, it did not yet list its shares on a national stock exchange, and instead, CNL has announced that it will cash out its stockholders in a merger agreement with an entity affiliated with Morgan Stanley.[6]

(b)    Inland Retail internalized its affiliated advisor in December 2004 for $167 million, and subsequently was sold to a public REIT in February 2007, and therefore did not List.

183.    These "Internalization" transactions are ruses for affiliates of the non-Listed REITs and owners of the Advisors to unjustifiably profit at the expense of the shareholders and the company. Moreover, internalization dilutes the value of the each investor's interest in the company.

184.    Accordingly, it is materially false and misleading for the Proxy to include a Fairness Opinion a material assumption the Company will List, when such event is just as likely as not to occur, omits such information from the Proxy and does not include a Fairness Opinion that opines on whether the consideration of $175 million is fair to the stockholders if some event, other than a Listing occurs. This is material information a reasonable shareholder would consider important in deciding how to vote on the Proxy.

---

[6]    In contrast, Dividend Capital Trust ("DCT"), also a non-listed REIT, did internalize its advisor and then list. In 2006, DCT's affiliated-advisor received DCT shares worth $170 million. Investors had invested approximately $10.25 per share for the DCT's shares and DCT was subsequently listed on the New York Stock Exchange in December 2006. DCT's shares currently trade for around $11.80.

**b.**    ***The Fairness Opinion Does Not Consider or Opine on the
Services Agreements That Remain in Place After the Merger.***

185.    As alleged above, subsequent to the consummation of the Merger, certain

Defendants and affiliates of the Advisor will continue to reap fees from the Company, pursuant

to the Services Agreements, for services that were purportedly performed by the Advisor that is

now being acquired for $175 million.

186.    Houlihan Lokey opines that the $175 million consideration is "fair" to the

stockholders but does not consider or discuss in rendering its Fairness Opinion the import or

impact of the Services Agreement on the $175 million consideration.   It is false and misleading

for the shareholders to be presented in the Proxy with a Fairness Opinion that does not consider

or opine on the Services Agreements that will garner fees for certain Defendants and their

affiliates for services that are supposedly being internalized under the Merger Agreement, after

such Merger is consummated.

187.    The existence of the Services Agreements (discussed above ¶¶ 147-166), and

Houlihan Lokey's failure to consider or opine on the Services Agreements as part of its Fairness

Opinion, renders the Fairness Opinion misleading and useless to the stockholders in rendering

their vote on the proposals in the Proxy.

188.    In addition, as certain services that were to be provided by the Advisor are now

going to be provided by certain Defendants and the Advisor's affiliates under the Services

Agreements, the Fairness Opinion is false, misleading and meaningless in that it did not value

the various services and components of the Advisor's business that were being acquired for $175

million.  Instead of having separately analyzed and valued the Advisor's business and services,

the Fairness Opinion is based on an analysis that inappropriately bundles and aggregates the

Advisor's business, thereby either ignoring or obfuscating the existence of these Services

Agreements.  Accordingly, the Fairness Opinion is false, misleading and meaningless to the

stockholders by not providing an appropriate, segmented valuation of the Advisor, that would

have taken into consideration the fact that these Services Agreements would be necessary and

that the Company and stockholders were to continue to pay external-affiliated entities for

services that the Advisor was supposedly performing, that were to have been internalized. This is

material information a reasonable shareholder would consider important in deciding how to vote

on the Proxy.

<em>c. <strong>The Fairness Opinion is False and Misleading in its Use of Non-<br>Comparable Companies and Transactions.</strong></em>

189.    The Fairness Opinion contains specific analyses that are flawed and obfuscate the

true nature of the Advisor's business and profitability in order to support management's inflated

valuation, by using non-comparable companies and transactions.  Such analyses include:

<em>i. <strong>Assets under Management Analysis.</strong></em>

190.    This is calculated by Houlihan Lokey as the enterprise value as a percentage of

assets under management.  Enterprise value is equal to a company's market capitalization minus

cash and cash equivalents plus preferred stock and debt.  For this analysis Houlihan Lokey

selected 10 publicly traded companies, calculated their enterprise value and determined that their

value fell within a range of 2.21% to 6.49% of the assets they managed and therefore the 4.2% of

Wells REIT's NAV, that the $175 million represented, was fair from a financial point of view.

191.    The Proxy does not disclose is that the 10 companies Houlihan Lokey selected are

not comparable to the Advisor.  The 10 companies managed securities and money funds and the

value of the funds under their control was, on average, almost $200 billion. The Advisor

manages $5 billion of real estate assets, an entirely different business. Not one of the companies

in this analysis was involved in the management of real estate assets.

59

192.   Further, value is a function of profitability and it is impossible to compare the operations of the labor intensive low margin real estate management business that is the Advisor's to the much more profitable, highly leveraged as to labor costs, money management business which was that of the ten companies mentioned. This analysis is misleading and irrelevant. This is material information a reasonable shareholder would consider important in deciding how to vote on the Proxy.

### ii.    Selected Companies Analysis.

193.   This is calculated by Houlihan Lokey as the enterprise value as a multiple of estimated EBITDA (earnings before interest, taxes, depreciation and amortization) for seven selected real estate advisory companies and financial advisory companies. Three of the companies used in this analysis are misleading, for the reasons set forth in ¶¶191-192, Assets under Management Analysis.  In addition, Houlihan Lokey points to Marsh & McLennan, the business of which is primarily insurance brokerage, which is not a comparable company.

194.   As for the three real estate related companies included in the analysis, Houlihan Lokey states that it took into consideration the Advisor's size relative to the selected companies but the Proxy fails to disclose how it took relative size into consideration, the actual size of the purportedly comparable companies, the percentage that EBIDTA represented of enterprise value and several other relevant measurements that should have been discussed and disclosed to shareholders. This is material information a reasonable shareholder would consider important in deciding how to vote on the Proxy.

195.   Moreover, the final three companies referred to by Houlihan Lokey are Grubb and Ellis, CB Richard Ellis, and Jones, Lang Lasalle, all of which are publicly traded and owned companies in contrast to the Advisor's private ownership. Table I contains summary information (information that was not contained in the Proxy) about these companies' financials which reveal

their incomparability to the Advisor:

## TABLE I

| (in Millions) | Grubb & Ellis FY 2006 | | CB Richard Ellis YE 2005 | | Jones Lang Lasalle YE 2005 | | Annualized Advisor 2006 | |
|---|---|---|---|---|---|---|---|---|
| Gross Revenue | $ | 490 | $ | 2,911 | $ | 1,390 | $ | 33 |
| Operating Expenses before Interest | | 474 | | 2,493 | | 1,225 | | 13 |
| Cash From Operations | $ | 16 | $ | 418 | $ | 165 | $ | 20 |
| Gross Profit Percentage | | 3% | | 14% | | 12% | | 60% |
| Total Assets | $ | 94 | $ | 2,819 | $ | 1,145 | $ | 1 |

196.    Among other things this Table I depicts that the Advisor was generating a 60% "gross profit percentage" (as a result of the excessive fees and self-dealing nature of its business with Wells REIT), but only had gross revenue of $33 million which stands in stark contrast to the approximately $500 million to $3 billion in gross revenue generated by the purportedly comparable companies. It should be noted that the incredible operating success of the Advisor was the result of an investment of less than $1 million, as compared to the substantial investments in assets and infrastructure made by the other companies as shown above. It is materially false and misleading for the Proxy and its Fairness Opinion to use these selected companies in the analysis.

### iii.    Precedent Transactions Analysis.

197.    This is calculated by Houlihan Lokey as the enterprise value as a multiple of EBITDA based on the purchase prices paid in selected transactions involving companies providing real estate services. This analysis differed from the others because all of the companies are real estate and it includes internalization transactions involving other non-listed REITs. However, it is flawed and contains false and misleading statements for several reasons:

(a)    Houlihan Lokey provided a range of multiples of enterprise value to EBITDA of 5.9x to 27.5x with a mean of 8.1x and a median of 13.5x. These are wide ranges

when applied to only 9 transactions. Thus, it would be material to identify (which was not done) which multiple attached to which transaction.

(b)    The EBITDA of public companies, which is closely related in amount to the cash flow calculation discussed in the selected company analysis, is not comparable to non-listed REIT advisors.

(c)    Several non-listed REIT internalization transactions are noted as comparables but material information about the key and most comparable transactions are not included in the Proxy. This information, which includes the following, is material to a Wells REIT shareholder voting on a substantially similar internalization transaction:

1.    *Inland Retail*. The Proxy fails to disclose that it is not a comparable transaction because unlike here, investors were informed in the company's prospectuses and registration statements that a purchase or internalization of the advisor was contemplated and that such internalization, and the consideration to be paid, would be governed by a <u>predetermined</u> formula. These material facts were not disclosed in the Proxy.

2.    *CNL Retirement*. The Proxy fails to disclose that (i) the advisor purchase was separate from the purchase of company; (ii) the advisor's business was based on different economic terms than the Advisor; (iii) the investors in CNL Retirement realized a 35% appreciation on their investment meaning that the advisor would have (unlike here, *see* ¶¶ 167-174, *above)* received an subordinated incentive fee at the price the company was sold.

3.      The Proxy fails to disclose the **CNL Hotels** internalization

transaction (discussed above in ¶ 182), and why or why not as a comparable

transaction it was not part of the analysis underlying the Fairness Opinion.

4.      The Proxy fails to disclose that Hartman Commercial Properties

Inc. (also a non-listed, externally managed REIT) fired its affiliated-external

advisor after the company's board reviewed the performance of its affiliated

advisor and decided that its performance did not justify renewal of the advisory

agreement.

198.    In sum, the Proxy, Fairness Opinion and the valuation of the Advisor are based on

false and misleading statements about assumptions and comparable companies and transactions.

The Wells REIT shareholders have no meaningful information to assess and vote on the

consideration to be paid for the Advisor.

### d.      *The Proxy and Fairness Opinion Omit Material Facts About the Advisor's Projected Earnings.*

199.    The Fairness Opinion was based on "Projected Earnings" reflecting all of the

anticipated expenses that go to the operations of Wells REIT.  The Proxy omits material facts

about the projections of profitability underlying the Projected Earnings which are material to

determine the viability and probability of the projections utilized to value the Advisor.

### e.      *The Fairness Opinion Uses Inflated Historical Financial Statements.*

200.    The historical financial statements of the Advisor as set out in the Proxy as part of

the Fairness Opinion, are false and misleading because they include inflated cash flows.  The

Advisor has been earning excessive fees and being reimbursed for expenses that are now forming

the basis for the Proxy's Fairness Opinion given to the stockholders.  For example, the Advisor

has been reimbursed by Wells REIT for the salaries and wages it paid (in addition to the fees it

was paid) in 2004 and 2005 totaling in excess of $8 million each year.

201.    The Advisor's historical financial information set out in the Proxy is also false and misleading in that it provides no break-down of the sources of income and categories of expenses of the Advisor, thus, making an evaluation of the Advisor's historical cash flow impossible.

#### f.    The Fairness Opinion and Valuation Use Unsupported Assumptions and Multiples.

202.    To arrive at a $175 million value (or to state that $175 million in consideration to be paid for the Advisor was fair to the Company), requires a multiple of 17.5 times the Advisor's historical cash flow. Such a multiple is, on its face, unprecedented and unsupported by comparable transactions.

### 5.    The Proxy Makes False and Misleading Statements About a Prior Valuation Done of the Advisor

203.    On December 21, 2005, Wells incorporated WREAS as a wholly-owned subsidiary of Wells Management. On December 21, 2005, Wells Management and Wells Capital, along with eight executives of Wells REF, including Defendants Williams, Fretz, Miller, and five other executives of Wells REF, formed WASI.

204.    To determine the relative values of the capital contributions made by Wells Management, Wells Capital and the eight executives of Wells REF (the "minority members") to WASI, Wells REF engaged an independent third party to determine the estimated fair market values of the Asset Management Advisory Agreement, the Acquisition Advisory Agreement and the Master Property Management Agreement as of the date such contracts were contributed to WASI.

64

205.    The valuation estimated the fair market value of each such contract using a discounted cash flow income approach commonly utilized in estimating the fair market value of intangible assets.  And based upon such procedures, the estimated fair market values of the Asset Management Advisory Agreement, the Acquisition Advisory Agreement and the Master Property Management Agreement were determined to be $71,734,000, $3,942,000 and $1,762,000, respectively, as of their applicable assignment dates, with the aggregate value of all three of the contracts totaling approximately $77.5 million.

206.    The Defendants then reduced the $77.5 million by applying discounts for lack of marketability, lack of control, and uncertainties resulting from the subordination of the economic interests of the minority members and Wells Capital.

207.    The restructuring of the Advisor and concurrent distribution of its ownership among Wells REIT's officers and directors, and the Defendants, was a vehicle for them to reap benefits from a future, and now realistic, internalization of the Advisor.

208.    At least the following material information is omitted from the Proxy on this matter:

(a)    The Proxy omits material facts as to the variance in the value now ascribed to the Advisor, which is essentially the same entity (except that Wells Government Services is included with the Advisor).

(b)    The Proxy omits material facts underlying the prior valuation including the financial operating information and assumptions used.

(c)    There is no basis for the shareholders to evaluate whether or why the same, or different assumptions and financial information (including income stream) that generated a $77.5 million valuation is now generating a $175 million valuation.

### 6.    The Proxy Contains Materially False And Misleading Statements Concerning the Pricing of Wells REIT's Stock

209.    The Proxy stated that the per share price of Wells REIT's stock ($8.9531 per share) used to calculate the number of Wells REIT's shares need to arrive at $175 million of Merger Consideration was derived as follows:

(a)    The $8.93 estimated net asset value per share was provided by an independent third party which based its estimate upon (1) the appraised value of our real estate assets as of September 30, 2006, and (2) consideration of the current value of our other assets and liabilities as of September 30, 2006 (including the contingent liability for the subordinated disposition fee described below). This estimated net asset value per share is only an estimate, and is based upon a number of assumptions and estimates, which may not be accurate or complete. There were no liquidity discounts applied to this estimated valuation or discounts relating to the fact that we are currently externally managed, and no attempt was made to value the Company as an enterprise. Further, this should not be viewed as the amount a stockholder would receive in the event that we were to list our shares in the future or to liquidate our assets and distribute the proceeds to our stockholders since, among other things, this valuation was not reduced by potential real estate brokerage commissions or other costs of sale.

(b)    As described elsewhere in this proxy statement, the Special Committee negotiated the amount of the Internalization consideration by negotiating an aggregate price expressed in dollars ($175 million) and agreeing to use the September 30, 2006 estimated net asset valuation as a basis for determining the number of shares that would represent $175 million in value; however, since the estimated net asset valuation took into account an approximately $12.4 million subordinated disposition fee otherwise payable to the Advisor upon a liquidation of our properties at their September 30, 2006 appraised values, and the obligation to pay this contingent liability would be extinguished upon the acquisition of the Advisor, the parties agreed in the Definitive Merger Agreement to use a per-share value of $8.9531 (calculated by excluding the potential liability for the subordinated disposition fee) to determine the amount of shares paid as Internalization Consideration and to Wells Capital in the Internalization Transaction. Since at present there is no active trading market for our shares of common stock, there is no objective way to precisely value the shares that WASI will receive in the Internalization.

210.    As to whether such price of Wells REIT's stock could deviate from $8.9531 per share, the Proxy only disclosed that:

If we complete a Listing in the future, the prices at which our common stock trade following the Listing will provide a more objective indication

of the value of each share received by WASI. If the fair market value of the 19,546,302 shares to be received by WASI in the Internalization turns out to be greater than $8.9531 per share, WASI will have received consideration worth more than $175 million for the Internalization. Conversely, if the fair market value of those shares turns out to be less than $8.9531 per share, WASI will have received consideration worth less than $175 million. Neither party has the right to terminate the Definitive Merger Agreement due to any change in the fair market value of our common stock. If we pursue and complete a Listing, our common stock may trade in the public market at prices higher or lower than $8.9531 per share.

211.    The only factor used to determine the number of shares that will be received by the Advisor is Defendants' calculation and use of the $8.9531 per share figure.  The stockholders are being asked to, via the Proxy, flatly accept this per share, without material information as to how this per share price was derived.  In addition, the Proxy's explanation as to how the Merger Consideration could fluctuate (and thus, the Advisor's owners could receive excessively more consideration) depending on the pricing of the Wells REIT's shares in the future, and especially, upon any Listing, is materially misleading and false.

212.    Specifically the Proxy is false and misleading in failing to disclose all of the assumptions that were used to arrive the $8.9531 per share price.  These facts are material to evaluating the propriety of the Merger Consideration.

213.    In addition, other than having generally stated that there could be potential fluctuations in the $175 million consideration if the market value of the shares following a Listing exceeds $8.9531, the Proxy omits at least the following material facts:

> (a)    REITs currently trade at prices that do not necessarily correspond to NAV, and therefore the evaluation of the Company as if it were to trade as a REIT was essential.  If office REITs commonly trade at prices that exceed NAV, then Defendants' per share price of $8.9531 would be understated.  No attempt was made to provide such a valuation.

> (b)    No trading history of comparable listed office REITs.

214.    Such facts are meaningful and material to investors in deciding how to vote on the Proxy and Merger in order to evaluate the Merger Consideration.

215.    In sum, the Proxy did not provide any meaningful information, evaluation or comparison concerning the pricing of Wells REIT stock, which would have been material to a member of the Class in determining how to cast their vote on the Proxy and on the Merger.

### 7.    The False and Misleading Statements About the Advisor's Performance

216.    The shareholders are asked to vote for a self-dealing, non-arms length transaction, in which certain Defendants would receive almost $175 million for their interests in the Advisor.

217.    The shareholders are entitled to information concerning the Advisor's past performance.

218.    Specifically, the Proxy omits information concerning how the Advisor has performed based on industry and role specific criteria.

219.    Absent such material information, a shareholder cannot make an informed decision concerning the Merger.

220.    Such material information would include:

(a)    the success of the Advisor in generating opportunities that meet the investment objectives of the Company;

(b)    the quality and extent of service and advice furnished by the Advisor;

(c)    the performance of the investment portfolio of the Company, including income, conservation or appreciation of capital, and number and frequency of problem investments; and

(d)    the quality of the Asset portfolio of the Company in relationship to the investments generated by the Advisor for its own account.

C.    **Breaches of Fiduciary Duty by the Individual Defendants and the Advisor**

221.    The Advisory Agreements are annual contracts; the most recent Advisory Agreements are to terminate on January 1, 2008, and thereafter are automatically extended for an additional one year period unless terminated at an earlier date upon 60 days prior written notice by either party.

222.    The Advisory Agreements are inherently vehicles for the Individual Defendants and the Advisor to act in a self-dealing manner and in conflict of the fiduciary duties owed to Wells REIT and its stockholders.

223.    It was incumbent on the Individual Defendants and the Advisor to implement appropriate measures to assure that the Advisor and Advisory Agreements did not become a vehicle for wrongful self-dealing. The Individual Defendants and the Advisor failed to implement such measures, and consequently breached the fiduciary duties of loyalty, good faith and due care that they owed to Wells REIT and the Wells REIT stockholders.

224.    The Individual Defendants and the Advisor sought to conceal those breaches of fiduciary duty and to effectuate a merger of Wells REIT and the Advisor that would permit the Individual Defendants who owned the Advisor to exploit and capitalize on those breaches of fiduciary duty.

1.    **The Advisor Performed Poorly and Such Poor Performance was Left Unchecked by the Defendants.**

225.    Wells REIT's Articles of Incorporation state that each of the directors serves in a fiduciary capacity to the Company and has a fiduciary duty to the Stockholders of the Company, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor:

The Directors are responsible for setting the general policies of the Company and for the general supervision of its business conducted by officers, agents, employees, advisors or independent contractors of the Company. However, the Directors are not required personally to conduct the business of the Company, and they may (but need not) appoint, employ or contract with any Person (including a Person Affiliated with any Director) as an Advisor and may grant or delegate such authority to the Advisor as the Directors may, in their sole discretion, deem necessary or desirable. The term of retention of any Advisor shall not exceed one (1) year, although there is no limit to the number of times that a particular Advisor may be retained. The Advisor shall make an initial investment of $200,000 in the Operating Partnership. The Advisor or any Affiliate may not sell this initial investment while the Advisor remains a Sponsor but may transfer the initial investment to other Affiliates.

226.    In addition, each of the directors is responsible for:

    (a)    evaluating the performance of the Advisor before entering into or renewing an advisory contract and the criteria used in such evaluation shall be reflected in the minutes of meetings of the Board. The Directors may exercise broad discretion in allowing the Advisor to administer and regulate the operations of the Company, to act as agent for the Company, to execute documents on behalf of the Company and to make executive decisions which conform to general policies and principles established by the Directors.

    (b)    monitoring the Advisor to assure that the administrative procedures, operations and programs of the Company are in the best interests of the Stockholders and are fulfilled.

    (c)    determining whether any successor Advisor possesses sufficient qualifications to perform the advisory function for the Company and whether the compensation provided for in its contract with the Company is justified.

227.    The so-called "Independent Directors", which includes all directors except Wells, Williams, and Miller, are responsible for:

    (a)    reviewing the fees and expenses of the Company at least annually or with sufficient frequency to determine that the expenses incurred are reasonable in light of the investment performance of the Company, its Net Assets, its Net Income and the fees and expenses of other comparable unaffiliated REITs;

    (b)    at least annually approving each transaction with the Advisor or its Affiliates by a majority of the Independent Directors and a majority of Directors not otherwise interested in the transaction;

(c)     reviewing the performance of the Advisor and determining that compensation to be paid to the Advisor is reasonable in relation to the nature and quality of services performed and the investment performance of the Company and that the provisions of the Advisory Agreement are being carried out.

228.    In addition, the Articles of Incorporation provide that if Listing occurs, Wells REIT and the Advisor would "negotiate in good faith a fee structure. . . subject to approval by a majority of the Independent Directors." In negotiating a new fee structure, the Independent Directors were to have considered all of the factors they deem relevant, including:

(a)     the amount of the advisory fee in relation to the asset value, composition, and profitability of the Company's portfolio;

(b)     the success of the Advisor in generating opportunities that meet the investment objectives of the Company;

(c)     the rates charged to other REITs and to investors other than REITs by Advisors that perform the same or similar services;

(d)     additional revenues realized by the Advisor and its Affiliates through their relationship with the Company, including loan administration, underwriting or broker commissions, servicing, engineering, inspection and other fees, whether paid by the Company or by others with whom the Company does business;

(e)     the quality and extent of service and advice furnished by the Advisor;

(f)     the performance of the investment portfolio of the Company, including income, conservation or appreciation of capital, and number and frequency of problem investments; and

(g)     the quality of the Property portfolio of the Company in relation to the investments generated by the Advisor for its own account.

(h)     The Board of Directors, including a majority of the Independent Directors, may not approve a new fee structure that, in its judgment, is more favorable to the Advisor than the current fee structure

229.    As the Advisory Agreements drew to the point of termination each year, and most recently on December 31, 2006, the Individual Defendants and the Advisor who were fully apprised of the Advisor's performance, should have, based on the Advisor's performance

71

(measured by and as reflected in Wells REIT's dismal financial performance and condition) and Wells REIT's own criteria for assessment of the relationship with its Advisor, not renewed the Advisory Agreements or, if renewed, should have a significantly modified fee structure that reduced the Advisor's fees dramatically.

230.    Because of the inherent conflicts of interest of the Individual Defendants and the Advisor and the self-dealing nature of Wells REIT's relationship with the Advisor, action consistent with the fiduciary duties owed to the Company and its shareholders was not taken by the Advisor or the Individual Defendants.  A comparison of the performance of Wells REIT's investment portfolio to the performance of eight publicly traded office REITs with a market capitalization between $2.5 and $7.5 billion from 1999 through 2006 (as depicted in the following chart), supports the position that the Advisor's and consequently Wells REIT's performance were not in line with comparable companies:

| | Dividends 2006 | | Market Price at | | % Increase | Dividend Return on Original Investment |
| | | Y/E 2006 | | Y/E 1998 | | |
|---|---|---|---|---|---|---|
| SL Green Realty | $ 2.50 | $ 133 | $ 13 | | 1040% | 20% |
| Mack Cali Realty | $ 2.53 | $ 50 | $ 16 | | 324% | 16% |
| Liberty Property Trust | $ 2.47 | $ 48 | $ 12 | | 391% | 20% |
| Kilroy Realty | $ 2.12 | $ 77 | $ 12 | | 629% | 17% |
| Duke Reatly | $ 1.90 | $ 40 | $ 13 | | 318% | 15% |
| Brandywine Realty | $ 1.74 | $ 33 | $ 17 | | 202% | 11% |
| Brookfield Properties * | $ 0.75 | $ 39 | $ 13 | | 308% | 6% |
| Average Returns | | | | | 459% | 15% |

* Formed in June 1999

231.    This chart demonstrates that the average return generated by public REITs of similar size and investment focus was a 459% increase in share price and an average 15% return on original investment in the form of cash distributions/dividends.  This contrasts to the Company's less than 10% return on investment and the current distribution rate of 6%.

### 2.    The Merger and Internalization Are Self-Dealing Transactions

232.    The Advisor and Individual Defendants, and each of them, owe and owed to Wells REIT the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Wells REIT and in the use and preservation of Wells REIT's property and assets.

233.    The proposed Merger and Internalization, based on the allegations set forth in Section VI.B, above, constitutes a waste of its assets and places the Advisor's and Individual Defendants' own personal self-interests above Wells REIT's and its shareholders best interests.

## VII.  COUNTS

### COUNT I

### BY THE CLASS AGAINST WELLS REIT, THE ADVISOR AND THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 14(A) AND RULE 14a-9

234.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 14(a) claim.

235.    This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-1 promulgated thereunder on behalf of the Class against Wells REIT, the Advisor and the Individual Defendants.

236.    Wells REIT, the Advisor and the Individual Defendants, as more fully set forth below, provided information which was contained in the Proxy, allowed their names to be used in connection with the Proxy and the solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy, would have a continuing material relationship with Wells REIT following the votes on the Merger and other issues presented in the Proxy, solicited votes under the Proxy, and caused the Proxy to be disseminated to the Proxy

Class through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

237.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false and misleading."

238.    Defendants Wells REIT, the Individual Defendants and the Advisor solicited proxies from Plaintiffs and members of the Class by means of a Proxy Statement which contained false and misleading statements concerning, *inter alia*, the value of the Advisor, how that value was arrived at, the state of Wells REIT 's revenues and the impact thereof on Wells REIT's ability to make distributions, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

239.    These misrepresented or omitted facts are material, because, under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false or misleading statements or omitted facts important in deciding how to vote on the Proxy or a material part of the mix of information available to Class members in deciding how to exercise their voting rights.

240.    The Proxy was materially false and misleading based on the allegations contained above, specifically in Section VI.B.

241.    Each of the matters described in Section VI.B would have been considered by a reasonable investor, separately and not in the aggregate, to have been material to his or her decision in voting on the matters presented in the Proxy, and to have been a material part of the mix of information upon which such decisions were made. By reason of the foregoing, the Proxy is materially false and misleading, in violation of Section 14(a) of the 1934 Act and the rules and regulations promulgated thereunder.

242.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true, without omissions of any material facts, and not misleading. Specifically, the Defendants named in this Count are liable under Section 14(a) of the Exchange Act for the following reasons:

243.    The Advisor provided material information that it knew, understood and intended would be contained in the Proxy, and which information was false and misleading and/or omitted material and necessary facts. The information provided by the Advisor Defendant included information about its own business, finances, prospects and profitability, as well as virtually all of the information with respect to Wells REIT, its business and finances, for which it effectively functioned as its staff and management because Wells REIT had no employees or executives of its own. In addition, the Advisor was directly financially interested in the matters to be voted on in the Proxy because one of the subject matters of the Proxy was the sale of the Advisor for hundreds of millions of dollars, as well as a proposal that the Advisor be merged into and become a continuing part of Wells REIT. Finally, the Advisor allowed its name to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy.

244.    Wells REIT was the stated author and issuer of the Proxy, directly solicited votes in connection with the matters to be voted upon in the Proxy, and permitted the use of its name both in the Proxy and in that solicitation effort.

245.    The Individual Defendants as directors and/or officers of Wells REIT, allowed their names to be used in the Proxy, in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy, and affirmatively recommended in the Proxy that shareholders vote in favor of all of the proposals contained in the Proxy.

246.    The Director Defendants allowed their names to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy and allowed a description of their backgrounds and other relevant information to be used in the Proxy. The use of their names was not incidental, but rather material in connection with the solicitation of votes regarding all of the matters to be voted upon in the Proxy, including, but not limited to, their standing for election as directors of Wells REIT. The use of their names lent substantial and material support to the other matters to be voted upon and which were recommended for affirmative action by Wells REIT's Board of Directors.

247.    Director Defendants Woody, Buchanan, Carpenter, and Keogler served on the Special Committee of the Board of Directors, which recommended the Merger to the full Wells REIT Board. Further, Defendants Woody, Buchanan, Carpenter, and Keogler allowed their names and a description of their roles, duties and activities on the Special Committee, as well as their endorsement and recommendation of the Merger, to be used in the Proxy in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy.

248.    Director Defendants Wells and Woody signed the Proxy, as well as an accompanying explanatory letter to shareholders (which was part of the Proxy solicitation materials) that contained the Board's recommendation in favor of each proposal for which proxies were being sought by Wells REIT.

249.    Director Defendants Wells, Williams and Miller and Individual Defendant Fretz were directly financially interested in the outcome of the votes being solicited by the Proxy because of their significant ownership interest in the Advisor.

250.    The Individual Defendants, the Advisor Defendants, and Wells REIT, directly, or through the employ of others, solicited votes for the matters to be voted upon in the Proxy.

251.    None of the materially false and misleading statements contained in the Proxy, or material matters omitted from the Proxy, all as described above, were known to Plaintiffs or the Proxy Class at the time they voted on the matters presented to them in the Proxy.

252.    As a result of these Proxy violations, the Class members are threatened with irreparable injury, for which there is no adequate remedy at law, as well as substantive economic damages.

## COUNT II

## BY CLASS AGAINST THE ADVISOR AND THE  INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

253.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 20(a) claim.

254.    This Count is asserted under § 20(a) of the Exchange Act on behalf of the Class against the Advisor and the Individual Defendants.

255.    As described in Count I, Wells REIT, the Advisor and the Individual Defendants provided information which was contained in the Proxy, allowed their names to be used in connection with the Proxy and the solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy, would have a continuing material relationship with Wells REIT following the votes on the Merger and other issues presented in the Proxy,

solicited votes under the Proxy, and caused the Proxy to be disseminated to the Proxy Class through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

256.    With respect to the Proxy, the Advisor and the Individual Defendants acted as controlling persons of within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of authority as officers and/or directors of Wells REIT, and their ability to control the activities of Wells REIT, particularly with regard to the Proxy which they caused Wells REIT to issue, and their exercise and use of that control, the Individual Defendants had the power, influence and authority to cause or prevent the wrongful conduct described herein.  Each of the Individual Defendants, other than Miller and Fretz, approved and recommended the transactions which were presented in the Proxy which are being challenged by this Complaint.  Each of the Individual Defendants is sued as a direct participant in the wrongdoing alleged herein and in his capacity as a controlling person of Wells REIT.  In addition, based on the allegations made herein, the Advisor had the power, influence and authority to cause or prevent the wrongful conduct described herein.

257.    None of the materially false and misleading statements contained in the Proxy, or material matters omitted from the Proxy, all as described above, were known to Plaintiffs or the Proxy Class at the time they voted on the matters presented to them in the Proxy.

## COUNT III

## BY THE CLASS AGAINST THE ADVISOR AND THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

258.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

259.    The Individual Defendants, with the exception of Defendant Fretz, are all members of the Board of Directors of Wells REIT.  As such, the Wells REIT Articles of Incorporation provide that they "have a fiduciary duty to the Stockholders of the Company, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor."  In addition, as a corporate officer, Defendant Fretz owes the fiduciary duties of loyalty, candor, and due care to the stockholders of Wells REIT.

260.    The Wells REIT Articles of Incorporation provide that the "Advisor has a fiduciary responsibility to the Company and to the Stockholders."

261.    The Individual Defendants and the Advisor, and each of them, owe and owed to the Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Wells REIT and in the use and preservation of Wells REIT's property and assets. Further, said defendants owed a duty to the shareholders of Wells REIT to supervise the relationship of the Company with the Advisor and not to place their own personal self-interest above the Wells REIT shareholders' best interests.

262.    To discharge those duties, the Individual Defendants and the Advisor and each of them were required to exercise prudent supervision over Wells REIT's management, policies, practices, controls, and financial and corporate affairs.

263.    Specifically with regard to the duty to supervise the relationship of the Company with the Advisor, the Director Defendants were responsible for:

(a)    evaluating the performance of the Advisor before entering into or renewing an advisory contract and the criteria used in such evaluation shall be reflected in the minutes of meetings of the Board. The Directors may exercise broad discretion in allowing the Advisor to administer and regulate the operations of the Company, to act as agent for the Company, to execute documents on behalf of the Company and to make executive decisions which conform to general policies and principles established by the Directors.

(b)    monitoring the Advisor to assure that the administrative procedures, operations and programs of the Company are in the best interests of the Stockholders and are fulfilled.

(c)    determining whether any successor Advisor possesses sufficient qualifications to perform the advisory function for the Company and whether the compensation provided for in its contract with the Company is justified.

264.    As the Advisory Agreements drew to the point of termination each year, and most recently on December 31, 2006, the Director Defendants owed a duty to the shareholders to evaluate the performance of the Advisor before entering into or renewing an advisory contract. As alleged herein, based upon Wells REIT's dismal financial performance and condition, had the Individual Defendants properly evaluated the performance of the Advisor, the Director Defendants should not have renewed the Advisory Agreements or, if renewed, should have a significantly modified fee structure that reduced the Advisor's fees dramatically.

265.    As alleged in this Complaint, each of the Director Defendants breached his fiduciary duties to the Class members by failing to evaluate the performance of the Advisor and permitting and causing Wells REIT to enter into the proposed Merger and Internalization, which places the Advisor's and Director Defendants' own personal self-interests above the Class members' best interests.

266.    As alleged in this Complaint, each of the Director Defendants breached his fiduciary duties to the Class members by failing to implement appropriate measures to ensure that the Advisor and the Advisory Agreements did not become a vehicle for wrongful self-dealing.

267.    Each of the Director Defendants breached his fiduciary duties to the Class members by failing to monitor the Advisor to assure that the administrative procedures, operations and programs of the Company are in the best interests of the Stockholders and are fulfilled.

268.    Each of the Director Defendants breached his fiduciary duties to the Class members by failing to determine whether the compensation provided for the Advisor in its contract with the Company is justified.

269.    Each of the Individual Defendants and the Advisor breached his fiduciary duties to the Class members by causing Wells REIT to enter into the proposed Merger and Internalization, which places the Advisor's and Individual Defendants' own personal self-interests above the Class members' best interests, and by seeking to accomplish the Merger by means of a false and misleading Proxy statement.

270.    Each stockholder suffered injury to their individual economic interests and their voting rights as a result of the wrongful conduct of the Individual Defendants and the Advisor, and several Individual Defendants received unfair benefits, at the expense of the Limited Partners.

271.    As a direct and proximate result of those breaches of fiduciary duties, the Class members have suffered damages.

## COUNT IV

## BY THE CLASS AGAINST INDIVIDUAL DEFENDANTS AND THE ADVISOR FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

272.    Plaintiff realleges and incorporate by reference each and every allegation contained above herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

273.    By their conduct complained of herein, the Individual Defendants and the Advisor have breached fiduciary duties of loyalty and due care to the members of the Class. The Individual Defendants and the Advisor owe and owed to the Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Wells REIT and in the use and preservation of Wells REIT's property and assets.

274.    Further, the Director Defendants owed a duty to the shareholders of Wells REIT to supervise the relationship of the Company with the Advisor and not to place their own personal self-interest above the Wells REIT shareholders' best interests.  As described herein, the Individual Defendants and the Advisor did not act alone in their scheme.

275.    Individual Defendants and the Advisor knowingly aided and abetted the breaches of fiduciary duty committed by the Independent Defendants to the detriment of the Class members.  Indeed, the Merger Agreement could not have been entered into without the active participation of the Individual Defendants and the Advisor.  Not only is the Merger adverse to the interests of the Class members, but certain Individual Defendants and the Advisor are to be the beneficiaries of the wrongs complained of and will be unjustly enriched.

276.    Individual Defendants and the Advisor were at all times aware of the fiduciary duties being breached by the Advisor and Individual Defendants, respectively.   Individual Defendants and the Advisor knew or should have known that as members of the Board of

Directors of Wells REIT, the Director Defendants owed "a fiduciary duty to the Stockholders of the Company, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor." Moreover, Wells REIT and the Advisor knew or should have known that as a corporate officer of Wells REIT, Defendant Fretz owed a fiduciary duty to the stockholders.

277.    Defendants Wells REIT and the Advisor knew that the Director Defendants disseminated a Proxy Statement which contained false and misleading statements concerning, *inter alia*, the value of the Advisor, how that value was arrived at, the state of Wells REIT's revenues and the impact thereof on Wells REIT's ability to make distributions, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

278.    Wells REIT and the Advisor rendered substantial and knowing assistance to the Individual Defendants in the breaches of their fiduciary duties to the stockholders by, among other things:

(a)    using Wells REIT as the instrumentalities and means to effect the Merger Agreement and Internalization for the benefit of themselves and to the detriment of the stockholders;

(b)    retaining, instructing and encouraging the preparers of the so-called fairness opinions to distort the value of the Advisor;

(c)    failing to implement appropriate measures to ensure that the Advisor and the Advisory Agreements did not become a vehicle for wrongful self-dealing.

(d)    jointly preparing and disseminating a false and misleading Final Proxy;

(e)    soliciting each stockholder's vote pursuant to the Final Proxy; and

(f)    rendering substantial and knowing assistance to the wrongful self-dealing by the Individual Defendants.

279.    By their conduct complained of herein, Individual Defendants and the Advisor are liable for aiding and abetting breach of fiduciary duties.

280.    As a direct and proximate result of the aiding and abetting of the breach of fiduciary duties, the Class members have suffered damages.

## COUNT V

## SHAREHOLDERS' DERIVATIVE CLAIM AGAINST THE ADVISOR AND THE DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(A) AND RULE 14a-9

281.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 14(a) claim.

282.    This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

283.    Each of the Director Defendants authorized the Final Proxy soliciting proxies.

284.    All Director Defendants allowed their names to be used in connection with the proxies and the solicitation of votes, solicited votes under the Final Proxy, and caused the Proxy to be disseminated through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

285.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact,

84

or which omits to state any material fact necessary to make the statements therein not false and misleading."

286.    The Director Defendants solicited votes on the Merger and Internalization by means of a Final Proxy which contained false and misleading statements concerning, *inter alia*, *inter alia*, the value of the Advisor, how that value was arrived at, the state of Wells REIT 's revenues and the impact thereof on Wells REIT's ability to make distributions, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

287.    These misrepresented or omitted facts are material, because, under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false or misleading statements or omitted facts important in deciding how to vote on the Proxy or a material part of the mix of information available to Class members in deciding how to exercise their voting rights.

288.    The Proxy was materially false and misleading based on the allegations contained above, specifically in Section VI.B.

289.    Each of the matters described in Section VI.B, would have been considered by a reasonable investor, separately and not in the aggregate, to have been material to his or her decision in voting on the matters presented in the Proxy, and to have been a material part of the mix of information upon which such decisions were made. By reason of the foregoing, the Proxy is materially false and misleading, in violation of Section 14(a) of the 1934 Act and the rules and regulations promulgated thereunder.

290.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true,

without omissions of any material facts, and not misleading.  Specifically, the Defendants named in this Count are liable under Section 14(a) of the Exchange Act for the following reasons:

291.    The Advisor provided material information that it knew, understood and intended would be contained in the Proxy, and which information was false and misleading and/or omitted material and necessary facts. The information provided by the Advisor Defendant included information about its own business, finances, prospects and profitability, as well as virtually all of the information with respect to Wells REIT, its business and finances, for which it effectively functioned as its staff and management because Wells REIT had no employees or executives of its own. In addition, the Advisor was directly financially interested in the matters to be voted on in the Proxy because one of the subject matters of the Proxy was the sale of the Advisor for hundreds of millions of dollars, as well as a proposal that the Advisor be merged into and become a continuing part of Wells REIT.  Finally, the Advisor allowed its name to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy.

292.    The Director Defendants as directors and/or officers of Wells REIT, allowed their names to be used in the Proxy, in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy, and affirmatively recommended in the Proxy that shareholders vote in favor of all of the proposals contained in the Proxy.

293.    The Director Defendants allowed their names to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy and allowed a description of their backgrounds and other relevant information to be used in the Proxy.  The use of their names was not incidental, but rather material in connection with the solicitation of votes regarding all of the matters to be voted upon in the Proxy, including, but not limited to, their standing for election as directors of Wells REIT.  The use of their names lent substantial and

material support to the other matters to be voted upon and which were recommended for affirmative action by Wells REIT's Board of Directors.

294.    Director Defendants Woody, Buchanan, Carpenter, and Keogler served on the Special Committee of the Board of Directors, which recommended the Merger to the full Wells REIT Board.  Further, Defendants Woody, Buchanan, Carpenter, and Keogler allowed their names and a description of their roles, duties and activities on the Special Committee, as well as their endorsement and recommendation of the Merger, to be used in the Proxy in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy.

295.    Director Defendants Wells and Woody signed the Proxy, as well as an accompanying explanatory letter to shareholders (which was part of the Proxy solicitation materials) that contained the Board's recommendation in favor of each proposal for which proxies were being sought by Wells REIT.

296.    Director Defendants Wells, Williams and Miller were directly financially interested in the outcome of the votes being solicited by the Proxy because of their significant ownership interest in the Advisor.

297.    The Director Defendants and the Advisor Defendants directly, or through the employ of others, solicited votes for the matters to be voted upon in the Proxy.

298.    None of the materially false and misleading statements contained in the Proxy, or material matters omitted from the Proxy, all as described above, were known to Plaintiffs or the Proxy Class at the time they voted on the matters presented to them in the Proxy.

## COUNT VI

## SHAREHOLDERS' DERIVATIVE CLAIM AGAINST THE ADVISOR AND THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

299.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

300.    The Individual Defendants and the Advisor owes Wells REIT fiduciary obligations. The Wells REIT Articles of Incorporation state that "[t]he Directors serve in a fiduciary capacity to the Company" and that "[t]he Advisor has a fiduciary responsibility to the Company." In addition, as a corporate officer, Defendant Fretz owes the fiduciary duties of loyalty, candor, and due care to Wells REIT

301.    By reason of his or its fiduciary relationships, each Director Defendant and the Advisor owed and owe Wells REIT the highest obligation of good faith, fair dealing, loyalty and due care, discharging their duties in a manner the director or officer reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.   Md. Code, Corp. & Assoc., §2-405.1.

302.    The Advisor and Director Defendants, and each of them, owe and owed to Wells REIT the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Wells REIT and in the use and preservation of Wells REIT's property and assets. Further, said defendants owed a duty to Wells REIT not to waste its assets and not to place their own personal self-interest above Wells REIT's best interests.

303.    To discharge those duties, the Advisor and Director Defendants and each of them were required to exercise prudent supervision over Wells REIT's management, policies, practices, controls, and financial and corporate affairs.

304.    As alleged in this Complaint, each of the Advisor and the Director Defendants breached his, or its fiduciary duties to Wells REIT by permitting and causing the Advisor to proceed with the courses of action described herein which materially harmed Wells REIT.

305.    As alleged above, the Advisor and the Director Defendants, and each of them, also breached his, her, or its fiduciary duties to preserve and not to waste Wells REIT's assets by conducting Wells REIT's business in a way that benefited their interests and financially damaged Wells REIT.

306.    As a direct and proximate result of the wrongful conduct alleged above, Wells REIT suffered economic injuries in an amount to be determined at trial.

**COUNT VII**
**CLASS AND DERIVATIVE CLAIM AGAINST DEFENDANTS WELLS, WILLIAMS,**
**MILLER AND FRETZ FOR UNJUST ENRICHMENT**

307.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state an unjust enrichment claim.

308.    As alleged above, Defendants Wells, Williams, Miller and Fretz have a substantial financial interest in the outcome of the votes being sought by the allegedly false and misleading Proxy and will have a continuing material relationship with Wells REIT following the votes on the Merger.  Following a vote on the Merger and Internalization, Defendants Wells, Williams, Miller and Fretz will be and will continue to be unjustly enriched at the expense of and to the detriment of the Company and the stockholders.

309.    Accordingly, this Court should order Defendants Wells, Williams, Miller and Fretz to disgorge all profits, benefits and other compensation obtained by them, and each of them, from their wrongful conduct and fiduciary breaches described herein.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    An order certifying the Class as set forth herein and designating Plaintiff as the representative thereof;

B.    A judgment declaring the Proxy to be materially false and misleading in violation of Section 14(a) of the Securities Exchange Act of 1934;

C.    A judgment declaring the conduct of the Defendants to be in violation of law as set forth herein;

D.    Declaring any authorizations secured by Defendants pursuant to the false and misleading Proxy null and void, and requiring that any resolicitation of shareholder votes shall be pursuant to Court supervision and Court-approved proxy materials;

E.    Awarding Plaintiffs and members of the Class compensation for the damages which they have sustained as a result of Defendants' unlawful conduct;

F.    Awarding Wells REIT damages it has suffered as a result of the wrongful conduct committed by the Advisor and Individual Defendants, as set forth in Counts V and VI.

G.    Declaring the Merger Proposal, including the merger agreement with the Advisor, null and void;

H.    Awarding to Wells REIT restitution from Defendants Wells, Williams, Miller and Fretz and ordering disgorgement of all profits, benefits and other compensation obtained by them, and each of them, from their wrongful conduct and fiduciary breaches alleged herein.

I.    Approving the nomination and election of new independent directors and

the retention of a new financial advisor who will assess the advisability of: continuing,

modifying or terminating the agreement between Wells REIT and the Advisor; acquiring the

Advisor and, if so, on what terms and conditions; negotiating for advisory services with another

advisor; or becoming self-advised without acquiring the Advisor;

> J.    Awarding Plaintiffs reasonable attorneys' fees, experts' fees, interest and

cost of suit; and

> K.    Such other and further relief as this Court may deem just.

### PLAINTIFFS DEMAND A JURY TRIAL

Dated:    March 12th, 2007

LAW OFFICES OF PETER G. ANGELOS, PC

By: _____

M. Albert Figinski – Bar No. 02291
H. Russell Smouse - Bar No. 01637
Glenn E. Mintzer - Bar No. 26200
Louis F. Angelos – Bar No. 27826
 One Charles Center
100 N. Charles Street
Baltimore, MD 21201-3804
Tel: (410) 649-2000
Fax: (410) 649-2150

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Lawrence A. Sucharow
LABATON SUCHAROW
   & RUDOFF LLP
100 Park Avenue
New York, NY 10017
Telephone: (212) 907-0700


Lawrence P. Kolker
WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

Thomas Michaud
Michael Moco
VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578- 1200

***Counsel for Plaintiff Washtenaw County
Employees' Retirement System***