# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE WELLS REAL ESTATE INVESTMENT TRUST, INC. SECURITIES LITIGATION | CIVIL ACTION NUMBER: 1:07-CV-00862-CAP<br><br>CLASS ACTION |

## PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................ii

**I.    INTRODUCTION** ............................................................................... 1

**II.   REPLY ARGUMENT** ......................................................................... 3

    *A.    The Advisor Defendants Solicited Proxies.* ................................... 3

    *B.    The Defendants Were Negligent.* .................................................. 7

    *C.    The Lexington Letters Were Material.* ........................................ 11

    *D.    The Proxy Was an Essential Link.* .............................................. 15

    *E.    The Class Was Injured Within the Meaning of Section 14.* ......... 19

**III.  CONCLUSION** ................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976 (E.D. Mo. 1999) ...................... 8

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ....................................... 11, 12, 15

*Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) ............................................ 9

*Berman v. Thompson*, 312 F. Supp. 1031 (N.D. Ill. 1970)................................. 10

*Blau v. Harrison*, 2009 U.S. Dist. LEXIS 17196 (N.D. Ill. Mar. 3, 2009) ..................... 12

*Caruso, et al. v. Metex Corp.,* 1992 U.S. Dist. LEXIS 14556
    (E.D.N.Y. July 31, 1992).........................................................12-13

*Dominick v. Marcove*, 809 F. Supp. 805 (D. Col. 1992)................................. 18

*Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980)....................................... 6

*J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) ....................................... 7

*Katz v. Pels*, 774 F. Supp. 121 (S.D.N.Y. 1991) ............................................ 19

*Lewis v. Byrnes*, 538 F. Supp. 1221 (SDNY 1982) ............................................ 6

*Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697 (M.D.N.C. 1992) ............................ 9

*Salit v. Stanley Works*, 802 F. Supp. 728 (D. Conn. 1992) ........................................ 9, 13

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
    128 S. Ct. 761 (2008) ............................................................... 6

*Tracinda Corp. v. DaimlerChrysler AG*,
    364 F. Supp. 2d 362 (D. Del. 2005) ....................................................... 6

*TSC Indus. v. Northway*, 426 U.S. 438 (1976) ....................................................8, 11-12, 15

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991). ...............................8, 16-18

*Vogel v. Jobs*, No. C 06-5208, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007),
    *aff'd in part and rev'd in part*, *New York City ERS v. Jobs*,
    No. 08-16488, 2010 WL 309028 (9th Cir. Jan. 28, 2010) ...............................19-20

*Wellman v. Dickenson*, 475 F. Supp. 783 (S.D.N.Y. 1979) .............................................. 10

*Wilson v. Great American Indus., Inc.*, 855 F. 2d 987 (2d Cir. 1988) ........................7-10

*Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194 (11th Cir. Fla. 2001)................................... 6

## I.   __INTRODUCTION.__

Plaintiff submits this reply memorandum and Exhibits ("Reply Ex.--") in further support of its Motion for Partial Summary Judgment [Dkt. # 344]("Pltf's MPSJ") and in response to the Advisor Defendants' Memorandum of Law [Dkt. # 386] ("Advisor Mem.") and Defendants' Joint Memorandum of Law [Dkt. # 384]("Defs. Jt. Mem.").[1]

As an initial matter, despite Defendants' opening statement to the contrary (Defs. Jt. Mem. at 1), they have not rebutted the undisputed facts relied on by Plaintiff in support of its MPSJ.  Of Plaintiff's 96 UMFs, Defendants admit 62. Defs. Resp. to UMF #s 1-3, 5-6, 10, 17-25, 30, 32-34, 36-37, 42, 49-63, 65-67, 70, 72-81, 83-86, 89-95.  As for most of the remaining UMFs, Defendants:

- object, but do not give contradictory evidence because they cannot, *see* twelve of Defs. Resp. to UMFs: # 31 (object because "entitled to vote" is not defined, despite the fact that the phrase appears 72 times in the Proxy), and #s 38-41, 43-46, 48, 87-88 (object because UMF quotes a "document in writing that speaks for itself"); and

- make baseless assertions about immateriality, *see* eleven of Defs. Resp. to UMFs: #s 8-9, 11, 14-16, 26-29 (UMFs establish Advisor entities operated the REIT and their ownership), and # 47 ("price of shares redeemed . . . is not relevant.").

Defendants' filings present no basis on which to deny Plaintiff's MPSJ. *See also,* Plaintiff's Opposition to Defendants' MSJ ("Pltf's SJ Opp.") and Response to

---

[1]  Also filed were: Defendants' Response to Plaintiff's Statement of Undisputed Material Facts [Dkt # 383]("Defs. Resp. to UMF"); Defendants' Joint Statement of Additional Undisputed Material Facts [Dkt # 385]("Defs. Jt. Add. Facts"); and Advisor Defendants' Statement of Additional Undisputed Material Facts [Dkt # 387]("Advisor Add. Facts"). Filed concurrently herewith are Plaintiff's Responses to these Additional Facts.

Defendants' Statement of Facts ("Pltf's Resp. to SOF") [Dkt #s 380, 381].

First, other than the Advisor Defendants whose position is contrary to the evidence, applicable case law and their contractual obligations, Defendants admit that they solicited proxies within the meaning of Section 14. Defs. Jt. Mem. at 10, fn 6; Advisor Mem. at 2-8. Second, notwithstanding that the Special Committee's and their advisors' purported independence and supposed deliberations about disclosure are in dispute, Defendants' reliance on these assertions is irrelevant and fails to demonstrate any "lack of negligence" in committing a Section 14 violation.[2] *Id.* at 2-3, 27-36. Defendants' admission that they knowingly withheld the Letters from the Class constitutes negligence.[3] Defs. Resp. to UMF #s 40, 57-59, 66-71, 93. Third, in disputing the materiality of the Lexington Letters, Defendants continue to ignore the significance of the Letters and misapply Section 14 legal standards. Defs. Jt. Mem. at 10-22. Fourth, Defendants misunderstand the essential link element because the Proxy and the Board's resolution, which made the approval of the Merger Agreement and Internalization contingent upon shareholder approval, and rendered the Proxy an essential link. *Id.* at 22-24.[4] Finally, Defendants' arguments with respect to injury eviscerate shareholder rights

---

[2] *See also,* Pltf's SJ Opp. at 18-22, Pltf's Additional Facts in Opp. to Defs. MSJ [Dkt # 382], #s 10-12; and Pltf's Resp. to Defs. SOF [Dkt # 381], #s 5, 7, 9.

[3] Holding otherwise would have perverse and unintended implications for Section 14 jurisprudence. *See* 6/23/2009 Order, Dkt # 300 at pages 3-4.

[4] The Proxy affirms the Board's resolution: "Pursuant to the terms of the Definitive Merger Agreement, approval of this proposal requires the affirmative vote of the holders

under Section 14.  *Id.* at 24-27. The Class, which unknowingly approved a self-dealing transaction without being provided with material information that would have shed light on the Internalization's inflated price and unfairness to the Class, was injured.

## II.   REPLY ARGUMENT

### A.   *The Advisor Defendants Solicited Proxies.*

The Advisor Defendants rely on a faulty premise – that they are "secondary actors" – to contend that they did not solicit proxies. Advisor Mem. at 2.  First, they are not "secondary actors," legally or factually.  Second, they were obligated to conduct the solicitation and were integral to the solicitation, as the very subject of the solicitation.

It is frivolous to argue that "Plaintiff has produced no evidence of any specific 'assistance' provided by the Advisor entities in the proxy preparation process," Advisor Mem. at 6, or that the Advisor Defendants did not permit the use of their names to solicit the Proxy, especially when the Advisor Defendants were so substantially connected to the Proxy, *id.* at 2-4.  Wells REIT had no employees; that was the reason the Internalization was purportedly necessary. The Advisor Defendants cannot now escape liability by disclaiming their role prior to the Internalization for which they were handsomely paid and their unquestionable and critical involvement in the Proxy solicitation process:

Since [Wells REIT] commenced operations in 1998, our day-to-day operations, including investment analysis, acquisitions, financings, development, due

of at least a majority of our outstanding shares of common stock entitled to vote …" *See* UMF # 42-48; Pltf's SJ Opp at 9; Pltf's Add. Facts # 5; Pltf's Resp. to Defs. SOF # 29.

diligence, asset management, property management and certain administrative services, such as financial, tax and regulatory compliance reporting, have been provided by Wells Capital, Inc. ("Wells Capital") and Wells Management Company, Inc. ("Wells Management"), both of which are wholly owned subsidiaries of Wells Real Estate Funds, Inc. ("Wells REF"). . .

Such advisory, asset management and property management agreements have since been transferred and contributed to Wells Real Estate Advisory Services, Inc. ("WREAS") . . . In addition, certain of our properties having primarily government tenants are being managed by Wells Government Services, Inc. ("WGS").

WREAS and WGS are both wholly-owned subsidiaries of Wells Advisory Services I, LLC ("WASI") (references to the "Advisor" in the accompanying proxy statement include, collectively, WREAS, WGS and their predecessors, as applicable, including those portions of the operations of Wells Capital and Wells Management which previously provided advisory and management services to us under such advisory, asset management and property management agreements). . .

Upon consummation of the Internalization, WREAS and WGS will be our wholly-owned subsidiaries, and the Advisor's employees will become our employees.

Tab 2 to Defs. SOF, Proxy at WashI_00003467. Of course, the Proxy is replete with references to the Advisor Defendants, with respect to the reasons for, and structure of, the Merger Agreement, as well as, to WASI and its owners as the beneficiaries of the $175 million deal. UMF ¶ 11, 14, 18, 24. Furthermore, the Merger Agreement obligated WREAS and WGS, in addition to the "Advisor Companies," to prepare and file the Proxy.[5] Wells REIT, with no employees, contracted with Wells Management, which "either directly or by engaging an Affiliate," "[m]aintain[ed] and preserve[d] the books

---

[5] "The Advisor Companies shall, and shall cause WREAS and WGS to, furnish promptly all information as reasonably may be requested in connection with the preparation, filing and distribution of the Proxy Statement." *See* Tab 23 to Defs. SOF, at WashI_00018739, Section 5.5(a); "The parties shall cooperate in good faith in preparing and filing the Proxy Statement…"; *see id.* at WashI_00018739, Section 5.5 (b).

and records of Wells REIT", and, with respect to "*Accounting, SEC Compliance and Administrative Services. . .,*" "prepare[d] and file[d] periodic financial reports and returns required to be filed with the [SEC] and any other regulatory agency, … and "perform[ed] all reporting, record keeping internal controls and similar matters in a manner to allow Wells REIT to comply with applicable law including the Sarbanes-Oxley Act of 2002." *See* Tab 2 to Advisor Defs. SOAF, WashI_00001000, at (a)(iv)); WashI_00001002, at (c)(i), (c)(vi)).[6]   Not only were these duties integral to the Proxy solicitation, but the Advisor Defendants' information was included in the Proxy, including the combined financial statements of WREAS, WGS and their "predecessors", which were prepared from the historical accounting records of WREF and its subsidiaries. Tab 2 to Defs. SOF, Proxy, WashI_00003539-40; 3727-28.[7]   Houlihan, provider of the "fairness opinion" that was part of the Proxy relied on Wells REF and the Advisor Defendants for its due diligence on the REIT, the Advisor and the Interanlization. Reply Ex. 1, Puricelli Tr. at 65, 112.   Moreover, an officer of Wells REF and owner of WASI testified that he "certainly [] saw some drafts" of the Proxy and "reviewed and read through and tried to

---

[6]   When WASI was formed in December 2005, Wells Management assigned the Asset Management Advisory Agreement to WASI and WASI assigned it to WREAS. *See* Tab 23 to Defs. SOF, at WashI_00018705, 3rd Clause; Tab 2 to Defs. SOF, Proxy at WashI_00003496, top of page. *See also,* Pltf's Resp. to Advisor Add. Facts #s 4, 6.

[7]   The "financial forecasts and projections were reasonably prepared on bases reflecting the best currently available estimates and judgments *of the management of Wells REF as to the future financial results and condition of Wells REIT and the Advisor*." Tab 2 to Defs. SOF, Proxy at WashI_00003540 (emphasis added).

make sure the factual information was correct," and confirmed that Wells REF was responsible for providing data for the Proxy.  Reply Ex. 2, Bowers Tr. at 44:4-44:21; Reply Ex. 3, Thunhorst Tr. at 145-146:3 ("[I]n connection with drafting the proxy, company's securities counsel coordinated with representatives of the advisor . . .").[8]

The cases relied on in Plaintiff's MPSJ at 21-22 are still good law and on point. Advisor Mem. at 3.  *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 393-94 n7 (D. Del. 2005), *Lewis v. Byrnes*, 538 F. Supp. 1221, 1224 (SDNY 1982), and *Falstaff Brewing Corp.*, 629 F.2d 62, 66-70 (D.C. Cir. 1980) are not superseded by *Stoneridge*.  Advisor Mem. at 3.  Even if the Advisor Defendants were secondary actors,[9] *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 770 (2008) would be inapplicable.  In *Stoneridge*, the Supreme Court concluded that primary liability under Section 10(b) may not attach when deceptive acts are "too remote to satisfy the requirement of reliance" necessary to allege a primary violation of Section 10(b). *Id.* (emphasis added).  Such considerations are obviously not applicable here. *See also, Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. Fla. 2001)(court did

---

[8]  The Advisor Defendants also cannot hide behind their self-created affiliated machinations.  As Mr. Williams, an officer of Wells REF, explained when he was asked who he worked for, "I was working for all of them [Wells REF, Wells Capital, Wells Management and some other subsidiaries] in a sense.  I was an officer for all of those companies" , which were operating Wells REIT. Reply Ex. 4, Williams Tr. at 11:8-12:18. Even the REIT's legal counsel pointed out that "it's hard to distinguish legal services for these entities [the Advisor Defendants and Wells REIT] without, you know, viewing them as a whole." Reply Ex. 5, Kennicott Tr. at 20-21.

[9]  "Secondary actors" can be solicitors of proxies under Section 14. Pltf's MPSJ at 21-24.

not permit plaintiffs' Section 10 claims against a law firm to survive a motion to dismiss because plaintiffs could not demonstrate "reliance", a required element of Rule 10b-5.)

Finally, Defendants transparently attempt to narrow the applicability of case law by claiming the Advisor entities did not acquire any control of Wells REIT and were not seeking director nominees for Wells REIT. Advisor Mem. at 5. The Advisor Defendants' direct participation in the solicitation and the significant financial benefit garnered by WASI and its owners from the solicitation are undisputed facts entitling Plaintiff to summary judgment. *See* Defs. Resp. to UMF #s 9-11, 13-18, 29, 38-39.  Defendants Wells REF, Wells Capital, Wells Management, WASI, WREAS, and WGS, solicited the Class' proxies within the meaning of Section 14.  *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (Section 14 "prevents management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in a proxy solicitation.").

## B.    *The Defendants Were Negligent.*

Plaintiff does not contend that Section 14 imposes strict liability, notwithstanding Defendants' argument.  Defs. Jt. Mem. at 27-35.  Rather, Plaintiff acknowledges that negligence is the appropriate standard but asserts, and has established, that in this case, Defendants were negligent as a matter of law for failing to disclose the Lexington Letters in the Proxy.[10]  *Wilson v. Great American Indus., Inc.*, 855 F. 2d 987, 995 (2d Cir. 1988)

---

[10]    Defendants also now prophesy "that the Supreme Court will require evidence of scienter before imposing 14(a) liability once this issue ultimately is taken up by the

7

("[a]s a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient" to satisfy the § 14(a) negligence standard).

As Defendants have noted, a defendant is negligent under § 14(a) if he "fails to exercise reasonable care or competence in *obtaining* or *communicating*" information. *See* Restatement of Torts (Second) § 552 (Defs. MSJ at 35-36, 36 n.14.) (Emphasis added.)  However, Defendants then apply the negligence inquiry to the wrong conduct, asserting they were not negligent in *evaluating whether to disclose* the Lexington Letters.  Defs. Jt. Mem. at 30, 33, 34, 35.  While due care may be relevant for determining if a defendant acted reasonably in failing to "obtain" or "communicate" information, it is not similarly implicated where the defendant knows of, and intentionally withholds, the information, irrespective of how thoughtful or careful the undertaking in making the non-disclosure decision. Such intentional omission establishes negligence as a matter of law.  *Wilson*, 855 F. 2d at 995; *In re BankAmerica Corp. Sec.*

---

Court" based upon, *inter alia*, the fact that the Court decades ago reserved the issue in *TSC Indus. v. Northway*, 426 U.S. 438 (1976), and again in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991). Defs. Jt. Mem. at 28-29 n.16.  That the Supreme Court has had multiple opportunities in nearly 35 years' time to address the issue of culpability under § 14(a) – but has chosen not to do so – carries more weight than Defendants' prognostication. *See* Thomas L. Hazen, Securities Regulation § 10.3 at 458 (West 1985) ("the reasoning underlying the Supreme Court's ruling in *Aaron v. SEC*[, 446 U.S. 680 (1980),] mandates that a showing of negligent conduct will suffice" under Rule 14a-9). In any event, Defendants' admission that they chose not to disclose the Lexington Letters is sufficient to establish scienter.

*Litig.*, 78 F. Supp. 2d 976, 989 (E.D. Mo. 1999) (*citing Wilson*); *Salit v. Stanley Works*, 802 F. Supp. 728, 733 (D. Conn. 1992) (same); *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 703-04 (M.D.N.C. 1992) (same). Defendants have not cited a single case that excused a defendant for failing to disclose a known fact because he was careful.

Defendants cannot argue that there was an excusable failure to obtain the material information at issue because they knew the fact and substance of the Lexington Letters. Nor was there a lapse of care that interrupted Defendants' attempted communication of this information. Rather, they ***chose*** to omit the information from the Proxy. Defendants' purported reasonableness or good faith in making that choice is simply not relevant. *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("There is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading misrepresentation or omission violates the section *even if the issuer believed in perfect good faith* that there was nothing misleading in the proxy materials.") (Emphasis added). Just like the defendants in *Stanley Works*,[11] the Defendants in this case similarly knew of a third party's interest in acquiring Wells REIT, under alternative

---

[11] In *Salit v. Stanley Works*, a third-party corporation expressed interest in acquiring Stanley Works, and the two companies engaged in discussions regarding a possible combination. 802 F. Supp. at 730-31. That information was omitted from a proxy seeking shareholder approval of a new stock option plan that allegedly had anti-takeover effects. *Id.* at 733. The plaintiffs alleged that three of the individual defendants had attended meetings where the third party's expression of interest had been discussed. *Id.* at 733. Citing *Wilson*, the court held that those defendants were negligent as a matter of law and liable under § 14(a) because they had known of the omitted facts. *Id.*

terms that revealed an utter lack of value being placed on the Internalization, but failed to disclose those known facts in order to push their own agenda – *i.e.*, shareholder approval of the Internalization so that defendant Leo Wells and his colleagues could receive $175 million in stock.  Here, too, Defendants are negligent as a matter of law under § 14(a).[12]

Defendants' efforts to distinguish *Berman v. Thompson*, 312 F. Supp. 1031, 1035 (N.D. Ill. 1970), *Wellman v. Dickenson*, 475 F. Supp. 783, 832 (S.D.N.Y. 1979), and *Wilson*, 855 F. 2d at 995, demonstrate they have completely missed the point. Defs. Jt. Mem. at 31-33. They explain that the *Berman* "defendants' claim of good faith and honest business judgment was unavailing" because "the court found that the defendants had acted with scienter as they 'certainly do not contend that they did not know or in the exercise of due care could not have known'" the undisclosed information at issue – the exact scenario in this case. *Id.* at 31-32.  Defendants similarly address *Wellman* by explaining that good faith reliance on the advice of counsel was not a defense because the defendants knew of, but did not disclose to shareholders, efforts to takeover the company – also just like this case. *Id.* at 32.  As for *Wilson*, Defendants apparently argue that

---

[12] In Defendants' words, because "the Court has dismissed all fiduciary duty claims, and only the disclosure issue remains viable on the general question of liability . . . . [t]he Court should hold plainly that any form of opinion related to a purported breach of duty in responding to Lexington is not relevant and cannot be offered at trial." Defs. Reply in Supp. of Mot. to Exclude Fosheim (Dkt. #376). At the same time, Defendants assert that evidence of their "reasonable diligence and due care in considering disclosure of the Lexington Letters" is "highly relevant." Defs. Jt. Mem. at 35.  Unable to find support, Defendants attempt to extend Section 11's statutory due diligence defense to Section 14, for which there is no analogous statutory defense. *Id.* at 29-30; *see* 15 U.S.C. 77k(b)(3).

omitting material information known to them is somehow less "deliberate" and "culpable" than including and/or failing to correct affirmative false statements, another meaningless distinction. *Id.* at 33.  At bottom, Defendants' supposed reasonableness in deciding not to disclose the Letters is irrelevant, and this Court should find that Defendants were negligent as a matter of law.[13]

## C.    *The Lexington Letters Were Material.*

Defendants' Opposition incorrectly presents Plaintiff's position. In asserting that the reasonable shareholder standard of materiality set forth in *TSC Indus.* is the appropriate standard for assessing materiality under the circumstances of this case, Plaintiff does not contend that *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) is inappropriate for this case because it only applies to Section 10(b) cases.  Defs. Jt. Mem. at 10-11. Rather, Plaintiff demonstrates that applying *Basic* to these facts is both contrary

---

[13]    Furthermore, under **Maryland** law, the "correct and complete" Board and Special Committee minutes are the only admissible evidence as to the actions, decisions and views of the Board. *See* Pltf's MPSJ at 37-38 and Pltf's SJ Opp. at 28-29 n.17, incorporated herein by reference. The Maryland statutory requirement of "correct and complete" minutes of the proceedings of the board appears to be a unique mandate.  The **non-Maryland** decisions upon which Defendants rely, which do not involve the rigorous "correct and complete" requirement, are therefore not controlling. Defs. Jt. Mem. at 35-36 (*citing* Defs. Resp. to Pltf's Mot. to Exclude Persons (Dkt. #359) at 14-16). Defendants' extraneous evidence (Mem. at 7-17) of purported due care is inadmissible, and does not support a claim of good faith or due care. Even if parol evidence were admissible, Defendants' self-serving, post-mortem reconstruction of their purported good faith or due care is neither relevant, as discussed, nor plausible.

to case law and illogical.[14]  Certainly, Defendants' interest in applying *Basic* is obvious –

as the undisputed facts show, Defendants determined not to negotiate with Lexington

prior to the Internalization. However, the balancing test from *Basic* does not apply here

because it is the fact of, and pricing information contained in a contemporaneous merger

proposal, and not its probability or magnitude, that shareholders would consider

important in voting on a transaction that was directly implicated in the information.

Furthermore, the law fully supports Plaintiff's position.[15] *TSC Indus,* 426 U.S. at

449; Pltf's MPSJ at 26-30.  *Blau v. Harrison*, 2009 U.S. Dist. LEXIS 17196, 13-14 (N.D.

Ill. Mar. 3, 2009), illustrates that Defendants' view of the *Basic* balancing test is a

misapplication of the materiality analysis.  The *Blau* court held that the materiality of a

"no premium offer" made during merger discussions did not depend on its viability but

on whether the information would have been considered significant to a reasonable

investor considering the merger. *Id.*, at *13.  In *Caruso, et al. v. Metex Corp.,* 1992 U.S.

Dist. LEXIS 14556, *1, *15-19 (E.D.N.Y. July 31, 1992), the court did not apply *Basic* to

determine that the company should have disclosed a prior rejected proposal to acquire the

company's subsidiary in the context of a later full company acquisition. The *Metex* court

---

[14]  *See also,* Plaintiff's MPSJ at 26-30.

[15]  Defendants' passing argument, that the Letters were merely "soft information" and,
therefore, not required to be disclosed (Defs. Jt Mem. at 20), is based on a misapplication
of the law cited in which "soft information" refers to a company's internal valuations
based on projections of future financial performance – not third party offers to purchase
shares at a specific amount.  *See* Pltf's SJ Opp at 33-35.

found that the facts surrounding those undisclosed discussions were obviously important, altering the "total mix" of information available, because the discussions contemplated greater consideration for the subsidiary. *Id.,* at *27. Like Defendants, the *Metex* defendants argued that the discussions were not formal offers, *id.,* at *19.[16]

Defendants have not countered Plaintiff's showing of materiality.  Defs. Jt. Mem. at 13-16. Lexington, an unaffiliated real estate investor with its own management company, that had purchased $750 million of Wells' properties, ascribed *de minimus* value to the Internalization.  The per share prices Lexington set out for Wells REIT (the March 5 Letter's per share price of $9.25 and the April 5 Letter's per share prices of $9.07 and $9.45, *UMF* ¶ 87-88) were: (a) higher than Wells REIT's reported NAV; (b) higher than the share redemption price; (c) higher than the price used to determine the number of shares to be paid as consideration in the Internalization; and (d) within the range of pricing of "strategic alternatives" considered by Defendants and their advisors. *See UMF* ¶¶ 89-91; *see* Defs. Resp to UMF#s 89-91.  None of these is a "contingent event." As the Special Committee's legal advisor acknowledged, "[Lexington does] not believe the assets are hard to manage and the management is not worth the price agreed. Lexington might be wiling to pay something but not what is being paid." Tab 44 to Defs.

---

[16]     *See also, Stanley Works*, 802 F. Supp. 728 (court did not undertake probability/magnitude balancing in Section 14 disclosure claim; held that failed merger negotiations that ended over a year before proxy vote on a compensation plan with alleged anti-takeover effects could be material to shareholder decision on how to vote).

SOF at Washl-RH- 000262 ¶ 5.

As demonstrated in Pltf's SJ Opp. and Response to Defs. SOF #s 36-37, 40-41, 43-44, 46, 48, 54, 58, 60-62, 63, 70, 72, 74, 78, Defendants' unsupported and irrelevant assertions about Mr. Ashner and Lexington's credibility and intentions, in an attempt to show that the Letters and their contents were therefore contingent, are misplaced and unpersuasive. Defs. Jt. Mem. at 17-22.   The undisputed facts show that, even if the Letters contained contingent information, the likelihood of a transaction with Lexington was not nil (as Defendants now argue).   Not only did the Special Committee's financial advisors specifically consider Lexington as a "Potential Public Company Merger…Partner" (Tab 54 to Defs. SOF at WashI-BK-000052, 00067; Response to Defs. SOF #63), but even after the Internalization closed, they continued to perceive Lexington as a credible partner. [17]  Pltf's Add. Fact # 14.

Significantly, the very existence of the Lexington Letters would not have come to light absent the Lex-Win Tender Offers, which recited Lexington's efforts and the summary rejection of those efforts.[18]   Therefore, Defendants' point, that there is dearth

---

[17]   *See,* Ex. 15 to Pltf's SJ Opp at JPM 00158, 3rd and 4th bullets: "Deliver message to LXP that the board will continue to evaluate its alternatives . . . and in due course consideration of any revised LXP offer"; and "Organize process to accommodate a dual track process . . . and concurrently be in a position to evaluate any third party offers that may surface, including revised terms from LXP."

[18] There is a sharp contrast as between Defendants' litigation posture and Wells REIT's response to the Tender Offers, which was proximate in time to the pertinent events but prior to this Action being amended to include claims based on the failure to disclose the

of published case law other than *Basic*, proves nothing. Logically, either management discloses the unsolicited "expressions of interest" that are rejected by the target's management or they become subject to scrutiny on the chance they are revealed after the fact. *See, e.g.,* Reply Ex. 6, Exhibit B to Roberts' Report, Examples of Disclosure of Unsolicited Indications of Interest; Reply Ex. 7 "What Was the Airgas Chief Thinking?" Here, Lexington's undisclosed "indication of interest" coincided with and related to a "corporate event" upon which shareholders were asked to act.   Under these facts, the *Basic* analysis is necessarily rendered inapplicable and gives way to *TSC* because one needs to answer this question: should the Letters be disclosed so that the shareholders can have equal knowledge as management in order to vote on the corporate event.  Disclosure of the rejected unsolicited offer is necessary before a corporate event is acted upon, not because the offer is likely or unlikely to occur, but because it informs the decision contemplated by the corporate event.   The undisputed facts lead to only one conclusion: the Lexington Letters were material and their omission from the Proxy violates Section 14 as a matter of law.

### D.     The Proxy Was an Essential Link.

To avoid liability for their misleading proxy, Defendants now contend that the

---

Lexington Letters. Wells REIT's June 8, 2007 response to the Tender Offer does not state that Lexington was not credible or financially incapable of consummating a transaction. *Compendium Ex. 25, at pgs 3-4.* Rather, at that time, Defendants said:  "The [] letter[s] did not include any details with respect to such a transaction including details regarding financing, timing, closing conditions or due diligence. . ." *Id.*

shareholder vote they solicited was unnecessary. They argue that the vote was "cosmetic," a mere exercise in futility, and ultimately a complete waste of time, expense and effort. This desperate argument has no factual or legal basis. Defendants made the "Internalization Transaction" subject to shareholder approval by a board resolution.  Tab 3 to Defs. SOF at WashI_00000091 ¶3; Pltf's Add Fact # 4.   Therefore, Defendants told the Class it was their *right* to oppose the Internalization by voting against it:

> **Q:    What rights will I have if I oppose the Internalization?**
>
> A:    You can vote against the Internalization by indicating a vote against the Internalization Proposal on your proxy card and by signing and mailing your proxy card, by authorizing your proxy over the Internet (pursuant to instructions on the proxy card), by telephone, or by voting against the Internalization in person at the Special Meeting.

Tab 2 to Defs. SOF at WashI_00003488.  And, the Proxy stated that the shareholder vote was an absolute requirement for the Internalization: "[i]f the required stockholder approval is not received, *then the Internalization will not be consummated.*"  UMF ¶ 45.

This case, therefore, is unaffected by the reasoning in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), upon which Defendants rely.[19]  In this case, unlike

---

[19] In *Va. Bankshares,* the controlling shareholder, that owned more than two thirds of Virginia Bankshares' stock sought to merge with the company, had sufficient votes under Virginia law to approve the merger, rendering the votes of the public minority shareholders completely irrelevant. The Court also held that the controlling shareholder's alleged desire to obtain minority shareholders' approval did not transform the minority's votes into an essential link because the inquiry does not "turn on inferences about what the corporate directors would have thought and done without the minority shareholder approval." Defs. Jt. Mem. at 24 (*quoting Va. Bankshares*, 501 U.S. at 1105-06).

*Virginia Bankshares*, shareholder approval was required to consummate the Internalization.   Rather than address the reasons that they told shareholders the Internalization would not be consummated without their approval, Defendants now contend that Maryland law did not require shareholder approval because the board could issue stock under section 2-201.   That section, however, does not govern extraordinary transactions, such as mergers, for which shareholder approval is required under Maryland law.   Md. Corp. and Assoc. Code § 3-105(a)(3).   Moreover, Defendants' effort to avoid the requirement of shareholder approval of a merger by arguing that the Internalization falls within the "transfer of assets" exemption set forth in Md. Corp. and Assoc. Code § 3-105(a)(3) is frivolous.   The Internalization was *not* structured as a transfer of assets.   It was, as set forth in the Proxy, structured as a merger between Wells and the Advisor, and Defendants have not cited to any Maryland law provision exempting the merger from a shareholder vote.   The fact that Defendants hypothetically could have accomplished the Internalization by transferring the few assets that the Advisor had – its listed assets were worth less than $2 million – does not transform the merger into a transfer of assets.

In the end, Defendants' effort to exempt the Internalization from the Maryland law requirement of a shareholder vote by arguing about how it might have been, as opposed to how it was, accomplished, is pointless.   Defendants themselves imposed the shareholder approval requirement by resolution, as they were permitted to do under the Company's charter provisions dealing with transactions with affiliates such as the

Advisor.  *See* Response to Defs. SOF #29 and Tab 3 to Defs. SOF, January 31, 2007 Special Meeting Minutes at WashI_0000091 ¶ 3, in subsection (ii).   Under Maryland corporate law and Wells REIT's charter, such a Board resolution was permissible and legally binding.  *See* Pltf's SJ Opp. at 39-40.[20]   In addition, the Internalization required charter amendments, and therefore, shareholder approval. *Id.* at 41.  Thus, unlike *Virginia Bankshares*, the Internalization required shareholder approval, and Defendants, who did not control sufficient shares to control the vote, needed the Class' votes to consummate the Internalization, which is exactly what they told the shareholders in the Proxy.

Finally, Defendants try to confuse the issue by asserting that under the *Merger Agreement* between Wells REIT and Wells REF, shareholder approval was a waivable contractual condition.  Defs. Jt. Mem. at 22.  The private contractual provisions of the Merger Agreement cannot change the requirement, imposed by Maryland law and board resolution, and conveyed unconditionally to shareholders, that the Internalization Transaction, the Merger Agreement, and the Charter Amendments be approved by the shareholders.  In light of those requirements, which were independent of the contractual terms of the Merger Agreement, the Proxy was an essential link under Section 14.

---

[20] Wells REIT's Charter, Section 9.5, had an "Affiliate" provision that permitted the Board to provide by resolution express restrictions on transactions with Affiliates. Tab 2 to Defs. SOF, Proxy at WashI_00003864.  Maryland law permits companies to adopt additional restrictions on mergers, such as the "Affiliate" provision and the resolution adopted thereunder.  Md. Corp. and Assoc. Code § 3-102(b).  Thus, this case is not comparable to *Dominick v. Marcove*, 809 F. Supp. 805 (D. Col. 1992), where the restriction imposed by board resolution was not permissible under state corporate law.

#### E.     The Class Was Injured Within the Meaning of Section 14.

Defendants make two arguments about injury to oppose summary judgment in favor of the Class.  Defs. Jt. Mem. at 24-27.  The first is that the claim for relief belongs to Wells REIT and not to the shareholders.  The second is that the Class has not suffered any loss at all.  Both arguments are wrong.  As to the first point, there is no doubt that a proxy violation under Section 14(a) is a direct injury to shareholders.  *New York City Employees' Retirement System v. Jobs*, No. 08-16488, 2010 WL 309028, at *3 (9th Cir. Jan. 28, 2010); *accord Katz v. Pels*, 774 F. Supp. 121, 127 (S.D.N.Y. 1991).  The right to a fully informed vote is independent of injury to the corporation; thus, the claim is direct, even if the consequence of the misleading proxy is share dilution.  *Jobs*, 2010 WL 309028, at *3.  Moreover, relief can be in the form of rescission requiring the Internalization Consideration to be transferred either to Wells REIT (which increases the value of the existing shares of the Class) or to the Class, or in the form of a damages award that compensates the Class for their injury.

On the second point, shareholders did, in fact, suffer a monetary loss (a decline in share value) due to the misleading Proxy and the shareholder vote in favor of the Internalization.  The loss is easily demonstrated by the difference between the value of the Wells REIT shares before Internalization and the value afterwards.  Lexington offered $9.45 if no Internalization, but only $9.07 if the Internalization occurred (for a loss of $0.38 per share).  Lexington's two-tiered offer only confirms the fact that the price of

Wells REIT stock owned by the Class was reduced as a result of the Company's payment of $175 million of stock while receiving little or no value in exchange.  Ex. 23 to Pltf's SJ Opp. (Trugman Report at 7) (calculating damages); Pltf's Add. Fact # 18.[21]

In contrast to *Jobs*, here, in addition to suffering a diluted voting share, shareholders were harmed because the *value* of their stock declined as a result of the costly Internalization. After the Internalization, the Class never again had the chance to obtain $9.45 – the offer from Lexington that Defendants characterize as "lowball."  *See* Pltf's SJ Opp. at 43.  Indeed, the Class was limited to a mere possibility of being able to redeem stock at $8.38 per share, and they watched helplessly as the net asset value of their shares declined from $8.93 at the time of the Internalization to $7.40 at the end of 2008.  Pltf's Add. Fact # 8.

## III.  <u>CONCLUSION.</u>

For the reasons set forth herein and in Pltf's MPSJ, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgment.

---

[21]  Defendants seek to confuse the loss causation issue by claiming that mere "dilution" is the injury flowing from the Internalization, citing the lower court decision in *Jobs*.  The facts in *Jobs*, however, are inapposite. In *Jobs* there was no allegation that the share price *declined* as a result of the corrective disclosure, and thus, the sole harm to shareholders was a miniscule dilution of voting shares. *Vogel v. Jobs*, No. C 06-5208, 2007 WL 3461163, at *4 (N.D. Cal. Nov. 14, 2007), *aff'd in part and rev'd in part*, *New York City ERS v. Jobs*, No. 08-16488, 2010 WL 309028 (9th Cir. Jan. 28, 2010) ("Apple's stock price has not fallen as a result of the disclosure of the backdating"). In fact, it was undisputed that Apple's share value was unaffected by the backdating at issue in the case.

Dated February 15, 2010.[22]

**CHITWOOD HARLEY HARNES LLP**

  s/  Krissi T. Gore
Robert W. Killorin, Ga. Bar No. 417775
Krissi T. Gore, Ga. Bar No. 687020
Meryl W. Roper, Ga. Bar No. 238919
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
RKillorin@chitwoodlaw.com
KGore@chitwoodlaw.com
MRoper@chitwoodlaw.com

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 W. Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
nick@chimicles.com
kimdonaldson@chimicles.com
kimberlykimmel@chimicles.com

Lawrence A. Sucharow
Joseph Sternberg
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005

---

[22] In accordance with the Consent Order entered by the Court on January 12, 2010, Plaintiff will file this pleading with the Court on February 19, 2010.

Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lsucharow@labaton.com
jsternberg@labaton.com

***Co-Lead Counsel***

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

Counsel for Plaintiff hereby certifies that the text of this Pleading has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1B.

<u>  s/  Krissi T. Gore                    </u>
KRISSI T. GORE
Georgia Bar No. 687020
**CHITWOOD HARLEY HARNES LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2010, I electronically filed

**"PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS**

**MOTION FOR PARTIAL SUMMARY JUDGMENT"** with the Clerk of the

Court using the CM/ECF system, which will automatically send email notification

of such filing to the following attorneys of record:

Tony G. Powers   tpowers@rh-law.com
Kimberly L. Myers  kmyers@rh-law.com

Michael R. Smith  mrsmith@kslaw.com
Dan S. McDevitt   dmcdevitt@kslaw.com
Michael J. Cates   mcates@kslaw.com
Bethany M. Rezek  brezek@kslaw.com

In addition, the foregoing was served by email upon same on February 15, 2010.


  s/  Krissi T. Gore
Krissi T. Gore
Georgia Bar No. 687020
*Co-Lead Counsel for Plaintiff*

**CHITWOOD HARLEY HARNES LLP**
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
Phone: (404) 873-3900
Fax: (404) 876-4476
Email: kgore@chitwoodlaw.com