UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE WELLS REAL ESTATE INVESTMENT TRUST, INC. SECURITIES LITIGATION | CIVIL ACTION NUMBER: 1:07-CV-00862-CAP<br><br>CLASS ACTION |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

ROGERS & HARDIN LLP
Tony G. Powers (GA Bar No. 586586)
Kimberly L. Myers (GA Bar No. 533257)
Joshua P. Gunnemann (GA Bar No. 152250)
Stefanie H. Jackman (GA Bar No. 335652)
229 Peachtree Street, NE
2700 International Tower
Atlanta, GA 30303

*Counsel for Defendants Michael R. Buchanan, Richard W. Carpenter, Bud Carter, William H. Keogler, Jr., Donald S. Moss, Neil H. Strickland, and W. Wayne Woody*

KING & SPALDING LLP
Michael R. Smith (GA Bar No. 661689)
Dan S. McDevitt (GA Bar No. 488375)
Michael J. Cates (GA Bar No. 116356)
Bethany M. Rezek (GA Bar No. 553771)
1180 Peachtree Street, NE
Atlanta, GA 30309

*Counsel for Defendants Piedmont Office Realty Trust, Inc., Piedmont Office Management, LLC, Piedmont Government Services, LLC, Wells Capital, Inc., Wells Management Company, Inc., Wells Advisory Services I, LLC, Randall D. Fretz, Donald A. Miller, Douglas P. Williams, and Leo F. Wells, III*

# INTRODUCTION

The undisputed facts establish that neither Piedmont nor Lexington believed their discussions had any meaningful probability of resulting in a merger transaction. Lexington's CEO admitted that the overtures were mere "expressions of interest" that had not even been approved or authorized by Lexington's board of directors, and were "not even close" to being material.  Because there was no probability of a merger transaction between Piedmont and Lexington, the Lexington overtures were immaterial as a matter of law under *Basic v. Levinson*, 485 U.S. 224 (1988).  In addition, the undisputed record establishes that (1) as a matter of law, Defendants could not be found negligent for following the advice of experienced, independent counsel that the Lexington Letters did not need to be disclosed, (2) Plaintiff has failed to meet its burden of producing evidence of loss causation under 15 U.S.C. § 78u-4(b), and (3) the Proxy was not an "essential link" in effecting the Internalization because the shareholder vote was not required by law.  As a result, this Court should enter summary judgment in favor of Defendants.

## THE UNDISPUTED MATERIAL FACTS SUPPORT A FINDING THAT DEFENDANTS ARE NOT LIABLE UNDER SECTION 14(A)

### I.    The Lexington Overtures Were Assessed by Independent Directors With the Assistance of Independent Advisors.

Recognizing that the complete absence of conflict of interest undermines its attack on the Independent Directors' decisions, Plaintiff argues that the independence

1

of these directors is "disputed" (Pl.'s Br. at 5), because certain of the Independent

Directors were also independent directors of a separate REIT advised by Advisor-

affiliated entities.  However, board service on a company affiliated with the Advisor

does not affect independence (*see Werbowsky v. Collomb*, 766 A.2d 123, 129, 146

(Md. 2001)), and in no way alters the fundamental fact that neither the Independent

Directors nor their advisors had any personal economic interest in the Internalization

and were not otherwise beholden to Mr. Wells or the advisor entities.  The

independence and integrity of the process of evaluating the Lexington Letters (*see*

SOF ¶¶ 5-9) also dispels Plaintiff's baseless speculation that "Defendants' aim was to

close the Internalization before pursuing any discussion with Lexington."  Pl.'s Br. at

7-8.[1]  While the Independent Directors determined not to pursue discussions with

Lexington, that determination was grounded in, among other things, the Independent

Directors' view that Lexington was acting tactically (that is, Lexington was not a

serious bidder, but was acting opportunistically to try to make a fast buck), and that

---

[1]  "SOF" refers to the Statement of Undisputed Material Facts in Support of Defendants' Summary Judgment Motion (Dkt. # 345).  Capitalized terms, unless otherwise defined, are defined in Defendants' Brief in Support of Their Motion for Summary Judgment (Dkt. # 345) ("Defs.' Br.").

pursuing the Internalization and a potential listing, rather than pursuing a potential transaction with Lexington, was Piedmont's best strategic option.[2]

Plaintiff vainly attempts to raise a dispute of fact regarding the Special Committee's consideration of the Lexington Letters by again arguing that board minutes "do not reflect anything concerning disclosure," which according to Plaintiff, "raises the very real question of whether [Jack Hardin's advice concerning disclosure] was ever given." Pl.'s Br. at 10-11. However, Plaintiff cannot dispute that multiple witnesses testified regarding Mr. Hardin's advice, and the absence of reference to Hardin's specific advice in summary minutes fails to raise a genuine issue regarding the fact that the advice was given. *See* SOF ¶¶ 46-48.

## II.    The Fact That The Independent Directors Followed a Thorough Process Does Not Establish that the Lexington Letters Are Material.

Contrary to Plaintiff's insinuation, the fact that the Independent Directors employed a responsible process to evaluate the letters does not mean that they concluded that the letters were themselves serious proposals. The record evidence demonstrates that, after seeking and receiving guidance from their legal and financial advisors, the Independent Directors concluded that Lexington was not making a *bona*

---

[2]    Plaintiff also ascribes evil motives to the Confidentiality Agreement entered between Lexington and Piedmont in connection with the discussions over a possible sale of a portfolio of 11 properties. Such agreements are standard whenever companies share non-public information with competitors, and protect the company from harm through release of such information. *See* SOAF ¶ 2. "SOAF" refers to Defendants' Joint Statement of Additional Undisputed Material Facts (Dkt. # 385).

*fide*, credible proposal. *See* SOAF ¶ 5. What the Independent Directors took seriously was their fiduciary duties and adherence to good corporate governance, not the Lexington Letters. *See* SOAF ¶ 6 (citing Hardin Dep. at 212-13 ("What we took serious was the process, not the letter")). For a host of reasons, including those described more fully in Defendants' Brief at 24-33, the Independent Directors determined that the Lexington Letters lacked credibility. Based on the Independent Directors' decision to not pursue discussions with Lexington, and a host of other factors, Mr. Hardin concluded there was little or no probability that the merger transaction discussed in the April 5th Letter would occur and expressed his opinion that, like the March 5th Letter, the April 5th Letter was immaterial under *Basic*, and was not required to be disclosed. SOF ¶¶ 74-75.

## ARGUMENT

### I.    The Lexington Letters Were Immaterial As a Matter of Law.

#### A.    The proper test to be applied for assessing materiality in this case is *Basic v. Levinson*.

Plaintiff erroneously argues that *Basic* only applies to trading cases arising under Section 10(b) of the Securities Exchange Act of 1934 and not to claims under Section 14(a).[3] Pl.'s Br. at 24-25. There is no authority for the proposition that the

---

[3] Plaintiff argues that *Basic* does "not provide a helpful standard in this case arising under Section 14(a)" and that, instead, "the *Basic* line of cases helps to assess when a

materiality test for claims arising under Section 14(a) is any different from the materiality test under other provisions of the federal securities laws, nor does Plaintiff cite to any such case. On the other hand, several decisions squarely hold that the materiality standard does not vary depending on what provision of the federal securities laws is implicated. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330-31 (3d Cir. 2002); *SEC v. LADAVAC*, 51 F.3d 623, 637 n.17 (7th Cir. 1995); *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992); *Grace v. Rosenstock*, 23 F. Supp. 2d 326, 332 (E.D.N.Y. 1998); *In re Sears, Roebuck & Co. Sec. Litig.*, 792 F. Supp. 977, 981 (E.D. Pa. 1992); *see generally* Defs.' Br. at 20-24.[4]

The conclusion of these courts is entirely consistent with *Basic*. In *Basic*, the Court applied the definition of materiality as formulated in *TSC Industries v. Northway*, 426 U.S. 438 (1976) (a Section 14(a) case), to cases arising under Section

---

potential merger becomes sufficiently important that … it would influence a *trading decision* … under Section 10(b)." Pl.'s Br. at 23-24 (emphasis in original).

[4] The few Section 14(a) cases Plaintiff cites do not support its contention that *TSC* rather than *Basic* supplies the correct standard. *See* Pl.'s Br. at 33 n.20. First, both *Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795 (N.D. Ill. Mar. 46, 2006) and *Hayes v. Crown Central Petroleum Corp.*, 78 Fed. App'x 857 (4th Cir. 2003) involved omissions of information regarding a *pending* merger that was the subject of the proxies, not information regarding a potential merger that was not pursued, and are thus wholly inapplicable. Second, *Salit v. The Stanley Works*, 802 F. Supp. 728 (D. Conn. 1992) *specifically adopts* the *Basic* standard: "In the context of merger discussions, materiality 'will depend at any given time upon a balancing of both the indicated probability that the even will occur and the anticipated magnitude of the event ….'" *Id.* at 732 (citing *Basic*).

10(b).  At no point did the Court suggest that a reasonable investor's trading decision is subject to any different standard of materiality than a reasonable shareholder's voting decision.  Indeed, that the Court applied a definition of materiality formulated from a "voting case" (*TSC*) to a trading case (*Basic*) indicates that there are not distinct materiality standards.  Even Plaintiff's own materiality expert does not believe *Basic* applies only to Section 10(b) claims.  *See* SOAF ¶ 3 (citing Roberts Dep. at 131 ("Both cases [*i.e.*, *Basic* and *TSC*] apply all the time ….")).

Instead of formulating a new test applicable only to cases arising under Section 10(b), *Basic* further developed *TSC*'s general materiality standard for cases involving contingent or speculative information.  As the Supreme Court explained:

> The application of th[e] materiality standard to preliminary merger discussions is not self-evident.  Where the impact of the corporate development on the target's fortune is certain and clear, the TSC Industries materiality definition admits straightforward application.  Where, on the other hand, the event is contingent or speculative in nature, it is difficult to ascertain whether the 'reasonable investor' would have considered the omitted information significant at the time.  Merger negotiations, because of the ever-present possibility that the contemplated transaction will not be effectuated, fall into the latter category.

*Basic*, 485 U.S. at 232.  As such, the Court refined its *TSC* standard for situations involving contingent or speculative events, holding that courts must "balanc[e] the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."  *Id.* at 238.  The Lexington Letters are precisely the sort of information subject to the balancing called for by

*Basic*, regardless of the fact that this case arises under Section 14(a). To evaluate the alleged materiality of that information without applying *Basic* would invite legal error.

**B.     The tentativeness and seriousness of Lexington's expressions of interest are highly relevant to the materiality analysis.**

Plaintiff mistakenly asserts, without citation to a single case, that the tentativeness, adequacy, and seriousness of Lexington's expressions of interest are irrelevant to the question of materiality. Pl.'s Br. at 22-26. But even if *TSC* were the sole governing authority, it would be incorrect to contend that the tentative and conditional nature of the letters is irrelevant to their materiality. Under *TSC*, before an omitted fact is considered material, the Court must conclude that the undisputed facts establish "a <u>substantial likelihood</u> that a reasonable shareholder would consider it <u>important</u> in deciding how to vote …." *TSC*, 426 U.S. at 449 (emphasis added). No one – including Plaintiff's own expert (*see* SOAF ¶ 3) – believes that, in determining whether there is a "substantial likelihood" that a reasonable shareholder would find omitted information "important," the credibility and reliability of the information is irrelevant. That is why courts regularly reject calls to disclose "soft" information, as addressed below in Section I.D.

**C.     The undisputed facts demonstrate that Lexington's expressions of interest were tentative and inadequate.**

Plaintiff asserts that Lexington's expressions of interest were serious and that "testimony … shows that Lexington was serious about a merger with Wells REIT."

Pl.'s Br. at 29.  In fact, Lexington's CEO testified that the Lexington Letters, which had not even been approved by the Lexington Board, were not in any sense "offers" and did not constitute a "real proposal":  "I would characterize that [March 5] letter as an expression of interest, but clearly, there is detailed and in depth diligence that would be required to turn an expression of interest into *a real proposal*."  *See* RSOAF ¶ 7 (citing Eglin Dep at 112 (emphasis added)).[5]  Moreover, the letters were *expressly* non-binding: the April 5 letter concluded by stating "[n]aturally, legally binding obligations among the parties would occur only upon the execution and delivery of definitive agreements."  *See* SOF ¶¶ 57, 61.  Because of their preliminary and tentative nature, Lexington's CEO concluded that the letters were "not even close" to being material, and Lexington *never disclosed the letters* to its shareholders in March or April 2007.  SOF ¶ 43.  It is impossible to characterize Lexington's overtures as anything other than contingent and speculative and, as such, whether they were required to be disclosed must be evaluated under *Basic*.

### D.  The pricing/valuation information in the Lexington Letters is classic "soft information."

Plaintiff asserts that "the Lexington Letters were not hypothetical estimates of what a business enterprise might be worth" and that that Lexington's proposal was not "soft information" because it was not "a company's internal valuation[] based on

---

[5]  "RSOAF" refers to Defendants' Response to Plaintiff's Statement of Additional Material Facts Pursuant to LR 56.1(B)(3) filed concurrently herewith.

projections of future financial performance." Pl.'s Br. at 34-35. However, the defining characteristic of "soft" information is its inherent unreliable and speculative nature, not whether the information is generated internally or externally, or involves a future projection. *See*, *e.g.*, *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985) (no duty to disclose third party valuation because the reported values were not "virtually as certain as hard facts"). Plaintiff thus untenably argues that while *internal* assessments of future value may be deemed immaterial "soft" information, somehow less informed *external* speculation cannot be so characterized.

The record evidence demonstrates that information related to the value of the Internalization in the Lexington Letters was classic "soft" information because of its speculative, hypothetical and unreliable basis. Plaintiff incorrectly challenges Defendants' assertion that Lexington in fact did not analyze the value of the Internalization. Mr. Ashner's testimony makes clear that the two-tier pricing in the Lexington Letters simply reflected the dilution resulting from the issuance of the Internalization shares, and *was not* an assessment of the value of the advisory agreements or the Internalization. *See* SOF ¶ 43 (citing Ashner Dep. at 89-90 ("How did you come up with the differences in pricing there, and what does the difference represent? A. It reflects the dilution to shareholders as a result of the internalization, the issuance of additional shares.")); *see also* SOF ¶ 41 (citing Ashner Dep. at 277 (Ashner speculating that the advisory agreements involved in the Internalization might

9

be worth "40 million, not 175 million")); SOF ¶¶ 41, 51.  This testimony makes clear

that the two-tiered pricing in the Lexington Letters – and the implicit "zero value"

ascribed to the Internalization – was not the product of a reliable assessment of the

value of the Internalization.[6]  As such, the information was clearly speculative,

unreliable "soft" information not required to be disclosed.  Moreover, disclosure of the

information would have added nothing to the "total mix" of information, as the Proxy

clearly disclosed the potential dilutive impact of the issuance of the Internalization

shares.  *See* SOF ¶ 30 (citing Proxy at 5).

## II.    Based On the Undisputed Facts Regarding the Consideration of the Lexington Letters, Defendants Were Not Negligent As a Matter of Law.

**No** court has **ever** found directors liable under Section 14(a) who did not act at

least negligently.   As shown in Defendants' Opposition to Plaintiff's Motion for

Partial Summary Judgment (Dkt. # 384) ("Defs.' Opp'n") at 27-35, lower courts agree

that, rather than imposing the extraordinary standard of strict liability, the appropriate

liability standard under Section 14(a) is negligence.[7]  As the courts have recognized, a

---

[6]   Plaintiff incorrectly implies that Lexington's investment bankers and an internal financial analyst did financial modeling analyzing the Internalization's value.  Pl.'s Br. at 35 n.22.  Rather, it is clear that the limited modeling that was performed was "on the portfolio" of Piedmont's properties, not on the value of the advisory agreements or the Internalization.  *See*, *e.g.*, RSOAF ¶ 7 (citing Eglin Dep. at 35-36).

[7]   The Supreme Court has not yet defined the degree of culpability necessary to establish liability under Section 14(a) and has chosen to reserve this issue twice, although Justice Scalia has expressly opined that there should be no liability if

"strict liability rule would impose liability for fully innocent misstatements [and] is too blunt a tool to ferret out the kind of deceptive practices Congress sought to prevent in enacting section 14(a)." *Shidler v. All Am. Life & Fin. Corp.*, 775 F 2d 917, 927 (8th Cir. 1985). Thus, "reasonable investigation and reasonable belief in truth and completeness … will be an effective defense to Rule 14a-9 liability." BROMBERG, SECURITIES FRAUD AND COMMODITIES FRAUD: PRIVATE ACTIONS § 7:97 (West 2003).

While Plaintiff finally acknowledges that the standard for liability under Section 14(a) is at least negligence (Pl.'s Br. at 18-22), Plaintiff would improperly apply the applicable negligence standard to impose strict liability. Plaintiff contends that evidence of the Independent Directors' reasonable consideration and analysis of the Lexington Letters – including their obtaining and following advice from their financial and legal advisors, and the Defendants' reasonable belief in the completeness of the Proxy – is irrelevant. Pl.'s Br. at 19. In Plaintiff's view, if an undisclosed fact is found to be material by a court in hindsight, then board members – regardless of the reasonableness of their actions – purportedly should be found negligent "as a matter of law." Pl.'s Br. at 19.

Plaintiff's view eviscerates the critical distinction between strict liability and negligence and is inconsistent with both the law of negligence and Section 14(a) case

---

directors "honestly believed" in the accuracy of the challenged statements in a proxy. *See* Defs.' Opp'n at 28 & n.16 (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1110 (1991) (J. Scalia, concurring op.)).

law.  In contrast to a strict liability standard, a negligence standard expressly considers a defendant's conduct.  Negligence is a standard of <u>conduct</u> that considers whether the defendants' individual actions comport with those of a reasonable person in like circumstances.  *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Section 14(a) claims are subject to a negligence standard which requires "a failure, whether conscious or even unavoidable … to come up to the specified standard of care."); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976); *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F. Supp. 2d 1248, 1264 n.4 (N.D. Cal. 2000) (in Section 14(a) case, negligence standard protects directors "who were reasonably diligent in approving a proxy solicitation").  As these cases establish, under a negligence inquiry, an individualized examination of Defendants' actions <u>must</u> be undertaken to determine whether Defendants satisfied the applicable standard of due care.  Plaintiff is simply incorrect that a court's hindsight determination of materiality – without any inquiry into conduct – can establish negligence as "a matter of law."

Indeed, in the primary case relied on by Plaintiff, *Wilson v. Great American Industries, Inc.*, 855 F.2d 987 (2d Cir. 1998) (*see* Pl.'s Br. at 19), the Second Circuit held defendants liable for proxy violations only after reviewing the evidence establishing their conduct and knowledge.  The Second Circuit concluded that the defendants' conduct was "far in excess of negligence" and included express awareness of false and misleading statements in the proxy.  *Id.* at 995.  In particular, in *Wilson*,

the court viewed as significant the fact that the defendants had failed to correct, prior to the shareholder vote, an express statement in the proxy advising that no damages award had been entered in litigation against the company.  While this statement was correct at the time of the proxy's issuance, a significant damages award was entered thereafter against the company, and it was undisputed that the defendants were aware of this development in "ample time" to have alerted shareholders prior to the shareholder vote.  *Id.* at 992.  These facts, according to the court, evidenced "deliberate" conduct that "necessarily color[ed] [its] consideration of the other alleged misrepresentations."  *Id.*  These other alleged misrepresentations involved affirmative false statements whose falsity was found to have been expressly known by the defendants.  *Id.* at 995.  *Wilson* thus imposes liability under Section 14(a) based upon knowing, deliberate acts far more culpable than negligent conduct, and, in any event, upon conduct that clearly rose to the level of negligence.[8]  In contrast, the diligent conduct of Defendants who thoroughly and reasonably considered the question of

---

[8]    *Berman v. Thompson*, 312 F. Supp. 1031, 1035 (N.D. Ill. 1970), upon which Plaintiff also relies, similarly imposes Section 14(a) liability based upon facts which did not permit the defendants to "contend that they did not know or in the exercise of due care could not have known" of a material misleading proxy statement.  The other authority cited by Plaintiff at page 20 of its brief also does not support Plaintiff's position.  *Beck*, 559 F.3d 680, specifically recognizes that Section 14(a) liability must be premised on both materiality *and* a demonstration of negligent conduct.  *Id.* at 682.  *Seinfeld v. Barrett*, 2006 U.S. Dist. LEXIS 14827 (D. Del. Mar. 31 2006), does not even reach the question of the negligence requirement.  *See id.* at n.1 ("The Court concludes that it need not reach the question of a state of mind requirement ….").

disclosing the Lexington Letters, which constituted contingent soft information, does not rise to a breach of the standard duty of care.

Plaintiff also attempts to distinguish *Shidler* which holds that the defendants were not negligent in issuing a false proxy statement in reliance on the erroneous opinion of independent counsel that two-thirds of all outstanding stock was needed for approval of a merger. In fact, as subsequently confirmed by the state supreme court, state law required that a merger be approved by a two-thirds majority of outstanding common stock, rather than all stock. The Eighth Circuit held that "fully innocent misstatements" should not form the basis of Section 14(a) liability, and rejected the plaintiff's contention that the defendants were liable based solely on their decision to issue the proxy in accordance with independent counsel's interpretation of the applicable law. 775 F.2d at 926-27. Thus, the defendants' reliance on the advice of counsel in *Shidler* is analogous conceptually to the Independent Directors' conclusion on materiality based on advice of their counsel.[9]

---

[9] Other cases also support Defendants' position. For example, the court in *Lane v. Page*, 581 F. Supp. 2d 1094 (D.N.M. 2008), was unwilling to hold defendants liable for innocent reasonable conduct. After concluding that an allegedly false statement in a proxy was material, the district court in *Lane* determined that no actionable Section 14(a) claim existed because the plaintiff failed to allege that the defendant did not believe the truth of the allegedly false opinion stated in the proxy. 581 F. Supp. 2d at 1127. Significantly, *Lane* refuses to adopt a standard that would "punish[] good faith … statements," recognizing that "[o]nly when an opinion is both objectively and subjectively false is it actionable under §14(a)." *Id.*; *see also In re McKesson*, 126 F.

### III.    Plaintiff Fails To Show Loss Causation.

Plaintiff failed to meet its burden to produce evidence both of causation of injury (transaction causation) <u>and</u> of damages (loss causation).  As the Ninth Circuit recently held, "loss causation <u>must</u> be proven in the context of a private action under § 14 of the 1934 Act …."  *New York City Employees' Ret. Sys. v. Jobs*, --- F.3d ---, 2010 WL 309028, at *3 (9th Cir. Jan. 28, 2010) (quoting *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000)) (internal punctuation omitted and emphasis added); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008) (PSLRA imposes loss causation requirement upon "any private action" (citing 15 U.S.C. § 78u-4(b)).  "As codified, loss causation requires a showing that the defendant 'caused the loss for which the plaintiff seeks to recover damages.'"  *Jobs*, *WL 309028*, at *3 (quoting 15 U.S.C. § 78u-4(b)(4)).  In other words, Plaintiff must demonstrate a causal connection between the purportedly misleading proxy and "an actual economic harm."  *Id.* at *3 (citing *Grace*, 228 F.3d at 46).

The only purported "loss" Plaintiff has identified is an unspecified "economic injury" that Plaintiff claims is self-evident from the price differential in the Lexington Letters.  *See* Pl.'s Br. at 43.[10]  But Plaintiff fails to tie the price differential to "actual

---

Supp. 2d at 1264 n.4 & 1265 (defendant who makes a material mistake is not liable under Section 14(a) if the defendant exercised due care; "material statements of opinion are false only if the opinion was not sincerely held").

[10]    Plaintiff has asserted that impairment of its voting rights might be injury sufficient to support a Section 14(a) claim.  Pl.'s Br. at 44.  While *Jobs* holds that such a direct Section 14(a) claim might theoretically be viable <u>if</u> relevant state law treats such claims as direct,  *Jobs*, 2010 WL 309025, at *3, significantly, *Jobs* also holds that such a claim cannot survive without proof of <u>economic loss</u>.  *Id.* at *3.

economic harm" to Plaintiff (such as a drop in stock price or other identifiable harm). The price differential at best reflects only the dilution of Plaintiff's stockholdings resulting from the Internalization (*see* SOF ¶¶ 43, 61). Stock dilution alone cannot establish loss causation in a Section 14(a) claim:

> [Plaintiff] states that dilution "reduces a shareholder's percentage of ownership." [Plaintiff] elaborates, "This 20% transfer clearly has a highly significant economic consequence even though the Company's share price may not have moved in response to the transfer." [Plaintiff's] dilution theory of economic loss is unsupported in caselaw, and as the district court recognized, <u>economic loss does not necessarily accompany dilution, so such conclusory assertions of loss are insufficient</u>.

*Jobs*, 2010 WL 304028, at *4 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)) (emphasis added).

Plaintiff's claim of economic loss by dilution is unsupported by the case law and the record evidence. Plaintiff's only case citations are inapposite – addressing only whether a plaintiff may bring both direct and derivative claims in a Section 14(a) action, if both are appropriate and adequately alleged,[11] and whether a proxy vote may

---

[11] *See* Pl.'s Br. at 44 (citing *Katz v. Pels*, 774 F. Supp. 121, 127 (S.D.N.Y. 1991); *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977)); *see also J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (recognizing that "[t]he injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation <u>ordinarily flows from the damage done [to] the corporation, rather than from the damage inflicted directly</u> upon the shareholder") (emphasis supplied) (abrogated on other grounds).

be enjoined if a proxy statement is materially misleading.[12]  None of these cases address or endorse the idea that either dilution or impairment of voting rights – standing alone – entitles a shareholder to damages.[13]

Indeed, Plaintiff can show no economic loss whatsoever caused by the dilutive effect of issuing approximately 4% of the Company's outstanding shares in the Internalization.  It has not claimed a drop in share price, and, while Plaintiff notes that "after the Internalization, the Company's net asset value per share … declined," *see* Pl. Br. at 43-44 n.29, Plaintiff offers no evidence of a causal connection between the Internalization and this decrease, which instead resulted from the general economic decline of the real estate markets.  *See Jobs*, 2010 WL 309025, at *4 n.3.  Plaintiff's failure to produce evidence of loss causation – an essential element of its Section 14(a) claim – is sufficient by itself to entitle Defendants to summary judgment.

---

[12]  *See* Pl.'s Br. at 42 (citing *Kaufman v. Cooper Companies, Inc.*, 719 F. Supp. 174 (S.D.N.Y. 1989), and *Riggs v. National Bank of Washington, DC v. Allbritton*, 516 F. Supp. 164 (D.D.C. 1981)), both of which pre-date the 1995 adoption of the PSLRA's loss causation requirement, 15 U.S.C. § 78u-4(b)(4).

[13]  Moreover, with respect to Plaintiff's suggestion that it may also be entitled to "rescission (returning shares to the Company)" (*see* Pl. Br. at 42), Plaintiff's suggestion does not excuse it of the requirement to demonstrate loss causation.  *See Jobs*, 2010 WL 309028, at *4 ("The PSLRA does not differentiate between plaintiffs seeking legal and equitable remedies; without an allegation of economic loss, no remedy, equitable or otherwise, is available.").

**IV.    The Proxy Statement Was Not An "Essential Link" In The Accomplishment Of The Internalization.**

As Defendants' opening brief makes clear, the Proxy was not an essential link in the accomplishment of the Internalization transaction because no shareholder vote was legally required to approve the Internalization under either Maryland law or the Company's charter.   *See* Defs.' Br. at 42-43.   In response, Plaintiff argues that "Defendants erroneously rely on the 'transfer of assets' exception to the Maryland extraordinary actions statute" because "[i]n the Internalization … no assets were transferred by any corporation."   Pl.'s Br. at 38.   Plaintiff misapprehends Defendants' argument and misreads the Maryland statute.

Defendants do not "rely on the 'transfer of assets' exception to the Maryland extraordinary actions statute" because the Maryland extraordinary actions statute simply does not apply to the Internalization.   The Maryland extraordinary actions statute, by its terms, would apply only to "[a] consolidation, merger, share exchange, or transfer of assets" of Piedmont.   *See* Md. Code Ann. Corps. & Ass'ns § 3-105. The Internalization involved none of these actions by Piedmont; it was effected by a merger of the Advisor entities into Piedmont subsidiaries (not into Piedmont) and thus required no approval by Piedmont's shareholders.   In addition, the issuance of just over 4% of Piedmont's stock for the Internalization consideration did not require

shareholder approval.  *See* MD. CODE ANN. CORPS. & ASS'NS § 2-201.   There is no doubt that Piedmont shareholder approval was not required under Maryland law.

Plaintiff's "two other entirely independent reasons" that make the Proxy an essential link likewise fail.  First, Plaintiff argues that "shareholder approval of the Internalization became a legal requirement when the Board adopted a resolution requiring it."  Pl.'s Br. at 40.  The resolution adopted by the Board, however, did not make shareholder approval "a legal requirement"; rather, the resolution simply describes that the Merger Agreement was submitted to the stockholders for approval. Nothing Plaintiff cites required the Board to do so by law and, in fact, the very Merger Agreement approved by the resolution made clear that "receipt of the approval of our stockholders and ***may be waived* by us *in our sole discretion***."  *See* SOF ¶ 29; *see also* SOF ¶ 30 (citing Proxy at 5; Proxy at 1 (noting conditions and that Piedmont "may waive certain of these conditions in our sole discretion")). [14]

Second, Plaintiff's claim that the Internalization vote was legally required because a vote was required to amend Piedmont's Charter likewise does not pass muster.  *See* Pl.'s Br. at 41.  The Charter amendment, and the vote approving it, was

---

[14]  Plaintiff's attempt to distinguish *Dominic v. Marcove*, 809 F. Supp. 805 (D. Colo. 1992), utterly fails.   *Dominic v. Marcove* stands for the uncompromising legal principle that a self-imposed voting requirement that is not required by law is "without legal effect."   *Id.* at 807.   As is proper here, the Court held that such requirement therefore cannot be an essential link in the accomplishment of the transaction.

only required "should the Internalization Proposal be approved." *Id.*  Since the Internalization was a condition precedent to the Charter amendment, it therefore could not be an essential link in the accomplishment of the Internalization.  *Compare Siebert v. Nives*, 871 F. Supp. 110, 119 (D. Conn. 1994) (noting that Agreement which "depended on an authorization of additional shares - which … required a vote by a majority of shareholders" could properly be considered an essential link).

Therefore, the Board's desire for a "cosmetic vote," which was not legally required, cannot be an essential link in the accomplishment of the transaction.  The Supreme Court's decision in *Virginia Bankshares*, 501 U.S. 1083 (1991) does apply and, in fact, is controlling here.  *See* Pl.'s Br. at 41 n.27.  The Court in *Virginia Bankshares* specifically rejected the same argument Plaintiff makes here:  that a vote not legally required or necessary to the approval of the transaction should be given the force of law.  *Id.* at 1105-06; *see also* Defs.' Br. at 40-44.  Thus, without any legal requirement to obtain shareholder approval of the Internalization, there is no "essential link" between the vote and the Internalization, despite the fact that the Board elected to seek shareholder approval for the transaction.  *See also Dominick*, 809 F. Supp. at 808.

## CONCLUSION

For these reasons, and those set forth in Defendants opening brief, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

This 15th day of February, 2010.

ROGERS & HARDIN LLP

*/s/ Tony G. Powers*
(with express permission by Michael R. Smith)
Tony G. Powers (GA Bar No. 586586)
Kimberly L. Myers (GA Bar No. 533257)
Joshua P. Gunnemann (GA Bar No. 152250)
Stefanie H. Jackman (GA Bar No. 335652)
229 Peachtree Street NE
2700 International Tower
Atlanta, GA 30303
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email: tpowers@rh-law.com
        kmyers@rh-law.com
        jgunnemann@rh-law.com

*Counsel for Defendants Michael R. Buchanan, Richard W. Carpenter, Bud Carter, William H. Keogler, Jr., Donald S. Moss, Neil H. Strickland, and W. Wayne Woody*

KING & SPALDING LLP

*/s/ Michael R. Smith*
Michael R. Smith (GA Bar No. 661689)
Dan S. McDevitt (GA Bar No. 488375)
Michael J. Cates (GA Bar No. 116356)
Bethany M. Rezek (GA Bar No. 553771)
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: mrsmith@kslaw.com
        dmcdevitt@kslaw.com
        mcates@kslaw.com
        brezek@kslaw.com

*Counsel for Defendants Piedmont Office Realty Trust, Inc., Piedmont Office Management, LLC, Piedmont Government Services, LLC, Wells Capital, Inc., Wells Management Company, Inc., Wells Advisory Services I, LLC, Randall D. Fretz, Donald A. Miller, Douglas P. Williams, and Leo F. Wells, III*

## <u>CERTIFICATION OF COMPLIANCE WITH L.R. 5.1B</u>

I hereby certify that the foregoing has been computer processed with 14 point New Times Roman font in compliance with the United States District Court for the Northern District of Georgia Local Rule 5.1B.

This 15th day of February, 2010.

<u>/s/ Michael R. Smith</u>
Michael R. Smith
Georgia Bar No. 661689

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the within and foregoing was served electronically on all counsel of record, in accordance with the parties' agreement.

This 15th day of February, 2010.

<u>/s/ Michael R. Smith</u>
Michael R. Smith
Georgia Bar No. 661689