UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

In Re: Wells Real Estate
Investment Trust, Inc.
Securities Litigation

CIVIL ACTION

NO. 1:07-CV-862-CAP

## O R D E R

This matter is before the court on the plaintiff's motion for partial summary judgment [Doc. No. 344] and the defendants' motion for summary judgment and for oral argument [Doc. No. 345]. As an initial matter, the court has reviewed the briefs filed by the parties and finds that a hearing is not necessary. Therefore, the motion for oral argument [Doc. No. 345] is DENIED.

## BACKGROUND

This action was filed in the District Court of Maryland on March 12, 2007, as a purported class action and derivative complaint against the Wells Real Estate Investment Trust, Inc. ("Wells REIT" or "Company"), certain Wells REIT directors and officers, and the Company's advisor ("Advisor"). The lead plaintiff is Washtenaw County Employees' Retirement System, an

entity that held 1,274,794 shares of Wells REIT stock on February 28, 2007, and continues to hold shares of Wells REIT stock.

Wells REIT is a Maryland corporation with its principal executive offices located in Norcross, Georgia. The Company is primarily engaged in the acquisition and ownership of commercial real estate properties. It is a public unlisted REIT, which means that (1) it is public because it is registered with the Securities and Exchange Commission ("SEC"), can sell to the investing public rather than only to "qualified investors," and is required to file reports with the SEC; and (2) it is unlisted because its securities are not listed on a national stock exchange. Because of this business model, Wells REIT has a fixed life. According to the Articles of Incorporation, if its stock is not listed on a national securities exchange by January 30, 2008, the Company must sell its assets and distribute the proceeds.[1]

The Advisor was made up of third parties who contracted with Wells REIT to provide real estate management, advisory services, and administrative functions. Specifically, the following entities comprised the Advisor: (1) Wells Capital, Inc.; (2) Wells Management Company, Inc.; (3) Wells Real Estate Funds, Inc.; (4) Wells Real Estate Advisory Services, Inc.; (5) Wells Advisory

---

[1] This liquidation deadline has been extended through an amendment to the Company's Articles of Incorporation.

2

Services I, LLC; and (6) Wells Government Services, Inc.  All of the officers and some of the directors of the Advisor were Wells REIT's officers and directors.  The Advisor's authority to conduct the day-to-day operations of Wells REIT was delegated through the Company's Articles of Incorporation and a series of Advisory Agreements.

The Individual Defendants are comprised of eleven individuals who fall into three categories.  The first category of Individual Defendants is the Management Director Defendants and consists of: (1) Leo F. Wells, III; (2) Douglas P. Williams; (3) Randall D. Fretz;[2] and (4) Donald A. Miller.  The second category of Individual Defendants is the Non-Management Director Defendants and consists of: (1) Bud Carter; (2) Donald S. Moss; and (3) Neil H. Strickland.  The third category of Individual Defendants is the Non-Management Director Defendants & Members of the Special Committee[3] and consists of: (1) Michael R. Buchanan; (2) Richard W. Carpenter; (3) William H. Keogler, Jr.; and (4) W. Wayne Woody.

---

[2] Defendant Fretz has now been dismissed with prejudice [Doc. No. 402].

[3] The Special Committee was appointed by the Wells REIT Board in December 2004 to evaluate strategic alternatives available to the company, including internalization of the Advisor.

Finally, the plaintiff has named as a party defendant Robert E. Bowers.  Bowers has served as the CFO of Wells REIT since April 16, 2007.

On February 5, 2007, Wells REIT announced that it had entered into an agreement to internalize the Advisor ("Internalization"). The proposed consideration for the acquisition was to be the issuance of Wells REIT stock representing just over 4% of the outstanding shares of the Company, which amounted to approximately $175 million.  This proposed transaction was to be submitted to a vote by the Wells REIT stockholders on April 11, 2007.  In advance of the vote, Wells REIT filed the definitive proxy ("Proxy") and a supplement ("Supplemental Proxy") with the SEC regarding the proposed Internalization.

The plaintiff's original complaint asserted two claims: (1) the Proxy was misleading by omission in violation of Section 14(a) of the Exchange Act; and (2) the defendants breached their fiduciary duties by pursuing Internalization [Doc. No. 1].  On March 30, 2007, the plaintiff filed a motion for temporary restraining order ("TRO") and for expedited discovery [Doc. No. 16].  In this motion, the plaintiff sought to enjoin the scheduled vote and to obtain expedited discovery to support its motion for injunctive relief.

4

On April 9, 2007, the Maryland District Court held a hearing on the plaintiff's motions for TRO and for expedited discovery. The motions were denied [Doc. No. 49], and the scheduled stockholders' meeting was allowed to proceed. At the stockholders' meeting on April 16, 2007, the proposed Internalization was approved. On April 17, 2007, the lawsuit was transferred to this court [Doc. No. 51].

On June 27, 2007, the plaintiff filed its amended class action complaint [Doc. No. 103]. The amended complaint contained seven counts. After this court's ruling on the defendants' motion to dismiss [Doc. No. 115], only portions of counts I and II remain. Count I is a class action claim against the Advisor and the Individual Defendants asserting a violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9. Specifically, the court has allowed the plaintiff to proceed on its claim that the defendants failed to disclose in the Proxy and Supplemental Proxy that another company, Lexington, made tender offers to purchase shares of the REIT ("Lexington Offers"). Count II is a class action claim against the Advisor and Individual Defendants asserting a violation of § 20(a) of the Exchange Act 15 U.S.C. § 78t(a). This claim is merely an avenue of liability based upon the substantive conduct alleged in Count I.

**LEGAL ANALYSIS**

**I.    Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes a court to enter summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the burden of demonstrating that no dispute exists as to any material fact.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  This burden is discharged by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether the moving party has met its burden, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  Johnson v. Clifton, 74 F.3d 1087, 10 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the nonmovant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Ultimately, the court's function is not to resolve issues of material fact, but rather to determine whether

6

there are any such issues to be tried.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  Id. at 248. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## II.  Defendants' Motion for Summary Judgment

The defendants have moved for summary judgment arguing that the undisputed facts in this case establish that the Lexington Offers were immaterial and the defendants did not act negligently. Additionally, the defendants argue that the plaintiff cannot, as a matter of law, demonstrate an injury-in-fact or show that the Proxy was an "essential link" in the accomplishment of the Internalization.  The court will address each of these contentions below.

### A. Materiality

An omitted fact is immaterial unless "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), and unless its "disclosure . . . would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of

7

information made available." <u>Id.</u> "While materiality is generally a question of fact reserved for the jury, alleged misrepresentations are immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation." <u>In re Amdocs Ltd. Securities Litigation</u>, 390 F.3d 542, 547 (8th Cir. 2004). <u>See also</u>, <u>S.E.C. v. Reyes</u>, 491 F.Supp.2d 906, 909 (N.D. Cal. 2007)(summary judgment rarely the appropriate vehicle for resolving materiality inquiry, because "[a]ssessing the materiality of a misrepresentation requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts, and these assessments are peculiarly ones for the trier of fact.").

Summary judgment is appropriate on the issue of materiality only if the information in question is "so obviously important or so obviously unimportant to an investor, that reasonable minds cannot differ on the question." <u>Endo v. Albertine</u>, 863 F.Supp. 708, 717 (N.D. Ill. 1994); <u>see</u> <u>also</u> <u>Marks v. CDW Computer Centers, Inc.</u>, 122 F.3d 363, 370 (7th Cir. 1997); <u>In re Apple Computer Securities Litigation</u>, 886 F.2d 1109, 1113 (9th Cir. 1989)) (determination of materiality in securities fraud cases "should ordinarily be left to the trier of fact").

###### 1.  Proper Standard: __Basic__ or __TSC__?

The defendants contend that as a matter of law, the Lexington Offers were immaterial.  In making this argument, the defendants rely on __Basic v. Levinson__, 485 U.S. 224 (1988).  The Court in __Basic__ and courts applying __Basic__ have held that inchoate merger proposals are immaterial as a matter of law.  The defendants assert that the standard articulated in __Basic__ and its progeny rather than that of __TSC__ is the proper one to evaluate the materiality of the Lexington Offers.

The Court in __Basic__ adopted the materiality standard announced in the context of proxy-solicitation in __TSC__.  __Basic__, 485 U.S. at 231.  In other words, for an omitted fact to be deemed material, there must be a substantial likelihood that its disclosure would have been viewed by the reasonable investor as having significantly altered the "total mix" of information.  __Id.__  __Basic__ went further to refine the materiality standard in the context of preliminary merger discussions and held that materiality depends upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event to the issuer of the securities.  __Id.__ at 238.  The defendants argue that under the __Basic__ standard, the fact that there was little or no probability of a merger transaction with Lexington renders the Lexington Offers immaterial.

The court concludes that the balancing test announced in <u>Basic</u> is not applicable here.  The information that was omitted from the Proxy and the Supplemental Proxy was the fact that Lexington offered more per share in the absence of the Internalization.  The likelihood of the Lexington Offers coming to fruition is irrelevant in evaluating the materiality of the information omitted.  The defendants' argument completely ignores the allegations by the plaintiff--that the Lexington Offers were material in the sense that Lexington valued the REIT stock at a higher price if Internalization was not completed.  While the defendants contend that the two-tiered pricing offered by Lexington cannot be separated from the context in which it was made and point to their expert to support this argument, they have, at best, established a question of fact for a jury on this issue.

## 2.  Soft Information

Next, the defendants argue that they are entitled to summary judgment on the issue of materiality because Lexington's valuation[4] of the Internalization was subjective and unreliable "soft" information and therefore immaterial.  "The term 'soft information' refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts."  In re Donald J. Trump Casino Securities Litigation-Taj Mahal, 7 F.3d 357, 369 n.11 (3d Cir. 1993) (citing Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989)).

In response to the motion, the plaintiff argues that the value placed upon the Internalization by Lexington was not soft information.  The court agrees.  As the plaintiff points out, the Lexington Offers were actual statements of what Lexington would be willing to pay for Wells REIT stock with and without Internalization.  In contrast, soft information related to valuation consists of hypothetical estimates of what a business

---

[4] The defendants dispute whether the two-tiered pricing by Lexington was in fact a "valuation" of the Internalization.  Even in the absence of a specific business analysis to determine the worth of the Internalization from Lexington's point of view, the fact remains that Lexington made a tender offer to purchase Wells REIT stock, and for whatever reason, was willing to pay more for the shares in the absence of Internalization.

enterprise might be worth.  Therefore, the court concludes, as a matter of law, that the Lexington Offers were not "soft" information.

### 3.  Total Mix of Information

The defendants argue that even under the TSC standard and without assessing the probability that Lexington's tender offers would ripen into an acquisition, disclosure of the offers would not have altered the "total mix" of information available to shareholders.  This is so, according to the defendants, because Michael Ashner, Lexington's Executive Chairman and Director of Strategic Acquisitions, testified that the willingness to pay a higher per share price absent the Internalization was meant to address the additional shares issued to the Advisor in the Internalization, and the Proxy disclosed the share issuance and its potential effects.  Additionally, the defendants argue that to the extent the plaintiff alleges two-tiered pricing was equivalent to a valuation of the Internalization at zero, the Proxy warned of that very risk.

In response to the motion for summary judgment, the plaintiff claims that the general cautionary language relied upon by the defendants was insufficient to meet its disclosure requirements under Section 14(a).  The court agrees.

First, the Lexington Offers had already been made.  Therefore, the vague statements in the Proxy regarding the possibility of not realizing the anticipated benefits of the Internalization in the event of a third-party merger is insufficient to allow this court to conclude, as a matter of law, that disclosure of the Lexington Offers would not have altered the total mix of information available to shareholders.

Second, the defendants ignore testimony by T. Wilson Eglin, CEO of Lexington, that creates a question of fact as to the "valuation" of the Internalization from Lexington's point of view. Eglin stated that in coming up with the two-tiered pricing offer, factors considered included the "value of the assets related to the price to be paid for the internalization."  Eglin Dep. at 33 [Doc. No. 418].   In other words, the Internalization decreased the overall value of the Wells REIT in Lexington's estimation.

Based on the foregoing, the court finds there is a question of fact with respect to whether disclosure of the Lexington Offers would have altered the "total mix" of information available to shareholders.   Accordingly, the defendants are not entitled to summary judgment as to materiality of the Lexington Offers.

**B. Negligence**

The defendants next argue that they are entitled to summary judgment because the record demonstrates that they acted with due

care and conducted such investigations as were necessary to determine how to respond to the Lexington Offers and whether the offers should be disclosed.  The plaintiff, on the other hand, argues that negligence is established as a matter of law when defendants know of material facts and fail to disclose them.

In the Second Amended Complaint, the plaintiff alleges that none of the defendants "conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true, without omissions of any material facts, and not misleading." [Doc. No. 115 at 58].

The Supreme Court has held that "[u]se of a solicitation that is materially misleading is itself a violation of law." <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375, 382 (1970).  The Second Circuit has held that a showing that omissions and misrepresentations resulted from knowing conduct undertaken by director defendants <u>with an intent to deceive</u> is unnecessary. <u>Wilson v. Great American Industries, Inc.</u>, 855 F.2d 987, 995 (2d Cir. 1988) (emphasis added).  Likewise, the Seventh Circuit has held that "a proxy solicitation that contains a misleading misrepresentation or omission violates [Section 14(a)] even if the issuer believed in perfect good faith that there was nothing misleading in the proxy material." <u>Beck v. Dobrowski</u>, 559 F.3d 680, 682 (7th Cir. 2009).

14

In the instant case, it is undisputed that the defendants made a decision to omit information about the Lexington Offers from the Proxy and Supplemental Proxy.  Whether this decision amounts to negligence turns on whether or not this choice was reasonable in light of the totality of the circumstances; this result is in turn dependent on whether the alleged omissions were material.  As set forth above, there remains a question of fact as to the materiality of the Lexington Offers (and the fact that Lexington was willing to pay more per share in the absence of Internalization).  Therefore, there remains a question of fact as to negligence.  See Brown v. Brewer, 2010 WL 2472182, *25 (C.D. Ca. June 17, 2010) (If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.) Accordingly, the defendants are not entitled to summary judgment on the issue of negligence.

### C.  Injury-in-Fact

The defendants argue they are entitled to summary judgment because there is no evidence of any direct injury suffered by the plaintiff as a result of the Internalization.  In response, the plaintiff argues that Class Members were injured because they lost the ability to know of, synthesize, or have their vote on Internalization influenced by material information.  As to the

15

specific remedy it is seeking, the plaintiff contends that the harm it suffered can be "measured by the difference between what Lexington offered if the Internalization were not consummated -- $9.45 -- and what it offered if the Internalization were completed -- $9.07" [Doc. No. 380 at 43].   The defendants contend that this type of claim can only be brought as a derivative action, not as a private right of action as asserted in this case.

It is true that a claim for dilution of stock value cannot be brought as a private claim, is a claim shared by all shareholders, and is considered derivative.   Privacywear, Inc. v. OTS & CTFC, LLC, 2009 WL 2590082 (C.D. Cal. 2009).   To bring a private right of action, the plaintiff must suffer an injury separate and distinct from the dilution of share value, which belongs to the corporation itself.   See Waller v. Waller, 49 A.2d 449, 452 (Md. 1946); Strougo v. Bassini, 282 F.3d 162, 171 (2nd Cir. 2002) (relying on Waller). The threshold inquiry for this court is "whether the shareholders' injury is 'distinct' from that suffered by the corporation." Strougo, 282 F.3d at 170 (quoting Tafflin v. Levitt, 608 A.2d 817, 820 (Md. 1992)); see also Danielewicz v. Arnold, 769 A.2d 274 (Md. 2001).

In response to the defendants' motion for summary judgment, the plaintiff argues that it has shown sufficient harm to entitle the Class to equitable relief, specifically the invalidation of the

16

Internalization and rescission of the entire transaction.  The plaintiff relies on <u>Kaufman v. Cooper Companies, Inc.</u>, 719 F. Supp. 174, 185 (S.D. N.Y. 1989) and <u>Riggs National Bank of Washington D.C. v. Allbritton</u>, 516 F. Supp. 164, 181 (D.D.C. 1981) for the proposition that the occurrence of the injury--loss of the right to an informed vote--is enough to entitle the Class to the equitable relief of rescission.  These cases are not directly on point procedurally and therefore are not particularly persuasive at this juncture in this litigation.  The very existence, however, of a private right of action under Section 14(a) (which is undisputed) and the Congressional purpose[5] behind it are enough for this court to conclude that the plaintiff may pursue a claim based on the alleged injury--the loss of the right to an informed vote on Internalization.  <u>See</u> <u>Mills</u>, 396 U.S. at 381.  To conclude that because the remedy for an injury done to an individual shareholder is related to the dilution of overall share value that may only be brought as a derivative claim would be tantamount to removing the private right of action under Section 14(a).  This would be

---

[5]  In enacting Section 14(a), Congress sought to protect "the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" <u>Mills</u>, 396 U.S. at 381 (citing H.R. Rep. No.1383, 73d Cong., 2d Sess., 13 and S. Rep. No.792, 73d Cong., 2d Sess., 12).

contrary to the Congressional purpose of the statute as well as direct Supreme Court precedent.

Additionally, the defendants contend that the Internalization has generated significant financial benefits to the company and thus, the plaintiff has suffered no injury.  The Supreme Court, however, has held that a judicial appraisal of a transaction's merits should not be substituted for an actual and informed vote of the stockholders.  <u>Mills</u>, 396 U.S. at 382 (1970).  Therefore, even if the court takes as true the defendants' contention that the company has financially benefitted from the Internalization (which is disputed by the plaintiff), the deprivation of an informed vote is a harm sufficient to survive the defendant's motion for summary judgment.[6]

Based on the foregoing, the defendants are not entitled to summary judgment based on an absence of injury in fact.

**D.  Essential Link**

Finally, the defendants argue that they are entitled to summary judgment because the Proxy was not an "essential link" in the accomplishment of the Internalization.   In order to be actionable, challenged proxy statements must be "an essential link

---

[6] Obviously, should the defendants convince a fact finder that the Internalization was of financial benefit to the company, this would effect the remedy recoverable by the plaintiff.

18

in the accomplishment of the transaction." <u>Grace v. Rosenstock</u>, 228 F.3d 40, 47 (2d Cir. 2000).  "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, . . . , he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." <u>Mills</u>, 396 U.S. at 385 (1970). In other words, the plaintiff must establish "transaction causation," which is a showing that the violations in question caused the plaintiff to engage in the transaction in question. <u>Grace</u>, 228 F.3d at 46.  In this case, the transaction in question is the vote for Internalization.

The defendants argue that the plaintiff cannot establish transaction causation in this case because the challenged Proxy and Supplemental Proxy did not form an essential link to the accomplishment of the Internalization.  In support of this argument, the defendants contend that the shareholder vote was not legally required for approval of the Internalization.

Under Maryland law, issuance of a stock or transfer of assets requires only the approval of the board of directors and any other action required by the company's charter.  Md. Code Ann. Corps. & Ass'ns §§ 2-201, 3-105(a)(3). According to the defendants, nothing

in the REIT's charter or bylaws required additional action to approve the Internalization.

In response to the motion, the plaintiff points out that the Wells REIT Board adopted a resolution making the Internalization and all of its associated agreements, including the merger agreement with the Advisor, subject to the approval of shareholders.  This resolution was adopted pursuant to Section 9.5 of Wells REIT's charter, which provides, "transactions between the Company and its Affiliates are further subject to any express restrictions adopted by the Directors . . . by resolution."  Tab. 2 of Defs' Exhibits at WashI_00003864.  Therefore, according to the plaintiff, once the resolution was adopted, the company's charter required that the resolution be adhered to.

Additionally, the plaintiff directs the court to language within the Proxy itself, which informed shareholders that without shareholder approval, the Internalization would not be consummated. Id. at WashI_ 00003584.  Finally, the plaintiff points to the Internalization's requirement that the company's charter be modified to reflect that Wells REIT had become self-advised.  Under Maryland law, this modification could only be accomplished through an affirmative vote of shareholders.  Md. Code Ann. Corps. & Ass'ns § 2-604(d).

The Supreme Court has held that there is no transaction causation when a proxy solicitation was not legally required, but instead was made voluntarily by the directors in order to increase shareholders' goodwill. <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1105 (1991).  Therefore, the fact that the Wells REIT Board voluntarily opted to obtain shareholder approval for the Internalization is insufficient to establish that the vote was legally required.  However, the fact that the Board adopted the resolution requiring the vote coupled with the charter language pertaining to transactions with affiliates is sufficient to establish that the Board created a legal requirement for shareholder approval of the Internalization.  Language within the merger agreement regarding waiver of shareholder approval does not change this result.

Based on the foregoing, the plaintiff has established that shareholder approval became a legal requirement upon adoption of the resolution by the Board.  Thus, the Proxy and Supplemental Proxy did form an essential link to the accomplishment of the Internalization.  Therefore, the defendants are not entitled to summary judgment on this issue.

III.  **Plaintiff's Motion for Partial Summary Judgment**

The plaintiff contends that it is entitled to judgment as a matter of law on six issues.

A.  **Solicitation**

The plaintiff contends that there is no issue of material fact as to whether the defendants solicited proxies from Class Members. Only the Advisor Defendants[7] oppose the plaintiff's motion on this issue.  The plaintiff contends that the Advisor entities' ties to the solicitation of the Class' votes on the Proxy's proposals were pivotal because (1) the Advisor was contractually bound by the merger agreement to prepare and file the Proxy and communicate with the SEC about the Proxy, if necessary, and (2) the Advisor entities were prominently discussed in the Proxy.  Thus, the plaintiff contends that the Advisor Defendants were primary actors in the solicitation and can be held liable for a violation of Section 14(a).

In support of its motion for summary judgment, the plaintiff points to the language of the Proxy itself:

Since [Wells REIT] commenced operations in 1998, our day-to-day operations including investment analysis,

---

[7] Pursuant to the second amended complaint [Doc. No. 117], the Advisor Defendants are Wells Capital, Inc.; Wells Management Company, Inc.; Wells Real Estate Funds, Inc.; Wells Real Estate Advisory Services, Inc.; Wells Advisory Services I, LLC; and Wells Government Services, Inc.

> acquisitions, financings, development, due diligence, asset management, property management and certain administrative services, such as financial, tax and regulator compliance reporting, have been provided by Wells Capital, Inc. ("Wells Capital") and Wells Management Company, Inc. ("Wells Management"), both of which are wholly owned subsidiaries of Wells Real Estate Funds, Inc. ("Wells REF") . . .
>
> Such advisory, asset management and property management agreements have since been transferred and contributed to Wells Real Estate Advisory Services, Inc. ("WREAS") . . . In addition, certain of our properties having primarily government tenants are being managed by Wells Government Services, Inc. ("WGS").
>
> WREAS and WGS are both wholly-owned subsidiaries of Wells Advisory Services I, LLC ("WASI") (references to the "Advisor" in the accompanying proxy statement include, collectively, WREAS, WGS and their predecessors, as applicable, including those portions of the operations of Wells Capital and Wells Management which previously provided advisory and management services to us under such advisory, asset management and property management agreements) . . .
>
> Upon consummation of the Internalization, WREAS and WGS will be our wholly-owned subsidiaries, and the Advisor's employees will become our employees.

Tab 2 of Defs.' Exhibits at WashI_00003467. Additionally, the plaintiff contends that merger agreement required WREAS and WGS to "furnish promptly all information as reasonably may be requested in connection with the preparation, filing and distribution of the Proxy Statement." Tab 23 of Defs.' Exhibits at WashI_00018739. Finally, the plaintiff directs the court to evidence that the combined financial statements of WREAS, WGS, and their predecessors were included in the Proxy.

In response to the plaintiff's motion for summary judgment on this issue, the Advisor Defendants contend that they are merely secondary actors and the trend of the Supreme Court is to give restrictive reading to securities statutes when applied to secondary actors (citing Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc., 552 U.S. 148 (2008)).  This argument fails, however, because the court finds that the Advisor Defendants were not secondary actors.  Rather, their participation was crucial and quite substantial.  Courts interpreting Section 14(a) have recognized that a defendant who permits the use of his name in a manner substantially connected to the proxy solicitation may be held liable under the statute for misstatements and omissions contained in the proxy materials.  See Freedman v. Value Health, Inc., 135 F.Supp.2d 317, 339 (D.Conn. 2001) (holding that Section 14(a) encompassed defendants who issued a joint prospectus and proxy statement to the shareholders of the other company involved in the merger); SEC v. Falstaff Brewing Corp., 629 F.2d 62, 66-70 (D.C. Cir. 1980) ("That the proxies nominally were sought by the [target's] management is not dispositive; in reality it was [the acquiror] who was seeking the shareholders' votes to approve his taking control. His connection with the transaction was more than substantial. It was pivotal.") Accordingly, the plaintiff is

entitled to judgment as a matter of law as to the issue of solicitation by all the defendants.

**B.  Omission of Material Facts**

The Supreme Court has held that an omitted fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." <u>TSC Industries, Inc.</u>, 426 U.S. at 449.[8]  In adjudicating the defendants' motion for summary judgment, the court found questions of fact as whether disclosure of the Lexington Offers would have altered the "total mix" of information available to shareholders. Specifically, the court found issues of fact as to Lexington's "valuation" of the Internalization.  Lexington's CEO stated that in coming up with the two-tiered pricing offer, factors considered included the "value of the assets related to the price to be paid for the internalization."  Eglin Dep. at 33 [Doc. No. 418].  In other words, the Internalization decreased the overall value of the Wells REIT in Lexington's estimation.  On the other hand, there is evidence in the record that indicates Lexington did not place a

_____

[8] The parties disagree as to the controlling authority on the issue of materiality.  The defendants contend that this case is controlled by <u>Basic v. Levinson</u>, 485 U.S. 224 (1988) while the plaintiff argues that it is controlled by <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976).  In addressing the defendants' motion for summary judgment, the court has determined that the <u>TSC</u> standard is to be used to determine materiality under the facts of this case.

value on Internalization and that the two-tiered pricing simply reflected the dilution of share value that resulted from the issuance of shares in conjunction with the Internalization. Ashner Dep. at 220 [Doc. No. 413]. Accordingly, the plaintiff is not entitled to summary judgment on the issue of materiality.

### C. Essential Link

In ruling on the defendants' motion for summary judgment, the court concluded that the Board's adoption of the resolution requiring a shareholder vote on the Internalization coupled with the charter language pertaining to transactions with affiliates created a legal requirement for shareholder approval of the Internalization. Therefore, as a matter of law, the Proxy solicitation was an "essential link" in accomplishing the Internalization. The plaintiff is entitled to judgment as a matter of law on this issue.

### D. Injury

The plaintiff claims that Class Members were injured by virtue of having made a decision on the Proxy's proposals based on materially incomplete information. The defendants, on the other hand, contend that the lack of an informed vote standing alone is insufficient to establish injury.

As set forth above, the Supreme Court's reliance on the Congressional belief underlying Section 14(a) ("(f)air corporate

suffrage is an important right that should attach to every equity security bought on a public exchange") is a clear indication that loss of the right to an informed vote due to a material misleading proxy statement is, in and of itself, injury. <u>Mills</u>, 396 U.S. at 381 (quoting H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13).  The question that must be resolved by the finder of fact is what the proper remedy is for this injury.  However, because there remains a question of fact regarding the materiality of the omitted facts in the Proxy statements at issue in this case, the court cannot conclude as a matter of law that the plaintiff was injured.  Should the plaintiff prevail on the materiality issue, the existence of an injury will be established and will not require proof before the fact finder.

### E.  Proper Materiality Test

As set forth above, the proper test for the materiality of the omitted facts in this case is found in <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438 (1976).

### F.  Good Faith Defense

The plaintiff seeks a ruling from this court that the defendants are not entitled to a "good faith" defense as a matter of law.  This issue is raised as a response to the defendants' claim that their good faith exercise of business judgment and reliance on the advice of their advisors in deciding to omit

reference to the Lexington Offers in the Proxy materials equates to an absence of negligence and relieves them of liability under Section 14(a).

As set forth above, however, it is undisputed that the defendants made a decision to omit information about the Lexington Offers from the Proxy statements.  Whether this decision amounts to negligence turns on whether or not this choice was reasonable in light of the totality of the circumstances; this result is in turn dependent on whether the alleged omissions were material.  In other words, if the fact finder determines that the information withheld was material, then these defendants would be, as a matter of law, negligent in choosing to omit the information from the Proxy materials.  See Brown v. Brewer, 2010 WL 2472182, *25 (C.D. Ca. June 17, 2010) (If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.)  See also Beck, 559 F.3d at 682 ("a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy material.")

The court recognizes the defendants' argument that this holding is essentially an imposition strict liability under

Section 14(a).  In fact, the defendants, in response to the plaintiff's motion for partial summary judgment, contend this ruling will stretch Section 14(a) liability to cover any instance when information is omitted from a proxy that is subsequently determined to have been material, regardless of the defendants' knowledge or due diligence at the time.  However, it is important to note that there is no lack of knowledge on the part of the defendants in this case.  Furthermore, the court declines to hold that the omission of a material fact in absence of knowledge after appropriate due diligence is exercised is necessarily negligence.  Rather, under the facts of this case, negligence will flow from a finding of materiality; knowledge has been established. Accordingly, the "good faith" defense of the defendants is irrelevant in light of the existence of knowledge.  Therefore, the plaintiff is entitled to judgment as a matter of law on this issue.

## CONCLUSION

(1) The defendants' motion for summary judgment and motion for oral argument [Doc. No. 345] are DENIED;

(2) the plaintiff's motion for partial summary judgment [Doc. No. 344] is GRANTED in part and DENIED in part;

(3) the court believes this ruling negates the necessity or relevance of certain expert testimony, i.e., testimony related to good faith on the part of the defendants, business judgment, or

good corporate governance; the parties are therefore DIRECTED to meet and confer to determine what issues within the pending motions in limine [Doc. Nos. 336, 337, 338, 339, 340, 341, 342, and 343] are now moot;

(4) the court intends to appoint a special master to address the pending motions in limine; the parties are DIRECTED to also discuss whether a Magistrate Judge (chosen randomly) or a private party agreed upon by the parties is preferable; and

(5) the parties are DIRECTED to submit a joint status report to this court no later than August 11, 2010, outlining their respective positions as to the portions of the motions in limine that are now moot, as well as a proposal as to the appointment of a special master.

SO ORDERED, this 2nd day of August, 2010.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge